11 CIV 8291

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



STICHTING PENSIOENFONDS ABP,

      Plaintiff,

  vs.

CITIGROUP INC., CITIGROUP GLOBAL
MARKETS, INC., CHARLES PRINCE, VIKRAM
PANDIT, GARY CRITTENDEN, JOHN C.
GERSPACH, C. MICHAEL ARMSTRONG,
ALAIN J.P. BELDA, GEORGE DAVID,
KENNETH T. DERR, JOHN M. DEUTCH,
ROBERTO HERNANDEZ RAMIREZ, ANDREW
N. LIVERIS, ANNE M. MULCAHY, RICHARD
D. PARSONS, JUDITH RODIN, ROBERT L.
RYAN, FRANKLIN A. THOMAS, ROBERT
DRUSKIN, THOMAS G. MAHERAS, MICHAEL
STUART KLEIN, STEVEN FREIBERG, and
ARTHUR H. TILDESLEY, Jr.,

      Defendants.

Civil Action No.

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

**GRANT & EISENHOFER P.A.**
Stuart M. Grant
Megan D. McIntyre
Shelly L. Friedland
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel: (646) 722-8500
Fax: (646) 722-8501

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

**Page**

I.   NATURE AND SUMMARY OF THE ACTION ................................................................ 1

II.  JURISDICTION AND VENUE ................................................................ 9

III. THE PARTIES................................................................ 10

    A.   PLAINTIFF STICHTING PENSIOENFONDS ABP ........................................................ 10

    B.   DEFENDANTS ................................................................ 11

        1.   Citigroup Defendants ................................................................ 11

        2.   Individual Defendants ................................................................ 12

IV.  SECURITIES PURCHASED BY PLAINTIFF ................................................................ 19

V.   BACKGROUND ALLEGATIONS PERTINENT TO ALL COUNTS.......................... 24

    A.   SUBPRIME MORTGAGES BECOME ATTRACTIVE TO LENDERS ................................ 24

    B.   THE PROLIFERATION OF FINANCIAL INSTRUMENTS BACKED BY U.S. RESIDENTIAL MORTGAGES ................................................................ 25

    C.   CITIGROUP'S INVOLVEMENT IN MORTGAGE-RELATED ACTIVITIES ...................... 29

        1.   Subprime Lending Fuels Citi's Bottom Line ............................................ 29

        2.   Citi's Mortgage Portfolio Included Large Volumes Of Subprime And Other Risky Loans ................................................................ 30

        3.   Citigroup's CDOs ................................................................ 30

        4.   Citigroup's SIVs ................................................................ 32

        5.   Citigroup's ARS................................................................ 34

    D.   INDICATORS THAT MORTGAGE MARKETS WERE DETERIORATING BY 2005 ........ 37

    E.   INDICATORS THAT SECONDARY MARKETS FOR MBS AND CDOS WERE DETERIORATING BY JANUARY 2007 ................................................................ 39

VI.  DEFENDANTS MISREPRESENTED CITI'S FINANCIAL POSITION AND RESULTS, AND FAILED TO DISCLOSE MATERIAL INFORMATION REGARDING THE RISKS AND LOSSES TO WHICH CITI WAS EXPOSED .......... 42

**A.** DEFENDANTS DID NOT DISCLOSE THE NATURE AND EXTENT OF CITI'S CDO EXPOSURES ............................................................................. 42

**B.** CITIGROUP'S FINANCIAL STATEMENTS DURING THE RELEVANT PERIOD WERE MATERIALLY UNTRUE AND VIOLATED GAAP AND SEC REGULATIONS ........................................................................................... 43

    1. Citigroup Reported Materially Understated Loan Loss Reserves In Violation Of GAAP ....................................................................... 50

    2. Citigroup Failed To Disclose Massive Concentrations Of Credit Risk From Subprime-Related Assets In Violation Of GAAP ................. 56

    3. Citigroup Failed To Consolidate Its SIVs On Its Balance Sheet In Violation Of GAAP ....................................................................... 59

    4. Citigroup Failed To Consolidate Its Commercial Paper CDOs In Violation Of GAAP ....................................................................... 68

    5. Citigroup Overstated The Fair Value Of Its Subprime-related CDOs In Violation Of GAAP ........................................................... 70

    6. Citigroup Overstated The Fair Value Of Its Total Assets In Violation Of GAAP ....................................................................... 81

    7. Citigroup Failed to Disclose Its Exposures to Illiquid Auction Rate Securities ............................................................................... 83

    8. Citigroup Overstated Its Capital Adequacy ................................. 89

**C.** DEFENDANTS PRINCE, PANDIT AND CRITTENDEN SIGNED FALSE SARBANES-OXLEY CERTIFICATIONS ..................................................... 92

**D.** ADDITIONAL UNTRUE STATEMENTS AND OMISSIONS ........................... 92

**VII.** THE TRUE FACTS ARE SLOWLY REVEALED ....................................... 122

**A.** OCTOBER 2007: CITIGROUP MAKES PARTIAL BUT INCOMPLETE DISCLOSURES CONCERNING ITS GROWING LOSSES AND SUBPRIME EXPOSURE ....................................................................................... 122

    1. October 1: Citi Issues Pre-Earnings Release ........................... 122

    2. October 15, 2007: Citi Announces Third Quarter Results ............ 123

**B.** EARLY FALL 2007: CITI MAKES PARTIAL BUT INCOMPLETE DISCLOSURES REGARDING ITS SIV EXPOSURE .......................................................... 124

**C.**  NOVEMBER 2007:  CITI MAKES PARTIAL BUT INCOMPLETE DISCLOSURES REGARDING ADDITIONAL CDO EXPOSURE AND MASSIVE WRITE-DOWNS, AND SHAKES UP ITS MANAGEMENT TEAM..........................................................128

    1.  November 4, 2007 Press Releases ..........................................................128

        a.  Citi's Overall Picture; Prince Resigns ..........................................128

        b.  CDOs..............................................................................................128

    2.  Citi Discloses Support Of SIVs In Form 10-Q For Third Quarter 2007......................................................................................................130

**D.**  DECEMBER 2007:  CITI ADMITS OBLIGATION TO CONSOLIDATE SIVS ...............130

**E.**  JANUARY 2008:  CITI DISCLOSES ADDITIONAL WRITE-DOWNS...........................131

    1.  Citi Reports Record Losses.....................................................................131

    2.  CDOs........................................................................................................131

    3.  Consumer Lending, Including Mortgages ...............................................133

**F.**  APRIL 2008:  CITI REVEALS NEW SOURCES OF PROBLEMS .................................135

    1.  First Quarter Results Show Improvement, But Continued Problems.....135

    2.  First Mention of Significant Exposure Of Alt-A Loans .........................136

    3.  Partial But Incomplete Disclosures Regarding ARS .............................136

**G.**  JULY 2008:  CITI TAKES MORE WRITE-DOWNS....................................................137

**H.**  AUGUST 2008:  SEC ANNOUNCES ARS SETTLEMENT; CITI IS FORCED TO DISCLOSE ARS EXPOSURE STEMMING FROM CLIENT LOSSES.............................137

**I.**  SEPTEMBER 2008:  CITI ATTEMPTS TO REASSURE MARKET OF ITS VIABILITY, DESPITE FINANCIAL SECTOR TURMOIL .............................................138

**J.**  OCTOBER 2008 .........................................................................................................139

    1.  First TARP Installment...........................................................................139

    2.  Third Quarter Results Show Still More Write-Downs, With SIVs And Alt-A Securities As Primary Sources................................................139

**K.**  NOVEMBER 2008 ......................................................................................................140

    1.  Citi Discloses Reclassification Of $80 Billion In Assets.......................140

2.     Citi Announces Plan To Dismantle SIVs And Purchase Remaining $17.4 Billion, Yet Reasserts Strength ..................................................... 141

3.     Federal Government Rescues Citi, With Government Guaranteeing $306 Billion Of Assets And Providing $20 Billion Cash Infusion ......... 142

L.     JANUARY 2009: DETAILS OF BAIL-OUT REVEAL TRUE WEAKNESSES OF MORTGAGE-RELATED ASSETS AND CONTENTS OF $80 BILLION RECATEGORIZED IN NOVEMBER ........................................................ 142

VIII.  LOSS CAUSATION ................................................................................ 144

IX.    TOLLING OF THE STATUTE OF LIMITATIONS FOR PLAINTIFF'S NON-FRAUD-BASED CLAIMS ..................................................................... 153

X.     CLAIMS FOR RELIEF UNDER THE SECURITIES ACT .......................... 153

COUNT ONE FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT (AGAINST DEFENDANTS CITIGROUP, CITIGROUP GLOBAL MARKETS, ARMSTRONG, BELDA, DAVID, DERR, DEUTCH, RAMIREZ, LIVERIS, MULCAHY, PARSONS, RODIN, RYAN AND THOMAS) ........................... 153

COUNT TWO FOR VIOLATIONS OF SECTION 12(A)(2) OF THE SECURITIES ACT (AGAINST CITIGROUP AND CITIGROUP GLOBAL MARKETS) ............................... 156

COUNT THREE CONTROL PERSON LIABILITY PURSUANT TO SECTION 15 OF THE SECURITIES ACT (AGAINST DEFENDANTS PANDIT, CRITTENDEN, DRUSKIN, MAHERAS, KLEIN AND GERSPACH BASED ON VIOLATIONS OF SECTIONS 11 AND 12(A)(2) OF THE SECURITIES ACT BY CITIGROUP) ..................................... 158

COUNT FOUR CONTROL PERSON LIABILITY PURSUANT TO SECTION 15 OF THE SECURITIES ACT (AGAINST DEFENDANT CITIGROUP BASED ON VIOLATIONS OF SECTIONS 11 AND 12(A)(2) OF THE SECURITIES ACT BY CITIGROUP GLOBAL MARKETS) .............................................................. 159

XI.    NON-FRAUD CLAIM UNDER ENGLISH LAW ....................................... 159

COUNT FIVE FOR VIOLATIONS OF SECTION 90 OF THE FINANCIAL SERVICES AND MARKETS ACT 2000, AS AMENDED (AGAINST DEFENDANT CITIGROUP) ............ 159

XII.   ADDITIONAL FACTUAL ALLEGATIONS PERTINENT TO PLAINTIFF'S FRAUD-BASED COUNTS ....................................................................... 161

A.     THE FRAUD DEFENDANTS' SCIENTER ............................................... 162

1.     The Fraud Defendants Knew That Citi's Mortgage Portfolio Contained High-Risk Subprime Loans That Would Lead To Large Losses .................................................................................................. 162

iv

2.      The Fraud Defendants Knew Citi Was Exposed To Losses Via Its
        Subprime Holdings ................................................................................ 167

        a.      The Fraud Defendants Knew The CDOs Were Not
                Structured To Withstand The Collapse Of The Housing
                Market ........................................................................................ 167

        b.      The Fraud Defendants Knew Citi's CDOs Were Not
                Immune To The Market Downturn ............................................. 170

                (1)     Citi Publicly Acknowledged Risks Associated With
                        CDOs ............................................................................. 170

                (2)     Aware Of Market Developments, Citi Tried To
                        Protect Itself ................................................................. 172

                (3)     Synthetic CDOs ............................................................ 174

                (4)     Repackaged CDOs ........................................................ 175

3.      The Fraud Defendants Knew Citi Was Obligated To Consolidate
        The Off-Balance Sheet Entities ............................................................ 178

        a.      The Fraud Defendants Knew Citi Would Not Let The SIVs
                Fail, And Therefore That It Was Required To Consolidate
                Them Once Trouble Emerged ...................................................... 178

        b.      The Fraud Defendants Knew Citi Was Obligated To
                Consolidate The Commercial Paper CDOs ............................... 180

4.      The Fraud Defendants Concealed Citi's Exposure to Billions of
        Dollars of Illiquid Auction Rate Securities ........................................... 181

5.      Government Investigations Support a Strong Inference of Scienter ...... 183

        a.      The SEC's 2007 Investigation Into Citi's Accounting
                Practices .................................................................................... 183

        b.      The SEC's 2010 Investigation of Citi's Use of "Repo 105" ...... 188

        c.      The SEC And New York Attorney General Recovered
                More Than $7.3 Billion From Citi On Its Clients' Behalf .......... 190

        d.      The Senate FCIC Investigation .................................................. 191

6.      Citi's Numerous Violations Of GAAP Support An Inference Of
        Scienter ................................................................................................ 195

      7.      Motive And Opportunity:  Citi Avoided The Necessary Disclosures, Write-downs, And Reserve Increases In Order To Preserve Its Tier 1 Capital Ratio .............................................................. 196

    **B.**    PRESUMPTION OF RELIANCE: FRAUD-ON-THE MARKET DOCTRINE .................... 198

**XIII.** TOLLING OF THE STATUTE OF LIMITATIONS ON PLAINTIFF'S FRAUD-BASED CLAIMS ........................................................................................ 199

**XIV.** INAPPLICABILITY OF THE STATUTORY SAFE HARBOR TO PLAINTIFFS' FRAUD-BASED CLAIMS ........................................................ 200

**XV.** CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ........................................... 201

    COUNT SIX FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT  AND RULE 10B-5 PROMULGATED THEREUNDER  (AGAINST CITIGROUP, PRINCE, PANDIT, CRITTENDEN, GERSPACH, DRUSKIN, MAHERAS, KLEIN, FREIBERG AND TILDESLEY) ...................................................................................... 201

    COUNT SEVEN FOR VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT (AGAINST PRINCE, PANDIT, CRITTENDEN, GERSPACH, DRUSKIN, MAHERAS, KLEIN, AND TILDESLEY BASED ON CITIGROUP'S VIOLATION OF SECTION 10(B)) ............................................................................................... 202

JURY DEMAND ................................................................................................ 204

PRAYER FOR RELIEF ....................................................................................... 204

Plaintiff Stichting Pensioenfonds ABP ("ABP" or "Plaintiff"), by its undersigned counsel, makes this complaint upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, based upon the investigation by its counsel, which has included review and analysis of annual reports and publicly filed documents; press releases; news articles; analysts' statements; conference call transcripts and presentations; information released by the United States Senate Financial Crisis Inquiry Commission (the "FCIC") and the Securities and Exchange Commission (the "SEC"); and transcripts from speeches and remarks given by the defendants.   Plaintiff makes the following allegations against Citigroup Inc. ("Citigroup" or "Citi" or the "Company"), Citigroup Global Markets, Inc. ("Citigroup Global Markets"), Charles Prince, Vikram Pandit, Gary Crittenden, John C. Gerspach, C. Michael Armstrong, Alain J.P. Belda, George David, Kenneth T. Derr, John M. Deutch, Roberto Hernandez Ramirez, Andrew N. Liveris, Anne M. Mulcahy, Richard D. Parsons, Judith Rodin, Robert L. Ryan, Franklin A. Thomas, Robert Druskin, Thomas G. Maheras, Michael Stuart Klein, Steven Freiberg, and Arthur H. Tildesley, Jr. (collectively, the "Defendants").   Based on the foregoing, Plaintiff believes that substantial additional evidentiary support exists for the allegations herein, which Plaintiff will find after a reasonable opportunity for discovery.

## I.     NATURE AND SUMMARY OF THE ACTION

1.     Plaintiff asserts both fraud and non-fraud claims to recover money damages for injuries sustained as a result of investments in Citi securities.   Due to the Defendants' repeated material untrue statements and non-disclosure of material information to investors, Plaintiff purchased Citi securities at inflated prices during the period from January 1, 2004 through January 15, 2009 (the "Relevant Period").   When the market slowly learned the truth of Citi's financial condition, Citi came close to insolvency, and Plaintiff lost a substantial amount on its investments.

2.      Citi's near-demise had its genesis in the Company's increasing willingness to take on risks for the sake of profit, without regard for – and without disclosing – the magnitude of the downside exposure it faced if those risks materialized.  As the housing industry heated up in the early 2000s, Citi had ramped up its residential mortgage lending, both through its own sales force and through correspondent channels.  But in order to sustain the desired growth, Citi needed to lower its lending standards.  In 2005, Citi specifically chose to grow by expanding into the segment known as subprime, which includes borrowers with poor credit histories or those taking out risky loans.  Such subprime mortgages (whether originated by Citi or another lender) were then packaged into residential mortgage-backed securities ("RMBS"), and sold to investors or to banks such as Citi which packaged the subprime-based RMBS into collateralized debt obligations ("CDOs").  This expansion of subprime lending spurred Citi's growth, both through its lending activities and through the gallimaufry of derivative instruments that Citi created and sold.  As summarized by the Federal Reserve's examiner in an inspection report pertaining to calendar year 2007 (which was not released to the public until 2011):  "[S]enior management at the firm allowed its drive for additional revenue growth to eclipse proper management of risk, while Risk Management failed to serve as an effective check against these decisions."[1]

3.      In addition, Citi had sponsored seven off-balance-sheet entities, known as structured investment vehicles ("SIVs"), which sold short-term debt and then invested in longer-term instruments such as RMBS and other subprime-related assets.  Because of the way the SIVs were structured and marketed, Citigroup was required to consolidate them on its balance sheet in accordance with new accounting rules beginning on January 1, 2004.  Citi did in fact consolidate the SIVs in its public filings, but not until the third quarter of 2007.

---

[1] Report for Federal Reserve Bank of New York, April 15, 2008 ("Fed Report"), at 3.

4.       In addition, starting at least by January 1, 2004, Citigroup structured and underwrote CDOs that included a feature known as a "liquidity put."  The liquidity put was an instrument that obligated Citigroup under certain circumstances to purchase commercial paper backed by certain tranches of the CDO.  Under the terms of the liquidity put arrangement, Citi's obligation to purchase that commercial paper would be triggered if there were a dramatic drop in demand for the commercial paper such that the commercial paper issuer, *i.e.*, the CDO, were unable to re-issue the commercial paper below a certain interest rate.  For Citigroup, owning the commercial paper would be the economic equivalent of holding the tranche that backed the commercial paper, subjecting Citigroup to ever-increasing exposures to the credit markets. Citigroup did not publicly disclose the existence of these liquidity puts, or the risks they posed to Citigroup, until November 2007 – more than three years after they were first entered into.

5.       By mid-2007 as the United States housing market declined, Citi had accumulated a large portfolio of loans at a high risk of default, as well as bundles of CDOs it could not sell. While other banks began to show signs of trouble, Citi touted its ability to withstand the downturn.  Citi did not disclose that it had been unable to sell many tranches of the CDOs it had created, leaving it holding assets that were losing value as the housing market deteriorated.

6.       By the fall of 2007, Citi's loan loss reserves had dropped to a precariously low level, due to the mounting losses incurred in the Company's mortgage portfolio.  On October 15, 2007, Citi released its third quarter earnings and disclosed that it had increased its reserves by $2.24 billion, a belated yet still inadequate step.  The earnings release focused on the increased credit costs stemming from its lending activities.  Citi mentioned approximately $11.4 billion in recently-packaged CDOs and warehoused loans awaiting securitization, but continued to conceal

3

an additional $54 billion of CDOs it was holding.  In reaction to this partial disclosure, Citi's stock price began its long decline, closing at $44.79, down from $46.24 the day before.

7.     On Sunday evening, November 4, 2007, the Company disclosed the existence of a further $43 billion in CDO exposure on Citi's balance sheet, on top of the previously-disclosed $11.4 billion (which the Company indicated had grown to $11.7 billion).  In part because the rating agencies downgraded numerous CDOs in October 2007, and these ratings directly affected Citi's holdings, Citi also stated that it expected to write down the reported fair value of its CDO portfolio between $8 billion and $11 billion.  These disclosures shocked the market, with analysts noting that "the majority of the exposure . . . has never been disclosed before . . . which is very surprising," and that the sudden write-downs were "unsettling . . . com[ing] only 3 weeks after the company released 3Q07 earnings."

8.     The market was particularly shocked that Citi was disclosing for the first time that it was forced to repurchase $25 billion in CDOs *at face value*, due to the previously undisclosed liquidity puts it had written when it structured and sold those CDOs.  Because of the liquidity puts, Citi was required to retain these CDOs on its balance sheet when they were issued.  Further, analysts questioned why Citi waiting until November to write down these previously undisclosed assets, given that the turmoil in the underlying housing market had caused reverberations in the RMBS and CDO market since the beginning of 2007.

9.     In light of these dramatic developments, Citi's CEO and Chairman, defendant Charles Prince, announced his resignation and Citi's stock fell 4.85% to $35.90 at the close on November 5, 2007.  By the end of the week, on November 9, 2007, the stock closed at $33.10.

10.    Citi's loss in the fall of 2007 was not limited to the CDOs and increased loan loss reserves.  During the summer of 2007, as the credit markets tightened, Citi's sponsored SIVs

4

found it difficult both to issue new commercial paper to refinance their operations and to sell off their assets, whose value had become questionable.

11.     Throughout the fall of 2007, market concern increased regarding Citi's obligation to support its SIVs.  News reports discussed how banks could face liabilities for the SIVs they sponsored, and in mid-October, word leaked of a potential rescue fund that a group of banks was working to create.  In the meantime, Citi had taken small steps to support its SIVs.  While it disclosed these efforts, it maintained the position that it was not contractually obligated to support the SIVs and therefore did not have to consolidate them on its balance sheet.

12.     In mid-December 2007, after rating agencies downgraded the debt of several SIVs and Citi had conceded that the total assets of its SIVs were worth $66 billion, not the $83 previously reported, the Company announced that it would "provide a support facility" for its SIVs.  Belatedly, Citi consolidated the SIVs on its balance sheet, as it should have done when the SIVs were first created.

13.     On January 15, 2008, Citi reported record-breaking losses for the fourth quarter of 2007 – a staggering $9.83 billion, resulting from write-downs of $18.1 billion and increased credit costs of $12.7 billion.  Citi disclosed another $10.5 billion in CDO exposures, which Citi had hedged through contracts with monoline insurers.  In total, Citi eventually disclosed over $65 billion in CDO exposure.  However, even when Citi disclosed its CDO exposure, it continued to misrepresent the quality and value of its remaining holdings.  In constructing its valuation model, Citi disregarded market information, industry knowledge, and even its own internal analysis as to how these assets should be valued.

14.     Along with its fourth quarter results, Citi announced various efforts undertaken to raise capital, including roughly $11.8 billion that had already been secured.  Thus, while the

results were dismal, Citi gave its investors the impression that it was taking the necessary steps to reverse course.  Still, the market reacted sharply.  On January 15, 2008, the stock closed down over 7%, from $29.06 to $26.94.  By the end of that week, Citi's stock price had fallen to $24.40.

15.     What investors did not know is that the massive losses announced in January 2008 – as bad as they were – were actually understated.  If Citi had taken the appropriate write-downs and increased its loan loss reserves earlier, its losses would have been materially greater and its Tier 1 capital ratio – which measures a bank's core equity capital (its "Tier 1" capital) as a percentage of its risk-weighted assets – would have been reduced.  Similarly, its Tier 1 leverage ratio – which measures the bank's Tier 1 capital as a percentage of average total consolidated assets – would have been reduced.  Because Citi was highly leveraged, even a small increase in losses among its riskiest assets would have sent its Tier 1 capital ratio below the 6% threshold and the leverage ratio below the 3% threshold required by regulators for a "well capitalized" bank.  Falling below either threshold would have triggered regulatory scrutiny and set off an alarm to investors, putting the bank at risk of insolvency.

16.     For the first two quarters of 2008, Citi issued public statements to the effect that the Company had turned a corner, with losses decreasing each quarter.  For example, when Citi announced its first quarter results on April 18, 2008, those losses were lower than those from the fourth quarter of 2007, with lower write-downs and a smaller increase in loss reserves.  However, as would later be revealed, Citi was required to take much more substantial write-downs and to increase its loss reserves by a greater amount during the quarter.  Had it done so, its results would have painted a far less rosy picture.  In truth, Citi's loan loss reserves continued to be inadequate in light of its mounting mortgage defaults, and it still failed to take adequate write-downs on the CDOs it had retained.

17.     In August 2008, further bad news arrived.  The SEC and the New York Attorney General announced a settlement with Citigroup in relation to its involvement in the auction rate securities ("ARS") market.  ARS are investments that had been sold as alternatives to money market funds, supposedly with the same degree of liquidity.  However, unbeknownst to investors, Citi had been propping up the market during the summer and fall of 2007, in order to provide liquidity when demand fell short.  In February 2008, Citi could not continue supporting the auctions and the market seized.  Floods of customer complaints ensued, and various regulatory entities immediately launched investigations.  It turned out that Citi had been holding ARS, acquired when it was supporting the auctions, which it could not re-sell.  In addition to the ARS securities it already held, Citi was now going to have to repurchase $7.3 billion of its clients' ARS as part of a settlement.

18.     By mid-September 2008, the financial markets were reeling in the wake of the Lehman Brothers collapse.  Citi executives held morale-boosting sessions with employees and floated positive messages in the press, with its Chief Executive Officer, defendant Vikram Pandit, calling the Company a "pillar of strength in the markets."  But only a month later, on Tuesday, October 14, 2008, Citi received its first infusion of bail-out funds from the federal government.  Two days later, on October 16, the Company released its third-quarter earnings.  Citi had not, in fact, turned a corner; the Company's reported losses *increased* by $600 million, or $0.11 per share.  Citi announced yet another $4.4 billion in write-downs and another $3.9 billion increase in its loan loss reserves.  By Friday, October 17, 2008, Citi's stock had fallen from $18.62 on October 14 to $14.88, nearly double the decline in the S&P 500 during that time.

19.     The situation deteriorated further in November 2008.  On November 17, Pandit held an employee Town Hall meeting.  While he again noted Citi's strong capital position, the

market was skeptical.  Then, on November 19, Citi announced it would have to unwind its SIVs, taking a $17.4 billion hit in the process.  The damage to Citi's stock was dramatic.  After word surfaced of the Town Hall meeting, the price fell from $9.52 to $8.89.  Then, after the news on the SIVs, the stock fell 23% in a single day, to $6.40.  By Friday, November 21, 2008, the stock closed at $3.77.

20.      Despite this steady trickle of bad news, Citi continued to insist that the Company was strong.  On Sunday, November 23, 2008, however, after an emergency weekend session with the government and Citi's board, the parties announced a $326 billion bail-out package. The federal government would provide $301 billion in loan guarantees, largely to guarantee the at-risk subprime mortgages and toxic assets Citi could not sell.  Analysts noted that Citi had been touting the Company's soundness while at the same time negotiating with the government for the bail-out.

21.      Without the federal government's bail-out package the Company may well have gone under.  But even that effort was not enough to stop the stock's decline.  Starting on January 10, 2009, reports circulated about Citi's precarious condition and the prospect of it selling Smith Barney, its profitable brokerage arm, in order to generate cash.  This move signaled desperation to Citi's investors, and the stock fell from $6.75 to $5.60 on this news.

22.      Amid continued discussion of Citi's viability, on January 16, 2009, Citi released its earnings for the fourth quarter of 2008, which were worse than predicted – an $8.3 billion loss, or $ 1.72 per share.  Citi's stock price collapsed, closing at $3.50 on January 16.

23.      In less than two years, from October 15, 2007, through January 16, 2009, Citi's stock price fell almost 93%, from $47.72 to $3.50.  It performed worse than the Dow, the S&P Financial Index, and individual peers such as Bank of America, Goldman Sachs, and JPMorgan.

What now remains of this former giant is Citicorp, the unit that retains its profitable business lines, and Citi Holdings, which was created largely to manage the toxic assets that were central to Citi's collapse and generated an $8.3 billion loss in 2009.  In June 2009, Citi was removed from the Dow Jones Industrial Average.  Although Citi reported positive earnings per share for the first two quarters of 2010 (compared to losses in three of the four quarters in 2009), its recovery has only begun.  Its stock still hovers in the $3.00 range (unadjusted for stock splits), gaining back little of the ground lost between 2007 and 2009.[2]

24.     Plaintiff brings this suit to recover the losses it incurred as a result of its purchases of Citi securities during the period from January 1, 2004 to January 15, 2009, as outlined in detail below.

25.     In this complaint, Plaintiff asserts two different sets of claims.  The first set of claims (Counts One through Five) are non-fraud claims pursuant to the federal securities laws and English statutory law.  Plaintiff specifically disclaims any allegations of fraud in these claims, which include: (1) strict liability and negligence counts pursuant to the Securities Act of 1933 ("Securities Act"); and (2) for those public offerings governed by English law, violations of the United Kingdom's Financial Services and Markets Act 2000 (as amended).  In the second set of claims (Counts Six and Seven), Plaintiff asserts fraud-based counts under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

## II.     JURISDICTION AND VENUE

26.     The claims herein arise under Sections 11, 12, and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l, and 77o; Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b)

---

[2] Due to a 1-for-10 reverse stock split on May 9, 2011, Citi's stock price increased ten-fold, and now trades in a range between $20.00 to $30.00, but this corresponds in value to a range of $2.00 to $3.00 had Citi not effected the reverse split.

and 78t(a), and Rule 10b-5, 17 C.F.R. 240.10b-5, promulgated under the Exchange Act; and the Financial Services and Markets Act 2000 (UK).

27.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. §§ 1331, 1332 and 1367.

28.     Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b), as Citigroup is headquartered in this District and many of the untrue statements and omissions were made in or issued from this District.  Many of the acts and transactions giving rise to the violations of law complained of occurred in this District.

29.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange and market.

## III.   THE PARTIES

### A.   PLAINTIFF STICHTING PENSIOENFONDS ABP

30.     Plaintiff Stichting Pensioenfonds ABP ("ABP") is an entity established under the laws of the Kingdom of the Netherlands and is the pension fund for public employees in the governmental and education sectors in the Netherlands.  With assets amounting to nearly 150 billion Euros, ABP is one of the three largest pension funds in the world.  Its assets represent around 35% of total Dutch pension fund assets, and its client base totals some 2.2 million participants and retirees (e.g., civil servants, teachers, university professors, policemen and firemen).  ABP maintains its office and principal place of business in DL Heerlen, The Netherlands.  During the Relevant Period, ABP purchased shares of Citigroup common stock, as

well as Citigroup securities with the following ISINs: US172967EC18; US172967ES69; US172967EJ60; US172967EU16; XS0236075908; XS0303074883; and XS0354858564. Because Defendants' public disclosures were materially false and misleading, ABP suffered substantial losses on these investments.

     **B.**    **DEFENDANTS**

        **1.**    **Citigroup Defendants**

     31.    At all relevant times herein, defendant Citigroup Inc. ("Citigroup" or "Citi" or the "Company") has been a diversified global financial services holding company, incorporated under the laws of the State of Delaware, and headquartered at 399 Park Avenue, New York, New York. Citi offers a broad range of financial services to consumer and corporate customers, with more than 200 million customer accounts and operations in more than 100 countries. As of December 31, 2009, Citigroup reported total assets of approximately $1.86 trillion, down from $1.9 trillion in 2008 and $2.19 trillion in 2007, and 2009 net revenues of $80 billion, down from $86 billion in 2006. In terms of deposits, as of March 2010, Citigroup ranked as the third largest bank in the United States, behind Bank of America and JPMorgan Chase.

     32.    Defendant Citigroup Global Markets, Inc. ("Citigroup Global Markets"), a wholly-owned subsidiary of Citigroup, was the primary underwriter of several securities offerings identified below. Citigroup Global Markets serves as a brokerage and securities arm of Citigroup and provides investment banking services to corporate, institutional, government, and retail clients. Its headquarters are located at 388 Greenwich Street, New York, New York. As part of its duties as the underwriter of the various offerings, Citigroup Global Markets was required to conduct, prior to the offering, a reasonable investigation to ensure that the statements contained in the offering materials contained no material untrue statements and did not omit material facts.

33.     Citigroup and Citigroup Global Markets are collectively referred to herein as the "Citigroup Defendants."

### 2.     Individual Defendants

34.     Defendant Charles "Chuck" Prince ("Prince") served as Citi's Chief Executive Officer ("CEO") from October 2003 until November 4, 2007, when he resigned in the wake of revelations of large losses stemming from Citi's CDO exposure.   He also served as Citi's Chairman from April 18, 2006 through November 4, 2007.   Defendant Prince signed Citi's Form 10-K filings for the years 2003 through 2006, as well as certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act that those Form 10-K filings and Citi's Form 10-Q filings for each quarter through the third quarter of 2007 did not contain any untrue statement of material fact or omit any material fact, and that they presented fairly, in all material respects, the Company's financial condition and results of operations.   Prince was also quoted in Citi's press releases, participated in conference calls with securities and market analysts.   As the most senior executive officer of Citi during his tenure, Defendant Prince was responsible for the day-to-day operations of the Company.   Defendant Prince is responsible for Citi's untrue statements and omissions complained of herein that were made prior to November 4, 2007.

35.     Defendant Vikram Pandit ("Pandit") has served as CEO and a director of Citi from December 11, 2007 through the present.   Defendant Pandit signed Citi's Form 10-K filings for 2007 and 2008, as well as certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act that those Form 10-K filings and Citi's Form 10-Q filings for the first three quarters of 2008 did not contain any untrue statement of material fact or omit any material fact, and that they presented fairly, in all material respects, the Company's financial condition and results of operations.   Pandit was also quoted in Citi's press releases, and participated in conference calls with securities and market analysts.   As the senior-most executive officer of Citi during his

tenure, Defendant Pandit was responsible for the day-to-day operations of the Company. Defendant Pandit is responsible for Citi's untrue statements and omissions complained of herein that were made after December 11, 2007.

36.   Defendant Gary Crittenden ("Crittenden") served as Chief Financial Officer ("CFO") of Citi from March 12, 2007 until March 2009.  He subsequently served as Chairman of Citi Holdings until July 9, 2009, when he resigned to join a private equity firm.  Crittenden signed Citi's Form 10-K and 10-Q filings for 2007 and 2008, as well as certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act that those Form 10-K and 10-Q filings did not contain any untrue statement of material fact or omit any material fact, and that they presented fairly, in all material respects, the Company's financial condition and results of operations. Crittenden also participated in conference calls with securities and market analysts.  As a senior executive officer of Citi, Crittenden was responsible for the day-to-day operations of Citigroup and his behavior is central to Citigroup's misconduct.  On July 29, 2010, the SEC filed fraud charges against Citigroup challenging Citi's repeated misleading statements about the extent of its holdings of assets backed by sub-prime mortgages in earnings calls and public filings. Throughout the period in question, Citigroup represented that its sub-prime exposure in Citigroup's investment banking unit, Citi Markets & Banking, was $13 billion or less, when in fact, at all times during that period, the investment bank's sub-prime exposure was over $50 billion. Defendant Crittenden is responsible for Citi's untrue statements and omissions complained of herein that were made after March 12, 2007, and the SEC instituted (and settled) cease-and-desist proceedings against Defendant Crittenden for his role in making, and causing Citigroup to make, certain of these misleading statements.  Crittenden agreed to pay a penalty of $100,000.00.

37.     Defendant John C. Gerspach ("Gerspach") served as Citi's Chief Accounting Officer and Controller from March 2005 through July 9, 2009, when he became the Company's CFO.  Defendant Gerspach signed Citi's Form 10-Q and 10-K filings for 2005 through 2008.  As a senior executive officer of Citi, Gerspach was responsible for Citigroup's accounting and financial reporting during the Relevant Period.  Defendant Gerspach is responsible for Citi's untrue statements and omissions complained of herein that were made during his tenure at the Company.

38.     Defendant Robert Druskin ("Druskin") was Chief Operating Officer ("COO") of Citigroup and a member of the Office of the Chairman from December 11, 2006 until his retirement in December 2007.  During that period, he supervised all aspects of the business and was a participant in meetings regarding Citi's CDO exposure, held daily starting in July 2007.  Prior to becoming COO of Citigroup, Druskin had been a senior executive in the Citigroup Corporate and Investment Banking Group ("CIB"), serving as its President and COO from August 2002 until December 2003 and as its CEO since December 2003.

39.     From 2004 until October 2007, Defendant Thomas G. Maheras ("Maheras") was the CEO of the Company's Global Capital Markets, a division of Citi Markets and Banking, which arranged the CDOs and other Variable Interest Entities.  From January 2007 through October 2007, Defendant Maheras was also Co-President of Citi Markets and Banking, and was Co-Chair of Citi Markets and Banking from May 2007 through October 2007.  Maheras was involved in the drafting, preparation, and/or approval of Citi press releases, SEC filings, and other public statements.  Defendant Maheras was also a participant in meetings regarding Citi's CDO exposure, held daily starting in July 2007.

40.     Defendant Michael Stuart Klein ("Klein") was Chairman of the Institutional Clients Group and Vice Chairman of Citigroup from March 2008 until July 21, 2008. Previously, Klein was Chairman and Co-CEO of Citi Markets and Banking, and had been CEO of Global Banking from 2004 until he became Co-CEO of Citi Markets and Banking on January 20, 2007.  Klein was involved in the drafting, preparation, and/or approval of Citi press releases, SEC filings, and other public statements.  Defendant Klein was also a participant in meetings regarding Citi's CDO exposure, held daily starting in July 2007.

41.     During the Relevant Period, defendant Steven Freiberg ("Freiberg") was the CEO of Citi's Global Card Division, formerly known as the Global Consumer Group.  This unit was responsible for consumer lending, including residential mortgages.  Defendant Freiberg made representations at investor conferences regarding Citi's mortgage lending practices and the strength of its mortgage portfolio, including a conference held on September 12, 2007.

42.     Defendant C. Michael Armstrong ("Armstrong") was a member of the Citigroup Board of Directors from 1989 to April 2010.  Defendant Armstrong signed Citigroup's Form 10-K filings for the years 2006 through 2008, as well as its Form S-3 Registration Statement dated March 2, 2006.

43.     Defendant Alain J.P. Belda ("Belda") has been a member of the Citigroup Board of Directors since 1997.  Defendant Belda signed Citigroup's Form 10-K filings for the years 2006 through 2008, as well as its Form S-3 Registration Statement dated March 2, 2006.

44.     Defendant George David ("David") served as a member of the Citigroup Board of Directors from 2002 to April 22, 2008.  Defendant David signed Citigroup's Form 10-K filings for the years 2006 through 2007, as well as its Form S-3 Registration Statement dated March 2, 2006.

45.     Defendant Kenneth T. Derr ("Derr") was a member of the Citigroup Board of Directors from 1987 to April 21, 2009.  Defendant Derr signed Citigroup's Form 10-K filings for the years 2006 through 2008, as well as its Form S-3 Registration Statement dated March 2, 2006.

46.     Defendant John M. Deutch ("Deutch") was a member of the Citigroup Board of Directors from 1987 to 1993 and again from 1996 to April 2010.  He signed Citigroup's Form 10-K filings for the years 2006 through 2008, as well as its Form S-3 Registration Statement dated March 2, 2006.

47.     Defendant Roberto Hernandez Ramirez ("Ramirez") was a member of the Citigroup Board of Directors from 2001 to April 21, 2009.   Defendant Ramirez signed Citigroup's Form 10-K filings for the years 2006 through 2008, as well as its Form S-3 Registration Statement dated March 2, 2006.

48.     Defendant Andrew N. Liveris ("Liveris") was a member of the Citigroup Board of Directors from 2005 until February 2011. Defendant Liveris signed Citigroup's Form 10-K filings for the years 2006 through 2008, as well as its Form S-3 Registration Statement dated March 2, 2006.

49.     Defendant Anne M. Mulcahy ("Mulcahy") was a member of the Citigroup Board of Directors from 2004 to April 2010.  Defendant Mulcahy signed Citigroup's Form 10-K filings for the years 2006 through 2008, as well as its Form S-3 Registration Statement dated March 2, 2006.

50.     Defendant Richard D. Parsons ("Parsons") has been a member of the Citigroup Board of Directors since 1996, and has been Chairman of Citigroup since February 23, 2009.  He

signed Citigroup's Form 10-K filings for the years 2006 through 2008, as well as its Form S-3 Registration Statement dated March 2, 2006.

51.     Defendant Judith Rodin ("Rodin") has been a member of the Citigroup Board of Directors since 2004.  Defendant Rodin signed Citigroup's Form 10-K filings for the years 2006 through 2008, as well as its Form S-3 Registration Statement dated March 2, 2006.

52.     Defendant Robert L. Ryan ("Ryan") has been a member of the Citigroup Board of Directors since July 2007.  Defendant Ryan signed Citigroup's Form 10-K filings for the years 2007 and 2008.

53.     Defendant Franklin A. Thomas ("Thomas") was a member of the Citigroup Board of Directors from 1970 to April 21, 2009.  Defendant Thomas signed Citigroup's Form 10-K filings for the years 2006 through 2008, as well as its Form S-3 Registration Statement dated March 2, 2006.

54.     Defendant Arthur H. Tildesley, Jr. ("Tildesley") joined a predecessor of Citigroup in 1986 and has remained with Citigroup subsequent to that time.  In 2004, Tildesley became head of Citi's Investor Relations department, a position he held until February 2008, upon which time he became chief administrative officer of Citigroup's Global Wealth Management division. Tildesley subsequently became, and remains, Citi's head of Global Cross Marketing.  As head of IR, Tildesley reported directly to Defendant Crittenden, and oversaw preparation of, and approved, Citi's earnings releases and the scripts for its earnings calls.  On July 29, 2010, the SEC filed fraud charges against Citigroup challenging Citi's repeated misleading statements about the extent of its holdings of assets backed by sub-prime mortgages in earnings calls and public filings.  Throughout the period in question, Citigroup represented that its sub-prime exposure in Citigroup's investment banking unit, Citi Markets & Banking, was $13 billion or

less, when in fact, at all times during that period, the investment bank's sub-prime exposure was over $50 billion. The SEC instituted (and settled) cease-and-desist proceedings against Defendant Tildesley for his role in causing Citigroup to make certain of these misleading statements. Tildesley agreed to pay a penalty of $80,000.00.

55.     Defendants Prince, Pandit, Crittenden, Gerspach, Druskin, Maheras, Klein, Freiberg, Armstrong, Belda, David, Derr, Deutch, Ramirez, Liveris, Mulcahy, Parson, Rodin, Ryan, Thomas and Tildesley are collectively referred to herein as the "Individual Defendants."

56.     By virtue of the Individual Defendants' positions within the Company, they had access to undisclosed adverse information about Citigroup, its business, operations, operational trends, finances, and present and future business prospects. The Individual Defendants ascertained such information through Citigroup's internal corporate documents, conversations and connections with other corporate officers, bankers, traders, risk officers, marketing experts, and employees, attendance at management and/or Board of Directors' meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as Citigroup officers and/or directors.

57.     The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the Company's various SEC filings, press releases and other public statements during their tenures at the Company. Further, as officers and directors of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth,

operations, risk, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.

58.     It is appropriate to treat the Individual Defendants collectively as a group for pleading purposes and to presume that the Company's public filings, press releases and public statements were products of the collective actions of those Individual Defendants who were members of the Company's board of directors and/or senior management when those statements were issued.

## IV.     SECURITIES PURCHASED BY PLAINTIFF

59.     During the Relevant Period, Plaintiff purchased numerous securities issued by the Citigroup Defendants, both in the secondary market and in securities offerings conducted by Citigroup.  Specifically, Plaintiff purchased the following securities during the Relevant Period:

(i)      Common stock issued by Citi (ISIN US17296710) ("Common Stock");

(ii)     5.875% Notes due 2037, issued by Citi  (ISIN US172967EC18) ("5.875% Notes");

(iii)    5.5% Notes due 2012, issued by Citi (ISIN US172967EJ60) ("5.5% Notes");

(iv)    6.125% Notes due 2018, issued by Citi (ISIN US172967ES69) ("6.125% Notes");

(v)     6.5% Notes due 2013, issued by Citi (ISIN US172967EU16) ("6.5% Notes");

(vi)    3.625% fixed/floating rate callable Subordinated Notes due 2017, issued by Citi (ISIN XS0236075908) ("3.625% Notes");

(vii)   4.75% fixed/floating rate Callable Subordinated Notes due 2017, issued by Citi  (ISIN XS0303074883) ("4.75% Notes"); and

(viii)   6.4% Fixed Rate Notes Due 2013, issued by Citi (ISIN XS0354858564) ("6.4% Notes").

60.     The securities listed in the paragraph immediately above are collectively referred to herein as the "Securities."  The Securities listed in subparagraphs (ii) through (viii) above are collectively referred to herein as the "Citi Notes."  The securities listed in subparagraphs (i) through (v) are collectively referred to herein as the "U.S. Securities."  The U.S. Securities were all listed on a U.S. exchange during the Relevant Period.  Details regarding Plaintiff's purchases and sales of the Securities during the Relevant Period can be provided on a confidential basis to the Court or defense counsel.

61.     In this Complaint, Plaintiff asserts fraud-based claims based on its purchases of Citigroup Common Stock.

62.     Plaintiff asserts non-fraud-based claims based its purchases of the Citi Notes, which were issued in or traceable to the offerings described below in ¶¶ 63-69.

63.     The 5.875% Notes (ISIN US172967EC18) were issued by Citi in a May 29, 2007 offering underwritten primarily by Citigroup Global Markets.  The notes were registered and issued pursuant to the Registration Statement/Prospectus, as updated and amended by a prospectus dated June 5, 2007.  As so amended, the Registration Statement/Prospectus incorporated by reference Citi's: April 17, 2006 Form 8-K; May 5, 2006 Form 10-Q; July 17, 2006 Form 8-K; August 4, 2006 Form 10-Q; October 19, 2006 Form 8-K; November 3, 2006 Form 10-Q; January 19, 2007 Form 8-K; 2006 Form 10-K, filed February 23, 2007; April 16, 2007 Form 8-K; and May 4, 2007 Form 10-Q.

64.     The 5.5% Notes (ISIN US172967EJ60) were issued by Citi in an August 19, 2008 offering underwritten primarily by Citigroup Global Markets.  The notes were registered and issued pursuant to the Registration Statement/Prospectus, as updated and amended by a prospectus dated September 3, 2008.  As so amended, the Registration Statement/Prospectus incorporated by reference Citi's: April 17, 2006 Form 8-K; May 5, 2006 Form 10-Q; July 17, 2006 Form 8-K; August 4, 2006 Form 10-Q; October 19, 2006 Form 8-K; November 3, 2006 Form 10-Q; January 19, 2007 Form 8-K; 2006 Form 10-K, filed February 23, 2007; April 16, 2007 Form 8-K; May 4, 2007 Form 10-Q; July 20, 2007 Form 8-K; August 3, 2007 Form 10-Q; October 1, 2007 Form 8-K; October 15, 2007 Form 8-K; November 5, 2007 Form 8-K; November 5, 2007 Form 10-Q; December 14, 2007 Form 8-K; January 15, 2008 Form 8-K; January 22, 2008 Form 8-K; 2007 Form 10-K, filed February 22, 2008; April 18, 2008 Form 8-K; May 2, 2008 Form 10-Q; July 18, 2008 Form 8-K; and August 1, 2008 Form 10-Q.

65.     The 6.125% Notes (ISIN US172967ES69) were issued by Citi in a May 12, 2008 offering underwritten primarily by Citigroup Global Markets.  The notes were registered and issued pursuant to the Registration Statement/Prospectus, as updated and amended by a prospectus dated May 20, 2008.   As so amended, the Registration Statement/Prospectus incorporated by reference Citi's: April 17, 2006 Form 8-K; May 5, 2006 Form 10-Q; July 17, 2006 Form 8-K; August 4, 2006 Form 10-Q; October 19, 2006 Form 8-K; November 3, 2006 Form 10-Q; January 19, 2007 Form 8-K; 2006 Form 10-K, filed February 23, 2007; April 16, 2007 Form 8-K; May 4, 2007 Form 10-Q; July 20, 2007 Form 8-K; August 3, 2007 Form 10-Q; October 1, 2007 Form 8-K; October 15, 2007 Form 8-K; November 5, 2007 Form 8-K; November 5, 2007 Form 10-Q; December 14, 2007 Form 8-K; January 15, 2008 Form 8-K;

January 22, 2008 Form 8-K; 2007 Form 10-K, filed February 22, 2008; April 18, 2008 Form 8-K; and May 2, 2008 Form 10-Q.  Plaintiff purchased 6.125% Notes in the offering.

66.    The 6.5% Notes (ISIN US172967EU16) were issued by Citi in an August 19, 2008 offering underwritten primarily by Citigroup Global Markets.  The notes were registered and issued pursuant to the Registration Statement/Prospectus, as updated and amended by a prospectus dated September 3, 2008.  As so amended, the Registration Statement/Prospectus incorporated by reference Citi's: April 17, 2006 Form 8-K; May 5, 2006 Form 10-Q; July 17, 2006 Form 8-K; August 4, 2006 Form 10-Q; October 19, 2006 Form 8-K; November 3, 2006 Form 10-Q; January 19, 2007 Form 8-K; 2006 Form 10-K, filed February 23, 2007; April 16, 2007 Form 8-K; May 4, 2007 Form 10-Q; July 20, 2007 Form 8-K; August 3, 2007 Form 10-Q; October 1, 2007 Form 8-K; October 15, 2007 Form 8-K; November 5, 2007 Form 8-K; November 5, 2007 Form 10-Q; December 14, 2007 Form 8-K; January 15, 2008 Form 8-K; January 22, 2008 Form 8-K; 2007 Form 10-K, filed February 22, 2008; April 18, 2008 Form 8-K; May 2, 2008 Form 10-Q; July 18, 2008 Form 8-K; and August 1, 2008 Form 10-Q.  Plaintiff purchased 6.5% Notes in the offering.

67.    The 3.625% Notes (ISIN XS0236075908) were first issued by Citi in a November 28, 2005 offering under the US$40 billion Programme for the issuance of Euro Medium-Term Notes, Series B (the "US$40 billion Programme").  The offering documents included Citi's October 12, 2005 Base Prospectus for the US$40 billion Programme, as supplemented and updated by supplements to the Base Prospectus dated October 28, 2005, November 14, 2005, March 1, 2006 and August 14, 2006, and by the Final Terms dated November 28, 2005.  These offering documents incorporated by reference Citi's: 2005 Form 10-K, filed February 24, 2006; October 13, 2005 Form 10-Q (for the period ended September 30, 2005); May 11, 2006 Form

10-Q (for the period ended March 31, 2006); and August 4, 2006 Form 10-Q (for the period ended June 30, 2006).  The offerings of the 3.625% Notes are governed by the laws of England, according to its terms as set forth in the Base Prospectus for the US$40 billion Programme. Plaintiff purchased 3.625% Notes in the offering.

68.     The 4.75% Notes (ISIN XS0303074883) were issued by Citi in a May 30, 2007 offering under the US$55 billion Programme for the issuance of Euro Medium-Term Notes, Series B (the "US$55 billion Programme").  The offering documents included Citi's October 12, 2006 Base Prospectus for the US$55 billion Programme, as supplemented and updated by supplements to the Base Prospectus dated November 14, 2006, March 6, 2007 and May 10, 2007, and by the Final Terms dated May 30, 2007.   These offering documents incorporated by reference Citi's: 2005 Form 10-K, filed February 24 2006; 2004 Form 10-K, filed February 28, 2005; and August 4, 2006 Form 10-Q.  The offering of the 4.75% Notes is governed by the laws of England, according to its terms as set forth in the Base Prospectus.  Plaintiff purchased 4.75% Notes in the offering.

69.     The 6.4% Notes (ISIN XS0354858564) were issued by Citi in a March 27, 2008 offering under the US$110 billion Programme for the issuance of Euro Medium-Term Notes, Series B (the "US$110 billion Programme").  The offering documents included Citi's October 2, 2007 Base Prospectus for the US$110 billion Programme, as supplemented and updated by supplements to the Base Prospectus dated November 9, 2007 and February 27, 2008, and by the Final Terms dated March 25, 2008.   These offering documents incorporated by reference Citi's: 2005 Form 10-K, filed February 24, 2006; 2006 Form 10-K, filed February 23, 2007; August 3, 2007 Form 10-Q; and the financial statements and notes contained in the November 5, 2007 Form 10-Q and the 2007 Form 10-K.  The offering of the 6.4% Notes is governed by the laws of

England, according to its terms as set forth in the Base Prospectus for the US$110 billion Programme.  Plaintiff purchased 6.4% Notes in the offering.

70.     The securities offerings described in ¶¶ 63-69 above are collectively referred to herein as the "Offerings."  The Offerings described in ¶¶ 63-66 are collectively referred to herein as the "U.S. Offerings."  The Offerings described in ¶¶ 67-69 are collectively referred to herein as the "European Offerings."

## V.     BACKGROUND ALLEGATIONS PERTINENT TO ALL COUNTS

### A.     SUBPRIME MORTGAGES BECOME ATTRACTIVE TO LENDERS

71.     For lenders, the historically-underserved "subprime borrower" became a very attractive source of potential profit during the early-to-mid 2000s.  In broad terms, a subprime borrower is generally one who has a high debt-to-income ratio (usually 50% or greater), an impaired or minimal credit history, or some other characteristic that is associated with a higher risk of default.

72.     Lenders typically rely on the Fair Isaac Credit Organization ("FICO") credit score to classify a borrower as "prime," "nonprime," or "subprime."  FICO defines the FICO score, which ranges from 300 to 850, as "the standard measure of U.S. consumer risk" and "the recognized industry standard in consumer credit risk assessment."  A borrower with a FICO score below 660 is generally labeled "subprime."

73.     Additionally, "subprime," when used to describe mortgages, may refer to loans sharing certain underwriting characteristics that increase the likelihood of default, often because the borrower cannot satisfy the underwriting criteria employed for conforming, prime loans.  The underwriting features associated with subprime mortgages include: (1) high loan-to-value ("LTV") ratios, often in excess of 80%; (2) minimal or no down payment; (3) low introductory, or "teaser" rates; (4) the option to pay less than the monthly principal and interest payment; and

(5) minimal or no documentation or verification of borrower income or assets (otherwise known as "stated income," "no income/no asset verification," "NINA" or "no-doc" loans). Depending on the collateral and the lender's underwriting criteria, loans bearing some of these hallmarks may be classified as "Alt-A" or "nonprime," a category falling somewhere between prime and subprime.

74. The LTV ratio is particularly important in assessing the risk associated with a subprime loan. The LTV ratio compares the amount loaned to the total appraised value of the property. For example, if a borrower obtains a mortgage for $70,000 to purchase a house worth $100,000, the LTV ratio is 70%. Lower LTV ratios are indicative of less risk for two reasons. First, a borrower with a low loan balance relative to the value of the property is less likely to default, because he has too much equity at stake to risk losing the property if he defaults. Second, in the event of default, the built-in equity cushion protects the lender from loss, because even after the costs of foreclosure are factored in, the lender is still at a greater likelihood of recouping the original loan amount.

### B. THE PROLIFERATION OF FINANCIAL INSTRUMENTS BACKED BY U.S. RESIDENTIAL MORTGAGES

75. Lenders were motivated to engage in riskier lending practices, such as subprime lending, because of the expansion in the market for securities backed by pools of mortgages. These mortgage-backed securities ("MBS") and CDOs enabled lenders to sell mortgages to third parties, thereby transferring the risk of delinquencies and defaults on the mortgages they originated. Thus, lenders could generate profits by ramping up originations, regardless of loan quality.

76. MBS and CDOs are types of asset-backed securities ("ABS"). ABS are not a new concept. The Government National Mortgage Association ("Ginnie Mae") had been bundling

and selling securitized mortgages as ABS for years.  However, the collateral underlying Ginnie

Mae's ABS was subject to strict criteria that earned these securities AAA ratings from the credit

rating agencies.  As the real estate market exploded, ABS were used as a platform to propagate

new, more creative financial instruments that often bundled and re-bundled subprime mortgages

or loans to borrowers with less-than-stellar credit.

77.    For instance, the RMBS bundled subprime residential mortgages.  To create an

RMBS, an originator or underwriter purchased a large number of individual residential

mortgages (often numbering in the thousands) from banks and/or non-bank mortgage lenders

(e.g., Citigroup).  Generally, the mortgages underlying an RMBS possessed similar

characteristics with respect to the quality of the borrower (prime, Alt-A or subprime), so that

they could be pooled together and rated accordingly.

78.    Once the originator or underwriter purchased a sufficient number of mortgage

loans, it then pooled the mortgages together and sold them to a "special purpose vehicle"

("SPV").  An SPV is a separate, bankruptcy-remote legal entity created by the originator in order

to transfer the risk of the mortgages off the originator's balance sheet.  The SPV takes title of the

individual mortgages and issues bonds or RMBS collateralized by the transferred mortgage pool.

RMBS are issued in several unequal classes called tranches, ranging from "High Grade" (AAA

and AA-rated bonds), to "Mezzanine" (BBB- to B-rated bonds), to an unrated equity tranche

sometimes called the "residual."

79.    The SPV is able to issue AAA-rated paper out of a pool of subprime mortgages

through the prioritization of payments and the apportionment of losses among the different

classes.  Typically, the AAA-rated tranche of the RMBS receives first priority on cash flows

from the borrowers on the underlying mortgages (otherwise known as "remittance payments")

but receives a lower yield on the investment, reflecting less reward for less presumed risk. Conversely, the equity tranche holders receive the highest return on their investment because the equity tranche is the first tranche to experience losses in the event that the underlying pool of mortgages experiences defaults. Under the typical payment structure, the AAA-rated RMBS-holder would only experience losses if both the equity and mezzanine tranches were exhausted as a result of credit events, such as defaults, in the underlying mortgage collateral.

80.     In most instances, an RMBS originator or underwriter worked closely with one of the three rating agencies, Moody's Investors Service ("Moody's"), Standard & Poor's ("S&P") or Fitch Ratings ("Fitch"), to determine the right combination of mortgages to include as collateral for a given RMBS.  The goal for an originator or underwriter was to fill each mortgage pool with high-interest-paying but riskier collateral that would still allow for an AAA-rated class of RMBS.  Riskier Alt-A and subprime borrowers typically paid higher interest rates on their loans to compensate the lender for taking on the additional risk.  By securing an RMBS with riskier loans that carried higher interest rates, an originator theoretically maximized the amount of interest payments that were paid into the SPV.  This, in turn, allowed the SPV to issue RMBS bonds that paid higher interest rates, which placed the SPV at a competitive advantage in attracting investors.

81.     Once a payment schedule was agreed upon and the rating agency assigned ratings to the various RMBS tranches, the SPV sold the resulting RMBS to investors.  The SPV transferred proceeds from the sale of the RMBS to the originator in consideration for the underlying collateral. Additionally, the SPV passed on the remittance payments from the individual mortgagees to the RMBS-holders by the priority dictated in the RMBS agreement.

82.     The following chart, created by the Commercial Mortgage Securities Association ("CMSA"), illustrates the structure of a typical RMBS:



83.     While the RMBS structure may seem intuitive, it was by no means the end of the line from a financial engineering perspective.  Citigroup, among others, was also involved in developing more complex structured finance products designed to profit from subprime RMBS, most notably CDOs.

84.     Essentially, a CDO invests in a group of assets and then issues securities "collateralized" by those assets.  It is created in very much the same way as RMBS, the key difference being that while RMBS are backed by a pool of residential mortgages, the bonds issued by a CDO are collateralized by a pool of RMBS tranches.

85.    Just as with RMBS, CDO originators amassed a collection of assets for inclusion in the CDO, a process known as "warehousing" or "ramping up" the CDO.  Instead of warehousing residential mortgages, a CDO originator collected tranches of RMBS.  In the course of this process, the CDO originator had to evaluate the quality of the RMBS tranches that would be used to collateralize the CDO.  In other words, the originator had to decide if it was creating a "Mezzanine CDO," which typically would be collateralized by lower BBB/BB-rated RMBS tranches, or a "High Grade CDO," which typically would be collateralized by AAA/AA-rated RMBS tranches.  CDO originators earned higher fees for structuring Mezzanine CDOs, which also paid higher interest rates to the CDO investors.

C.    **CITIGROUP'S INVOLVEMENT IN MORTGAGE-RELATED ACTIVITIES**

86.    Citigroup was an active participant in both the mortgage origination and securitization industries during the Relevant Period, and its eventual losses were precipitated by its activities on both fronts.

**1.    Subprime Lending Fuels Citi's Bottom Line**

87.    Beginning in 2005, Citi aggressively expanded its subprime lending, both through direct originations and through purchases from third parties known as "correspondent" lenders. By 2006, Citi was the fourth-largest mortgage originator, with $132.9 billion in loan originations in the first nine months of that year.  Citi's first mortgage portfolio grew to $150 billion by the end of 2007.

88.    By expanding its loan originations, Citi generated a pool of mortgages it could then bundle into RMBS, which it could then bundle into CDOs, both of which were then often sold to Citi-sponsored SIVs.  Thus, the same loans became a source of revenue multiple times, and fueled Citi's growth in both its lending and banking businesses.

### 2.   Citi's Mortgage Portfolio Included Large Volumes Of Subprime And Other Risky Loans

89.   Citi's expansion into subprime lending also expanded its exposure to risk of default.  By the end of 2007, Citi had direct exposure to roughly $24 billion in subprime first mortgages and roughly $63 billion in second mortgages.[3]  These second mortgages posed significant risk because, as a holder of a second lien, the lender is the last to be re-paid.  Thus, as housing prices declined and default rates increased, the risk and magnitude of losses on the second mortgages became more severe than on first liens.

90.   Additionally, Citi's portfolio was highly susceptible to losses from its high LTV (loan-to-value) loans.  By the end of 2007, Citi was exposed to over $50 billion in loans in the highest-risk category (*i.e.*, LTV of 90+%) and another $75 billion in the 80+% category, more than any of its peers.

### 3.   Citigroup's CDOs

91.   Citigroup was heavily involved in the CDO market, and not simply as an investor. In 2006, Citi was the second-largest mortgage CDO underwriter, issuing $34 billion of such securities in a single year.  In 2007, Citi became the world's largest underwriter of mortgage CDOs, issuing $49.3 billion of such securities, eclipsing rivals Merrill Lynch and Deutsche Bank.  Citi thus had unparalleled insight into the true condition of the CDO market during the Relevant Period.  Citi also retained billions of dollars of CDOs on its books (and, as discussed below, off its books).

92.   In addition to underwriting and holding real CDOs, Citi was also the world's third-largest arranger of synthetic mezzanine ABS CDOs from 2004 to 2007.  According to the

---

[3]  Second mortgages are substantially similar to home equity lines of credit, or "HELOCs," and the two terms are sometimes used interchangeably by the press and analysts.  Technically, however, a HELOC is a credit line and operates more like a credit card, where the balance and interest rates can fluctuate.

Wall Street Journal, Citi underwrote more than $14 billion in notional value of these derivative products, more than any other U.S. bank, including Goldman Sachs.   Citi thus had almost unparalleled access to data showing that by the end of 2006, investor sentiment had started to turn sharply against these assets.

93.     As discussed in more detail below, Citigroup also wrote liquidity puts on $25 billion of Commercial Paper CDOs, but did not disclose the massive exposure until Citi had already repurchased the assets (at face value).

94.     Despite Citi's leading position and clear expertise in the CDO market, its true exposure to these assets was completely hidden from investors.   First, Citi's CDOs were created based on an unrealistic model, in terms of assessing the probable losses and assigning the appropriate ratings to correspond to the different degrees of risk among the tranches.   Second, as Citi's CDOs became harder to sell, it simply recycled unsold tranches into new issues, creating increasingly inferior products, with increasingly higher risks, despite the fact that each CDO was comprised primarily of ostensibly AAA-rated tranches.

95.     Citi created its CDOs based on assumptions regarding three key factors: (1) the risk of default of the underlying asset (*i.e.*, each RMBS tranche being included in the CDO); (2) the severity of any likely loss; and (3) the degree of correlation between the underlying assets, *i.e.*, the degree to which the risk of default among the RMBS was related and not independent.

96.     Citi's assumptions regarding these three factors were problematic for several reasons.   Citi's assumptions regarding the risk of default and likely losses were completely unreasonable.   In fact, Citi's model assumed that housing prices would continue to rise by 6% each year in perpetuity.   When prices started to decline, the foundation of Citi's model crumbled, as both the risk of default and severity of default were bound to increase.

97.     Additionally, Citi's assumptions regarding the degree of correlation were unrealistic in any housing market.  Each CDO collected a basket of RMBS, which themselves collected thousands of mortgages.  Thus, each CDO appeared to have massive diversification.  However, the CDOs did not provide the degree of non-correlation necessary to make diversification effective.  Because each RMBS tranche was comprised of subprime mortgages, which grew more similar and more risky between 2004 and 2006, each tranche was actually a basket of *highly correlated* assets.  A BBB-rated RMBS tranche contained mortgages that were somewhat likely to default; a BBB-rated CDO tranche contained tens of thousands of mortgages that shared the *same* likelihood of default.  Further, the diversification provided within each RMBS was actually reversed in the CDO, as explained in a Citigroup quantitative credit strategy and analysis group report for investors.[4]  Thus, losses were likely to spread widely across the CDO and the degree of correlation actually increased with each tranche.  Accordingly, the correlation was higher for the super senior tranches, rendering these super senior tranches quite vulnerable to losses from more junior tranches.  In this sense, these super senior tranches were far riskier than their name and AAA-rating would suggest.

### 4.     Citigroup's SIVs

98.     Citigroup also created highly risky off-balance sheet special purpose entities called SIVs.  SIVs, which were invented by Citigroup in 1988, are essentially investment companies set up as special purpose entities ("SPEs"), which generate investment returns by borrowing money at low interest rates in the short and medium term commercial paper market, and investing that money in long-term fixed income instruments, such as mortgage backed securities and credit card debt, which pay higher interest rates.  In other words, SIVs are set up to

---

[4] *See CDO of ABS sub-prime exposure assessed*, STRUCTURED CREDIT INVESTOR, Mar. 28, 2007.

capture the spread between lower short-term interest rates and higher long-term interest rates, a process that has been described as "yield curve arbitrage."  These SIVs also invest in CDOs and other mortgage-related securities.  All of these instruments rely on the underlying soundness of the long-term securities upon which their value is ultimately based.  Citigroup received significant fees in exchange for managing these SIVs.

99.    SIVs are subject to a number of risks, including the risk associated with their underlying investments.

100.    Furthermore, because SIVs fund their operations by raising short-term debt and then use these funds to purchase long-term assets, there is a classic mismatching of the duration of assets and liabilities, with the result that SIVs are subject to significant "liquidity risk."  In other words, because SIVs constantly re-borrow in the short-term commercial paper market, the SIVs always face the risk that they will not be able to re-borrow if lenders in the commercial paper market withdraw.  In that event, the SIVs would no longer be able to hold their long-term assets and would be required to sell them.  If there were no demand for those assets, the SIVs could be forced to sell those assets at depressed prices.

101.    The ratings agencies, which rated the commercial paper issued by SIVs, explicitly analyzed liquidity risk in rating SIVs.  On March 13, 2002, Standard & Poor's published "Structured Investment Vehicle Criteria," which outlined all the criteria considered by Standard & Poor's in rating an SIV.  Among the criteria, Standard & Poor's cited the SIV's liquidity risk, which was described as follows:

> Liquidity risk in a SIV arises in two scenarios. While most SIVs issue a mixture of CP [commercial paper] and MTNs [medium term notes], their weighted-average liability maturity is usually about four to six months, whereas the assets in the vehicle will have considerably longer average maturities. Secondly, some of

the SIV's assets will require due diligence by potential purchasers,
thereby increasing the sale period for such assets.

102.    Citi was affiliated with seven SIVs, for which it provided management and other services.  Additionally, for reputational reasons, Citi was at all material times committed to providing a liquidity back-stop to its affiliated SIVs in the event they failed.  Because of Citigroup's explicit and implicit commitments to its affiliated SIVs, Citigroup was a "primary beneficiary" of the SIVs and was required to consolidate these entities' financial results on its financial statements and to disclose the carrying amount and classification of the consolidated assets that were collateral for the SIVs' obligations.  In violation of applicable accounting rules, Citigroup did not comply with this requirement.

103.    By failing to consolidate the SIVs on its balance sheet, Citigroup understated the risk to which Citigroup was exposed – valued at $100 billion in the second quarter of 2007 – as a consequence of its ties to the SIVs.  The true extent of that risk did not become apparent to investors until November 19, 2008, when Citigroup disclosed that the SIVs were so impaired that it could not find a buyer.  Citi paid $17.4 billion to wind down the SIVs and bring the assets onto its balance sheet.  Simultaneously, the assets were written down by another $1.1 billion.

### 5.    Citigroup's ARS

104.    Auction rate securities ("ARS") are long-term debt instruments with an interest rate set through what is referred to as an auction process.  ARS are issued by municipalities, student loan entities, corporations or closed-end mutual funds.  These instruments are essentially bonds with interest rates that reset through frequent auctions, typically every seven, fourteen, twenty-eight or thirty-five days, and their maturity is usually 30 years.

105.    The ARS issuer selects one or more broker-dealers to underwrite the offering and/or manage the auction process.  At auction, the broker-dealer managing the process takes

orders from its customers and customers of non-participating broker-dealers.  Customers bid the lowest interest rate (or dividend) they are willing to accept and the auction clears at the lowest rate of those bid that is sufficient to cover all the securities for sale.  That rate then applies to all the securities in that auction until the next auction.  If there are not enough bids to cover the ARS for sale, the auction fails and the issuer pays a maximum rate, which is either a pre-determined flat rate or a rate set by a pre-determined formula.  In such a case, a customer seeking to re-sell her ARS is left holding them.

106.    While this process might frequently leave customers holding illiquid ARS, the firms managing the auctions – including Citi – did not allow this to happen.  Instead, they would smooth out the process by buying excess ARS with their own capital.  Thus, real auctions did not occur.  As a result, the clients who purchased ARS, particularly individual investors, did not see that the market had the potential to freeze.  This lack of transparency became problematic for Citi when the market froze in 2008.

107.    Citi was involved in the ARS market in several ways.  Through Citigroup Global Markets, Citi provided underwriting services for ARS issuers and managed the auction process through which the interest rates were reset and the ARS were resold.  Citi received underwriting fees from the issuers as well as fees for remarketing the ARS.  For ARS that Citi placed with its customers or held in inventory, Citi received higher fees than for other short-term instruments.

108.    Through Citigroup Global Markets and its Smith Barney brokerage division, Citi also marketed these ARS assets to its private brokerage clients, including wealthy individuals, retirement plans, and other institutional investors.  Citi billed the ARS as highly liquid cash equivalents with '"[c]ompetitive short-term interest rates compared with other money market

instruments,'"[5] which could be liquidated on demand at the next auction date.  Citi marketed the

ARS as cash and cash equivalents, similar to money market accounts.  From approximately

August 2006 through April 10, 2008, Citigroup Global Markets stated on its website that

"'[f]rom an investor's perspective, and subject to the conditions discussed in more detail below

[including the risk of a failed auction and liquidity risk], ARS are generally viewed as an

alternative to money market funds.'"[6]  Similarly, until March 2008, Citigroup Global Markets

account statements listed ARS under the heading of '"Money market and auction instruments,"'

and on the Portfolio Review statements generated to provide a snapshot of the customers'

accounts, ARS were listed in either the "cash" or "cash equivalents" asset class.[7]

109.    Given that the ARS were billed as comparable to money market funds, Citi's

customers invested funds in these instruments that might be needed for near-term expenses such

as down payments on real estate, college tuition, medical expenses, or taxes.  Citi did not explain

to these customers that the funds invested in ARS could become illiquid, and could remain so for

long periods of time.

110.    In order to ensure that the auctions did not fail, thereby providing its clients the

promised liquidity, Citi had a practice of submitting cover or support bids for the auctions in

which it was the lead broker.  In other words, by buying the securities itself when there were not

enough buyers at the auctions, Citi guaranteed the liquidity it had promised.  If Citi's cover bid

was "hit," Citi would purchase the amount of ARS necessary to prevent a failed auction and hold

---

[5] *Securities and Exchange Commission v. Citigroup Global Markets, Inc.*, 08-cv-10753 (S.D.N.Y.), Complaint ("SEC Compl.") ¶ 13.

[6] *In re Dealer Registration of Citigroup Global Markets, Inc.*, Tex. St. Sec. Bd., Order No. IC08-CAF-21 (Dec. 9, 2008) ("Tex. Consent Order") ¶ 23.

[7] Tex. Consent Order ¶¶ 24-26.

the ARS in its inventory until it could sell those ARS in the secondary market between auctions. Citi would submit sell orders for any ARS it still held by the time of the next auction.

### D.   INDICATORS THAT MORTGAGE MARKETS WERE DETERIORATING BY 2005

111.   By late 2005, three key indicators used by industry experts to assess the state of the mortgage market pointed in the direction of a slowdown in mortgage markets.   First, as illustrated by the chart below, the Housing Price Index, which measures changes in home prices, peaked in mid-2005 and declined precipitously from late 2005 through 2007:



112.   Second, as housing prices declined, interest rates began to rise from their historically-low levels:



113.    This combination was devastating for borrowers who had over-extended themselves by purchasing homes based on their ability to pay initial lower monthly payments marketed by lenders as part of "payment-option" loan products or other adjustable rate mortgages ("ARMs").   The original theory behind these mortgages was that as long as home values continued to rise, the borrower could use the increased equity to "catch-up" on their payments and refinance the mortgage when the low introductory or adjustable rate was about to expire.

114.    Unfortunately, with rising interest rates, declining home prices and expiring introductory rates, many borrowers began to experience "payment shock" as monthly payments increased to account for recasting of interest rates and resetting of payments to fully-amortizing levels.   As a result, beginning in mid-2005, mortgage default rates, the third indicator of the state of the mortgage market, rose drastically for subprime loans with variable rates, as illustrated in the chart below:



Mortgage delinquency rates, 2001–07

NOTE: The data are monthly. Prime-mortgage data extend through April 2007, and subprime-mortgage data extend through May 2007. Delinquency rate is the percent of loans ninety days or more past due or in foreclosure. Prime mortgages include near-prime mortgages.
SOURCE: First American LoanPerformance.

115.   Citi, which repeatedly touted its conservative approach, its sophisticated risk modeling tools, and its active and diligent risk management, was aware of the spike in loan delinquencies beginning in mid-2005 and witnessed a similar spike in delinquencies in its own mortgage loan portfolio.  These sharp increases in mortgage delinquency rates foreshadowed an increase in defaults by subprime and other ARM borrowers.

E.   **INDICATORS THAT SECONDARY MARKETS FOR MBS AND CDOS WERE DETERIORATING BY JANUARY 2007**

116.   The spike in mortgage delinquencies materially affected the value of RMBS and CDOs, which Citigroup had amassed in its loan portfolio and which were tied to the revenue streams that the underlying subprime mortgages were supposed to generate.  This rise in delinquencies, in conjunction with declining home values and rising interest rates, made it more difficult for subprime and ARM borrowers to refinance their way out of resetting mortgages they could not afford.  This, in turn, exacerbated already-deteriorating market conditions.

117.    By January 2007, if not earlier, Citi knew or should have known that this convergence of factors would materially impair even the highest rated subprime RMBS and thus even the most senior tranches of subprime-related CDOs.  This decline in value was reflected in a specialized index, the ABX.HE ("ABX Index"), which was designed in January 2006 by a consortium of banks, including Citigroup, to track the value of subprime RMBS tranches. Specifically, the ABX Index measures the cost of purchasing protection for a subprime RMBS. If the cost of "insuring" an RMBS increases, that suggests that the market anticipates that the RMBS will suffer future losses in value.   The American Institute of Certified Public Accountants' Center for Audit Quality has affirmed the relationship between the level of the ABX Index and the value of securities backed by subprime mortgages.

118.    The consortium created different ABX indices to correspond to different types of underlying RMBS.  Thus, the ABX.AAA was designed to correspond to the performance of AAA-rated RMBS, whereas the ABX.BBB corresponded to the performance of BBB-rated RMBS.  Additionally, in February 2007, the consortium of banks created an index called the TABX, to track the value of different tranches of Mezzanine CDOs.

119.    In June, 2006, national home prices began to fall.  By the end of November, 2006, the ABX posted it first "credit event" (interest-rate shortfall): borrowers were failing to make interest payments sufficient to pay off certain risky subprime bonds, the bonds typically used to fund CDOs.

120.    As set forth in the chart below, during the first half of 2007 the value of the ABX.BBB Index plummeted, evidence that the cost of insuring subprime RMBS had increased dramatically.  This corresponds to the rise in payment delinquencies reported at the same time.

**Figure 5: ABX.BBB 06-2**

Source: Markit

121.    By February and March 2007, the ABX Index for BBB and BBB- RMBS tranches had suffered substantial declines.  The ABX.BBB 06-2 index, shown above, was down to roughly 80% of par and some BBB- tranches had dropped to approximately 60% of par.  Likewise, CDO prices plummeted at every Mezzanine CDO level, including the "super senior" levels that had been retained by Citigroup during its securitization process.

122.    In addition, by the end of 2005, major Wall Street banks had stopped writing credit default swaps ("CDSs") on subprime RMBS (the types of assets used to fund most subprime CDOs).  For example, according to a book by Michael Lewis, "The Big Short," on November 4, 2005 Deutsche Bank not only stopped writing new CDSs but offered to repurchase swaps it had already written.  Three days later, on November 7, 2005, Veronica Grinstein at Goldman Sachs admitted that "management is concerned" and wanted to buy back some of its CDS exposure.  The same day, Morgan Stanley and Bank of America suddenly stopped writing

CDSs on subprime RMBS.  This sudden reversal among the largest swap underwriters (including Citigroup) coincided exactly with news of massive defaults by adjustable-rate mortgage holders. By the end of 2005 and early 2006, even AIG had stopped writing new swaps on subprime RMBS, although it retained the swaps it had already written.

123.     Within a year, by February 2007, banks had even stopped writing new CDSs on so-called "super-senior" tranches of subprime-related CDOs.

124.     Thus, the escalating risks associated with RMBS and CDOs were well understood by Wall Street insiders by early 2007.  What was unknown to investors was that Citigroup had built up billions of dollars of these securities in its portfolios because it had retained a sizeable share of the CDO tranches that it created, and that the CDOs were funded largely by subprime mortgage bonds that were quickly becoming worthless.

## VI.     DEFENDANTS MISREPRESENTED CITI'S FINANCIAL POSITION AND RESULTS, AND FAILED TO DISCLOSE MATERIAL INFORMATION REGARDING THE RISKS AND LOSSES TO WHICH CITI WAS EXPOSED

125.     The Defendants made numerous untrue statements to investors during the Relevant Period concerning the risks inherent in its loan portfolio and in its holdings of subprime-related assets.  The Defendants did not disclose Citi's full exposure to subprime-related risk, and did not take write-downs in a timely manner that reflected the deteriorating value of those assets.  Thus, throughout the Relevant Period, Citi's earnings and capital position were continually overstated because they did not take into account the degree of loss Citi would incur as a result of declining market conditions.

### A.     DEFENDANTS DID NOT DISCLOSE THE NATURE AND EXTENT OF CITI'S CDO EXPOSURES

126.     Citi issued billions of dollars worth of CDOs from 2004 through 2007.  In 2006, Citi was the second-largest underwriter of CDOs, doing $34 billion in new deals.

127.    Citi's financial statements and SEC filings indicated that its subprime securitized asset exposure (primarily CDOs) was $24 billion at the beginning of 2007, falling to $13 billion at the end of the second quarter, and declining further still during the third quarter.  Citigroup in actual fact retained a much larger volume of subprime securitized assets, primarily CDOs, on its balance sheet.  It was not until November 4, 2007 that Citi revealed an additional $43 billion in CDO-related exposures, and yet another $10.5 billion came to light in January 2008.

### B.    CITIGROUP'S FINANCIAL STATEMENTS DURING THE RELEVANT PERIOD WERE MATERIALLY UNTRUE AND VIOLATED GAAP AND SEC REGULATIONS

128.    Citigroup, in reporting its financial results during the Relevant Period, made untrue statements of material fact and omitted to state material facts necessary to make its reported financial position and results not misleading.  As set forth in detail below, Citigroup published financial statements and information that violated generally accepted accounting principles ("GAAP") and SEC regulations prohibiting false and misleading public disclosures.  These financial statements include the audited year-end financial statements included in Citigroup's 2004 Form 10-K, 2005 Form 10-K, 2006 Form 10-K and 2007 Form 10-K, and the financial information included in the Company's quarterly reports filed with the SEC on Form 10-Q for each of the interim quarterly periods during the years 2004 through 2008 (collectively, the "SEC Filings").  One of more of these sets of financial statements was included or incorporated by reference in the Registration Statement/Prospectus, as updated and amended by the prospectus and/or prospectus supplement for each of the U.S. Offerings, as well as in the offering documents for each of the European Offerings.

129.    GAAP are generally accepted principles recognized by the SEC and the accounting profession as the conventions, rules and procedures necessary to define accounting practice at a particular time.  GAAP is promulgated in part by the American Institute of Certified

Public Accountants ("AICPA") and consists of a hierarchy of authoritative literature established by the AICPA.  The highest level in the hierarchy includes Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Standards ("SFAS"), Financial Accounting Standards Board Interpretations ("FIN"), FASB Statements of Position ("FSP"), Accounting Principles Board Opinions ("APB"), AICPA Accounting Research Bulletins ("ARB"), AICPA Statements of Position ("SOP") and SEC Staff Accounting Bulletins ("SAB"). GAAP provide other authoritative pronouncements, including, among others, Statements of Financial Accounting Concepts ("SFAC"), which are standards that form the conceptual framework for financial accounting and reporting.

130.     Management is responsible for preparing financial statements that conform to GAAP.  As noted by AICPA auditing standards ("AU"), § 110.03:

> Financial statements are management's responsibility…
>
> Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, authorize, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management… Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

131.     As a publicly-traded company, Citigroup was required to maintain books and records in sufficient detail to reflect the transactions of the Company, and to maintain a system of internal controls sufficient to permit preparation of financial statements in accordance with GAAP.  Specifically, under the Exchange Act public companies must:

(i)     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

(ii)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that; (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets.

*See* Section 13(b)(2)(A) and (B).

132.    SEC Regulation S-X states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.   17 C.F.R. § 210.4-01(a)(1).

133.    In addition, Item 303 of SEC Regulation S-K requires, among other things, that the registrant provide information in the Management Discussion and Analysis ("MD&A") section of certain SEC filings that is sufficient to provide the reader with an understanding of what the financial statements show and do not show and to highlight important trends and risks that have shaped the past or are reasonably likely to shape the future.   Item 303 requires a registrant to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   The MD&A rules require that the registrant provide

information, where appropriate, which is not otherwise required under GAAP and/or which cannot otherwise be found in the financial statements.

134.    The SEC requires the issuer to furnish information required by Item 303 of Regulation S-K in the MD&A section of every Form 10-K and 10-Q filing.  The MD&A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosures enabling investors and other users to assess the financial condition and results of operations of the company, with particular emphasis on the company's prospects for the future.  To further explain what must be included by Item 303 in MD&A, the SEC issued an interpretive release as follows:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company. The Item asks management to discuss the dynamics of the business and to analyze the financials.

135.    Thus, the SEC requires management of a public company "to make full and prompt announcements of material facts regarding the company's financial condition."  Timely Disclosure of Material Corporate Developments, Securities Act Release No. 33-5092 (Oct. 15, 1970).  The SEC has emphasized that investors "have legitimate expectations that public companies are making, and will continue to make, prompt disclosure of significant corporate developments."  Report on Investigation In Re Sharon Steel Corp. as it related to prompt corporate disclosure, Exchange Act Release No. 18271 (Nov. 19, 1981).  The SEC also has stated, "[i]t is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an

understanding and evaluation of the individual company." Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 33-6349 (Sept. 28, 1981).

136. In Accounting Series Release 173, the SEC reiterated the duty of management to present a true representation of a company's operations: "[I]t is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations."

137. SAB 101, Revenue Recognition in Financial Statements, reiterates the importance of MD&A in financial statements:

> Management's Discussion & Analysis (MD&A) requires a discussion of liquidity, capital resources, results of operations and other information necessary to an understanding of a registrant's financial condition, changes in financial condition and results of operations. This includes unusual or infrequent transactions, known trends or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue. Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease. The Commission stated in Financial Reporting Release (FRR) 36 that **MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future."** (emphasis added).

138. The Instructions to Paragraph 303(a) of Regulation S-K further state: "The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results."

139.    Item 303 also specifically addresses, *inter alia*, disclosures regarding off-balance-sheet arrangements (including guarantees and variable interests), and requires disclosure of information sufficient to provide a clear understanding of a registrant's off-balance-sheet arrangements and their material effects.  Specifically, Item 303(a)(4)(i) requires a "separately-captioned section" of the MD&A that discusses the registrant's off-balance sheet arrangements that have or are reasonably likely to have a material effect on the registrant's financial condition or results, and states:

> The disclosure shall include the items specified in paragraphs (a)(4)(i)(A), (B), (C) and (D) of this Item to the extent necessary to an understanding of such arrangements and effect and shall also include such other information that the registrant believes is necessary for such an understanding.
>
> A.    The nature and business purpose to the registrant of such off-balance sheet arrangements;
>
> B.    The importance to the registrant of such off-balance-sheet arrangements in respect of its liquidity, capital resources, market risk support, credit risk support or other benefits;
>
> C.    The amounts of revenues, expenses and cash flows of the registrant arising from such arrangements; the nature and amounts of any interests retained, securities issued and other indebtedness incurred by the registrant in connection with such arrangements; and ***the nature and amounts of any other obligations or liabilities (including contingent obligations or liabilities) of the registrant arising from such arrangements that are or are reasonably likely to become material and the triggering events or circumstances that could cause them to arise; and***
>
> D.    Any known event, demand, commitment, trend or uncertainty that will result in or is reasonably likely to result in the termination, or material reduction in availability to the registrant, of its off-balance-sheet arrangements that provide material benefits to it, and the course of action that the registrant has taken or proposes to take in response to any such circumstances.

140.    Moreover, a Final Rule promulgated by the SEC entitled "Disclosure in Management's Discussion and Analysis About Off-Balance-Sheet Arrangements and Aggregate

Contractual Obligations," Securities Act Release No. 33-8182 (Jan. 28, 2003) amends Item 303

of Regulation S-K to clarify the MD&A disclosure requirement relating to off-balance-sheet

arrangements.  This amendment reaffirms the definition of "off-balance-sheet arrangements" in

Item 303(a)(4)(ii) to include guarantees, such as the guarantee arrangements that Citi had with its

SIVs.  Section III of the Final Rule prescribes the disclosure threshold for such off-balance sheet

arrangements at subsection B, as follows:

> The amendments require disclosure of off-balance-sheet arrangements that either have, or are reasonably likely to have, a current or future effect on the registrant's financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that is material to investors.  That disclosure threshold is consistent with the existing disclosure threshold under which information that could have a material effect on financial condition [Item 303 of Regulation S-K], changes in financial condition or results of operations must be included in MD&A.

141.   The Final Rule goes on to state:

> If management concludes that the known trend, demand, commitment, event or uncertainty is not reasonably likely to occur, then no disclosure is required in MD&A.  If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources is not reasonably likely to occur.

142.   Citigroup's financial statements during the Relevant Period violated GAAP in

material respects and/or omitted material information required by SEC regulations to be

disclosed by, among other things:

> (i)   Understating loan loss reserves;

(ii)    Failing to disclose a concentration of credit risk from CDOs with direct subprime exposure;

(iii)   Failing to consolidate Citi's SIVs on its balance sheet;

(iv)    Failing to consolidate Citi's Commercial Paper CDOs on its balance sheet;

(v)     Overstating the fair value of Citi's CDOs with direct subprime exposure;

(vi)    Overstating the fair value of Citi's total assets;

(vii)   Failing to disclose retained Auction Rate Securities on Citi's books, and Citi's potential exposures to additional ARSs; and

(viii)  Overstating the adequacy of Citi's capital.

**1.      Citigroup Reported Materially Understated Loan Loss Reserves In Violation Of GAAP**

143.    A bank sets aside loan loss reserves to provide a current reserve against credit losses.  Under GAAP, Citi is required to establish loan loss reserves at a level sufficient to cover probable losses from its lending activities, including its mortgage portfolio.  The level of reserves is an important data point for investors.

144.    Under SFAS No. 5, ACCOUNTING FOR CONTINGENCIES, Citigroup is required to set a reserve when (a) "it is *probable* that an asset had been impaired . . . at the date of the financial statements," and (b) "the amount of the loss can be reasonably estimated."  (emphasis added).  Even if losses on mortgage exposures are only "reasonably possible," SFAS No. 5 requires detailed disclosures, including estimates of losses.  Thus, GAAP required the Company to establish loss reserves that reflected the amount of loans that already had defaulted and been charged off, as well as the additional amount of loans that were likely to default but had not yet done so.

145.    Although SFAS No. 5 indicates that losses should be recognized once the events causing the losses are probable and can be reasonably estimated, the American Institute of Certified Public Accountants' (AICPA) Audit and Accounting Guide for Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies and Mortgage Companies (the "AICPA Guide"), notes that there is an important caveat to that rule: "if a faulty credit granting decision has been made or loan credit review procedures are inadequate or overly aggressive . . . the loss should be recognized at the date of loan origination."

146.    Additionally, SFAS No. 114, ACCOUNTING BY CREDITORS FOR IMPAIRMENT OF A LOAN, defines "impairment" for individual loans as "impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement."  This principle is also instructive in determining, in accordance with GAAP, when a group of pooled loans is impaired.

147.    These GAAP provisions support the "Expanded Guidance for Subprime Lending Programs" issued by federal bank regulators (the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, and the National Credit Union Administration) in 2001:

> The [allowance] required for subprime loans should be sufficient to absorb at least all estimated credit losses on outstanding balances over the current operating cycle, typically 12 months. The board of directors and management are expected to ensure that the institution's process for determining an adequate level for the [allowance] is based on a comprehensive and adequately documented analysis of all significant factors.  The consideration of factors should include historical loss experience, ratio analysis, peer group analysis, and other quantitative analysis, as a basis for the reasonableness of the [allowance].  To the extent that the historical net charge-off rate is used to estimate expected credit losses, *it should be adjusted for changes in trends, conditions, and other relevant factors*, including business volume, underwriting, risk selection, account management practices, and

current economic or business conditions that may alter such experience.  The allowance should represent a prudent, conservative estimate of losses that allows a reasonable margin for imprecision.  (emphasis added).

148.   The SEC also provides direct guidance on the proper accounting for loan losses. SEC Staff Accounting Bulletin No. 102, *Selected Loan Loss Allowance Methodology and Documentation Issues*, ("SAB 102"), issued in July 2001, states: "It is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process."  Thus, pursuant to SAB 102, a loan loss allowance methodology should "[c]onsider all known relevant internal and external factors that may affect loan collectability . . . [and] [b]e based on current and reliable data[.]"

149.   In sum, GAAP required Citigroup to consider the specific composition of its mortgage portfolio and the developing trends among borrowers with similar profiles and/or loans with similar characteristics when determining the proper level of loan loss reserves, and to include in those reserves not only loans that had already defaulted, but also those that were likely to go into default.

150.   In violation of these accounting rules, Citigroup reported loan loss reserves reflecting certain loans that had already gone into default, but excluding the increasing number of loans as to which a future default was probable and capable of reasonable estimation.  Indeed, in light of the Company's massive increase in high-risk loans, coupled with the downturn of the housing market in mid-2005, GAAP required Citigroup to increase its reserves substantially throughout 2006 and 2007.  Yet, Citigroup reduced its reserves as a percentage of its total loan balances through 2006 and 2007, as reflected in the chart below.

**Citigroup Loss Reserves and Loans: 2002-2008[8]**

| Period Ending | Reserve (millions) | Reserve Increase (Decrease) | Total Loans (millions) | Reserves as % of Total Loans |
|---|---|---|---|---|
| 12-31-2002 | $11,101 | -- | $447,805 | 2.48% |
| 12-31-2003 | $12,643 | $1,542 | $478,006 | 2.64% |
| 12-31-2004 | $11,269 | ($1,374) | $548,829 | 2.05% |
| 12-31-2005 | $ 9,782 | ($1,487) | $583,503 | 1.68% |
| 3-31-2006 | $ 9,505 | ($   277) | $605,307 | 1.57% |
| 6-30-2006 | $ 9,144 | ($   361) | $637,085 | 1.44% |
| 9-30-2006 | $ 8,979 | ($   165) | $655,832 | 1.37% |
| 12-31-2006 | $ 8,940 | ($    39) | $679,192 | 1.32% |
| 3-31-2007 | $ 9,510 | $ 570 | $693,344 | 1.37% |
| 6-30-2007 | $10,381 | $ 871 | $742,924 | 1.40% |
| 9-30-2007 | $12,728 | $2,347 | $773,969 | 1.64% |
| 12-31-2007 | $16,117 | $3,389 | $777,993 | 2.07% |
| 3-31-2008 | $18,257 | $2,140 | $789,843 | 2.31% |
| 6-30-2008 | $20,777 | $2,520 | $746,790 | 2.78% |
| 9-30-2008 | $24,005 | $3,228 | $716,955 | 3.35% |
| 12-31-2008 | $29,616 | $5,611 | $694,216 | 4.27% |

151. Whereas Citi had generally maintained a ratio of losses to total loans at or above 2%, the ratio had fallen below that level for the entire year 2006 and for the first three quarters of 2007. At the end of 2006, the Company maintained a reserve of only 1.32% of its total net loan balance – just half of the 2.64% it maintained in 2003, when the Company's loans were much less risky, and before the housing market began its decline. Further, throughout 2006, Citi was reducing the *dollar amount* of its reserves as it increased the volume of loans, thus pushing the reserve ratio down even further.

152. The reserves reached a low of $8.94 billion in the fourth quarter of 2006 and only increased marginally – to $9.51 billion – by the end of the first quarter of 2007, well after the downturn in the housing market (and associated increase in defaults) had become apparent. At a

---

[8] Figures from Citigroup Form 10-Ks for 2002, 2003, 2004, 2005, 2006, 2007, and 2008; Form 10-Qs for quarters ending Mar. 31, 2006, June 30, 2006; Sept. 30, 2006; Mar. 31, 2007; June 30, 2007; Sept. 30, 2007; Mar. 31, 2008; June 30, 2008; and Sept. 30, 2008.

minimum, Citi was required to keep its reserve ratio above the 2% level, which had been the norm before the Company significantly increased its portfolio of nonprime loans in 2005 and afterwards.  However, the reserve ratio should have been set much higher than 2% as the conditions in the market worsened.  Given that housing prices started to decline in mid-2005 and interest rates began to rise at roughly the same time, by no later than mid-2006, Defendants should have known that Citi's low reserves were inadequate, particularly in light of the large volume of adjustable-rate mortgages that were set to adjust in 2006 and 2007, triggering an increase in the default rate.  As the default rates increased, Citi was required to *increase* the reserve ratio above the historic averages.

153.    While Citi belatedly boosted its reserves in the third and fourth quarters of 2007, these increases were still insufficient under GAAP and Citi's loan loss reserves remained substantially understated in the fourth quarter of 2007 and in most of 2008.  By the end of 2007, the housing market had collapsed, yet Citi's 2007 Form 10-K reported that the Company's loan loss reserves were $16.117 billion as of December 31, 2007, a mere 2.07% of its total loans.  These reserves failed to account for the substantial probable losses Citi faced at year-end 2007.

154.    In an April 18, 2008 Form 8-K, Citi reported credit costs of $6.0 billion for the first quarter of 2008, comprised primarily of $3.8 billion in net credit losses and a $1.9 billion net charge to increase loan loss reserves.  It also reported total assets of approximately $2.2 trillion and a net loss of $5.1 billion, or $1.02 per share.  While the loan loss reserves were increased, the adjustment failed to keep pace with the deterioration of the market and the associated anticipated losses, meaning that Citi's losses were still understated and the value of its assets was still overstated.  Had the Company taken the appropriate charge to increase its loan loss reserves to the level necessitated by the risks in its loan portfolio, as required by GAAP, its earnings would

have declined (because an increase in reserves is a charge against income), leading to an even greater net loss for the first quarter of 2008.  At the end of that quarter, the loan loss reserve percentage was 2.31%.

155.    Even at the end of the second quarter of 2008, the Company's reserves stood at 2.78%, only slightly higher than the rate of 2.64% in 2003, in a superior credit environment. This ratio would increase to 4.27% by the end of 2008, when Citi acknowledged the full extent of its exposure.

156.    By failing to increase its loan loss reserves to appropriate levels or disclose the inadequacy of those reserves, Citigroup gave the impression to investors and the public that its exposure to loan defaults was substantially less than it truly was.

157.    Additionally, because Citi understated its loan loss reserves, the Company also materially overstated the value of its assets.  Had the Company taken the appropriate charge to increase its loan loss reserves to the level necessitated by the risks in its loan portfolio in the relevant periods, as required by GAAP, its earnings would have declined, leading to lower revenue for the reporting periods in 2006 and the first three quarters of 2007, and even greater net losses for the fourth quarter of 2007 and all of 2008.

158.    Citi materially understated its loan loss reserves and overstated its earnings in its Form 10-Q filings for the periods ending March 31, 2006, June 30, 2006, September 30, 2006, March 31, 2007, June 30, 2007, September 30, 2007, March 31, 2008, June 30, 2008 and September 30, 2008, and in its 2006 Form 10-K and 2007 Form 10-K, in violation of SFAS No. 5.

### 2. Citigroup Failed To Disclose Massive Concentrations Of Credit Risk From Subprime-Related Assets In Violation Of GAAP

159. Citigroup failed to disclose that it had a concentration of credit risk from CDOs, warehoused loans, and financing transactions with direct subprime exposure in its annual and quarterly financial statements for 2004, 2005, 2006, and 2007 and in its quarterly financial statements for the periods ending March 31, 2008 June 30, 2008, and September 30, 2008, in violation of GAAP.

160. DISCLOSURES ABOUT FAIR VALUE OF FINANCIAL INSTRUMENTS, SFAS No. 107 ¶ 15A (as amended by SFAS No. 133), required Citigroup to disclose "all significant concentrations of credit risk from all financial instruments, whether from an individual counterparty or groups of counterparties." Thus, Citigroup was required to disclose all significant concentrations of credit risk from CDOs, loans, and financing transactions with direct subprime exposure.

161. SFAS No. 107 ¶ 15A (as amended by SFAS No. 133) states that, "Group concentrations of credit risk exist if a number of counterparties are engaged in similar activities and have similar economic characteristics that would cause their ability to meet contractual obligations to be similarly affected by changes in economic or other conditions." It further requires that the following be disclosed about each significant concentration:

(i)     Information about the (shared) activity, region, or economic characteristic that identifies the concentration;

(ii)    The maximum amount of loss due to credit risk that, based on the gross fair value of the financial instrument, the entity would incur if parties to the financial instruments that make up the concentration failed completely to perform according to the terms of the contracts and the collateral or

other security, if any, for the amount due proved to be of no value to the entity;

(iii)   The entity's policy of requiring collateral or other security to support financial instruments subject to credit risk, information about the entity's access to that collateral or other security, and the nature and a brief description of the collateral or other security supporting those financial instruments; and

(iv)   The entity's policy of entering into master netting arrangements for which the entity is a party, and a brief description of the terms of those arrangements for which the entity is a party, and a brief description of the terms of those arrangements, including the extent to which they would reduce the entity's maximum amount of loss due to credit risk.

162.   TERMS OF LOAN PRODUCTS THAT MAY GIVE RISE TO A CONCENTRATION OF CREDIT RISK, FASB Staff Position No. 94-6-1 ¶ 7, states that, "The terms of certain loan products may increase a reporting entity's exposure to credit risk and thereby may result in a concentration of credit risk as that term is used in FAS No. 107, either as an individual product type or as a group of products with similar features."  FASB Staff Position No. 94-6-1 ¶¶ 2-6 gives examples of loan terms that may increase credit risk such as negative amortization, high loan-to-value ratio, option ARMs, interest-only loans, and other loan terms that fall under the general category of subprime.  Similarly, FASB Staff Position No. 94-6-1 ¶ 7 provides the following examples of shared characteristics which may give rise to significant concentrations of credit risk:  borrowers subject to significant payment increases, loans with terms that permit negative amortization, and loans with high LTV ratios.

163.    Citigroup's CDOs with direct subprime exposure had been issued as far back as 2003.  The majority remained undisclosed, with some kept off-balance-sheet, until November 4, 2007, when Citigroup shocked the market by disclosing that it had approximately $55 billion of direct subprime exposures, consisting of $43 billion of CDO exposures that were being disclosed for the first time, and $11.7 billion in lending and structuring exposure.[9]  The $11.7 billion in lending and structuring exposure had grown from the $11.4 billion disclosed on October 15.  The $43 billion of CDO exposures disclosed on November 4, 2007 included $25 billion of Commercial Paper CDOs that Citigroup failed to consolidate on its balance sheet, $10 billion of High Grade CDOs, $8 billion of Mezzanine CDOs, and $0.2 billion of CDOs-squared, which are CDOs collateralized by other CDOs.

164.    Prior to November 4, 2007, Citigroup's financial statements violated GAAP by failing to disclose that its CDOs, loans, and financing transactions with direct subprime exposure gave rise to a concentration of credit risk.  Citigroup was required by FAS 107 and FSP SOP 94-6-1 to disclose this concentration of credit risk because these financial instruments were primarily backed by subprime RMBS collateral.  The underlying loans had terms such as negative amortization, high LTV ratio, option ARMs, and interest-only, which increased Citigroup's exposure to credit risk.  The counterparties to these loans (*i.e.*, the subprime borrowers) had similar economic characteristics, such as being subject to significant payment increases, negative amortization and high LTV ratios.  In light of these similar economic

---

[9]   Citigroup later provided detail in its 2007 Form 10-K.  Citigroup's total gross exposure to CDOs was $65.1 billion.  The super senior exposure consisted of $24.9 billion in commercial paper CDOs, $9.5 billion in high grade CDOs, $8.3 billion in mezzanine CDOs, and $0.2 billion in CDO-squared, totaling $42.9 billion, which previously had been rounded off to $43 billion.  In addition to the $42.9 of super senior exposure and the $11.7 billion of lending and structuring exposure, for the first time Citi disclosed an additional $10.5 billion of exposure via hedged CDOs.

characteristics, the changes in economic conditions would similarly impact these borrowers' ability to meet the terms of these loans.

165.    The November 4, 2007 disclosure, as shocking as it was, still did not disclose the full extent of the Company's exposure to subprime mortgage-related credit risk.  The exposures that were disclosed on November 4 excluded $10.5 billion worth of super-senior CDO tranches that the Company had purportedly hedged by swapping the risk to certain insurers, even though Citigroup still had indirect exposure to losses on those CDOs.  Accordingly, the Company continued to violate GAAP by failing to disclose the "maximum amount of loss due to credit risk that, based on the gross fair value of the financial instrument, the entity would incur if parties to the financial instruments that make up the concentration failed completely to perform according to the terms of the contracts and the collateral or other security, if any, for the amount due proved to be of no value to the entity," as required by SFAS No. 107 ¶ 15A.

166.    Citigroup failed to disclose completely the above concentration of credit risk from CDOs, loans and financing transactions with direct subprime exposure in its Form 10-Q and Form 10-K filings for 2004, 2005, 2006, and 2007 and in its quarterly financial statements for the periods ending March 31, 2008 June 30, 2008, and September 30, 2008, as required by FAS 107 and FSP SOP 94-6-1, violated GAAP.

### 3.    Citigroup Failed To Consolidate Its SIVs On Its Balance Sheet In Violation Of GAAP

167.    Citigroup failed to consolidate its SIVs on its balance sheet in its Form 10-Q and Form 10-K filings for 2004, 2005, and 2006 and Form 10-Q filings for the periods ending March 31, 2007, June 30, 2007, and September 30, 2007, as required by GAAP.

168.    Citigroup created and maintained a number of SIVs during the Relevant Period. As of June 30, 2008, Citi was affiliated with seven SIVs: (1) Beta Finance Corp.; (2) Centauri

Corp.; (3) Dorada Corp.; (4) Five Finance Corp.; (5) Sedna Finance Corp.; (6) Vetra Finance Corp and (7) Zela Finance Corp. At that time, these SIVs ranged in size from about $300 million for Vetra Finance Corp. to $10.7 billion for Beta Finance Corp. At their peak, Citi's seven SIVs collectively owned $100 billion in assets, representing 25% of the total assets held by all SIVs globally.[10] By the end of 2008, these same seven SIVs held only $17.4 billion of assets.

169.    Citigroup's SIVs are Variable Interest Entities (VIEs) subject to the consolidation rules set forth in FIN 46(R), which Citi adopted as of January 1, 2004. FIN 46(R) recognizes that reporting companies may have "variable interests" in off-balance sheet entities, the combination of which may result in the reporting company bearing the majority of such an entity's risks and rewards. "Variable interests" refer to the economic and contractual arrangements that give an enterprise the associated "rights" to gains and losses of an entity's operations. Accordingly, FIN 46(R) requires that a reporting company consolidate the "Variable Interest Entity" or "VIE" if the company's variable interests in that VIE entity result in the company absorbing more than half of the VIE's expected losses and/or receiving more than half of the VIE's expected residual returns. Under these circumstances, the company is deemed the "primary beneficiary" of the VIE.

170.    As explained in a 2007 Bloomberg article titled "Citigroup SIV Accounting Looks Tough to Defend," FASB Chairman Robert Hertz said "FIN 46(R) requires a company and the auditors to understand all the arrangements in the structures, both explicit and implicit, and also understand the design and intent behind those structures.… And if there's a party at risk for a majority of the expected losses, then that party has to consolidate."[11]

---

[10]   David Reilly, Carrick Mollenkamp & Robin Sidel, *Conduit Risks Are Hovering Over Citigroup*, WALL ST. J., Sept. 5, 2007, at C1.

[11]   Jonathan Weil, *Citigroup SIV Accounting Looks Tough To Defend*, BLOOMBERG, Oct. 24, 2007 (internal quotes omitted).

171.    FASB member Tom Linsmeier has further explained that companies also must periodically reconsider if a VIE's "primary beneficiary" has changed.  Thus, implicit guarantees "must be taken into consideration both at the inception of the VIE and at specific reconsideration events – like the rollover of commercial paper in an SIV."[12]  Specifically, Linsmeier explained that "[i]f a bank sponsor in deteriorating credit markets feels it is necessary in order to protect its reputation to provide an implicit guarantee of additional support to a VIE, and that additional support would make it the party that is expected to absorb the majority of losses, then the bank sponsor should be consolidating the VIE."[13]

172.    IMPLICIT VARIABLE INTEREST UNDER FASB INTERPRETATION NO. 46, FASB Staff Position No. FIN 46(R)-5 (revised December 2003) ¶ 3, states that one example of an implicit variable interest is "an implicit agreement to replace impaired assets held by a variable interest entity that protects holders of other interests in the entity from suffering losses."  FASB Staff Position No. FIN 46(R)-5 also states that the determination as to whether a Company is effectively guaranteeing all or a portion of an investment or would be expected to make funds available and, therefore, an implicit variable interest exists, should take into consideration all the relevant facts and circumstances.  Those facts and circumstances include whether there is an economic incentive for the Company to act as a guarantor or to make funds available.

173.    Depending on whether an entity is considered the "primary beneficiary" of a VIE, CONSOLIDATION OF VARIABLE INTEREST ENTITIES, FASB Interpretation No. 46 provides for various disclosures.  Once a company is deemed to be the "primary beneficiary" of a VIE and is required to consolidate the VIE, the company is required to disclose, among other things, "the nature, purpose, size, and activities of the variable interest entity" and the "carrying amount and

---

[12] *Id.* (internal quotes omitted).

[13] *Id.*

classification of consolidated assets that are collateral for the variable interest entity's obligations."  Even where the company is not considered the "primary beneficiary," FASB Interpretation No. 46 provides that an enterprise that holds a "significant variable interest" in a VIE must disclose the "nature of its involvement with the variable interest entity and when that involvement began"; the "nature, purpose, size, and activities of the variable interest entity"; and the "enterprise's maximum exposure to loss as a result of its involvement with the variable interest entity."

174.    Citi maintained significant connections with the seven SIVs.  All seven were managed by a Citi unit called Citibank International PLC, whose responsibilities included evaluation of investment opportunities, valuation of the SIV's portfolio, and arranging funding and hedging on behalf of the SIV.  Citi also provided a liquidity back-stop for the SIVs, which many commentators have described as amounting to a guarantee.

175.    Additionally, Citi was at all material times committed to back-stopping the seven SIVs for reputational reasons.  As a managing director of Moody's Corp.'s SIV-ratings team explained:

> [I]t is clear that a bank sponsor, particularly a large commercial bank, can provide options to the SIV manager that another type of entity cannot.  Banks have reputations to protect, in business and political interests far removed from the world of SIVs, and the blow to a bank's reputation that may be occasioned by a failure of a SIV may be more than the bank can tolerate. … Even where the bank does not invest in the capital [of the SIV], the relationship with capital note investors may be such that it behooves the bank to avoid losses to capital note investors to protect that relationship.[14]

---

[14] *Update on Moody's Perspective on the Ongoing Liquidity Crisis and the Ratings of Debt Programmes in the SIV Sector*, Moody's Special Report, Sept. 5, 2007, at 7.

176.     From the beginning, it was understood that at least implicitly, Citi was committed to backstopping the SIVs and that Citi's reputation stood behind the SIVs. Citigroup even admitted as much. For example, in *The Banker Magazine's* Team of the Month column dated October 1, 2004, Citi's SIV business was featured. Citi had established a new business called SIV Strategies, headed by group managing director Tim Greatorex. When the Sedna SIV was launched in 2004, it was described as a "remarkable leap forward" because other SIV managers in 2004 were finding it "increasingly hard to place the subordinated capital notes." The article noted that prior to the launch of Sedna, "no new SIV has launched since the end of 2002." When asked why Citi was able to launch a new SIV in such an environment, Mr. Greatorex said: "Citigroup's reputation and placing power have enabled it to avoid these problems."

177.     The ratings agencies have consistently stated that Citigroup's reputation standing behind the SIVs was an important factor in assigning high ratings. For example, on September 17, 1998, S&P assigned AAA and A-1+ ratings to Dorada's $20 billion MTN program. S&P clearly stated that Citigroup's sponsorship and stewardship of the SIV was an important factor in this rating. S&P noted approvingly that "Dorada has contracted with Citibank International PLC . . . to serve as its group funding manager and its investment manager," and then added, "Standard & Poor's derives comfort from the presence of Citibank."

178.     Likewise, on March 17, 2006, Moody's assigned high ratings to Dorada in large part because of Citigroup's stewardship of the SIV, just as S&P had done eight years earlier. On the same date, Moody's assigned high ratings to debt issued by sister SIV Centauri, again citing Citigroup's heavy involvement as a positive factor.

179.     Purchasers of the SIVs' MTNs and other securities clearly understood that Citigroup's reputation stood behind these SIVs, and Citigroup's guarantee of liquidity was at

least implicit.  For example, in the offering memorandum for the Zela Note Programme, one could not escape the fact that this SIV was an extension of Citigroup:  The sponsor bank was a subsidiary of Citigroup.  The placement agent for the Notes was a subsidiary of Citigroup.  The issuing agent was a subsidiary of Citigroup.  The calculation agent was a subsidiary of Citigroup.  The investment manager was a subsidiary of Citigroup.  And most importantly, the group funding manager was a subsidiary of Citigroup.  The offering documents touted Citi's expertise to investors: "Citibank has extensive experience in the management of investments of the type in which the Issuer proposes to invest."

180.    In addition, although Citi was not obligated to purchase MTNs under the contracts incorporated by reference in the offering memoranda, Citi's role as funding manager did require that it manage the credit and liquidity risks associated with the investment portfolio, and it was clearly understood by MTN investors that Citigroup would be a liquidity provider if needed.

181.    For example, S&P's September 17, 1998 rating of Dorada Notes explicitly stated that "Dorada's rating is based on . . . liquidity management."  S&P understood Citi's role as being "responsible for ensuring that Dorada has sufficient liquidity through committed bank lines."  Every other rating announcement for the other SIVs stressed the importance of adequate liquidity facilities and Citigroup's role as group funding manager in securing such liquidity. Investors thus understood that Citigroup would provide liquidity if needed, even if Citigroup now claims that such support was not technically contractually required.

182.    In fact, various offering memoranda for the SIVs had provisions allowing for the removal of Citigroup as investment manager in the event that Citibank's long-term unsecured debt rating were downgraded below BBB- by S&P or below Baa3 by Moody's.  Although investors and ratings agencies often look to an investment manager's SIV management quality

rating (Citigroup had the highest rating, SIV MQ1), Citi's investment management contract with its SIVs was not tied to this metric.  Instead, according to the MTN offering documents, it was tied to Citi's *credit rating*, thus further underscoring that Citi's ability to provide liquidity was as important, if not more important, than its ability to provide quality management services to the SIVs.

183.    Until the day that Citigroup provided full support for the SIVs, it claimed it was not contractually required to do so.  However, this statement was not true.  By October 31, 2007, when Citi was still claiming it had no contractual duties to provide liquidity to the SIVs, Citi in fact had already arranged $10 billion of committed liquidity, of which the SIVs had already drawn down $7.6 billion.  This facility made Citi by far the largest investor in its own SIVs.

184.    Because of all of its extensive financial and reputational interests in the SIVs, Citi was at all material times committed to back-stopping the SIVs in the event they failed, and had an implicit guarantee to provide support to its sponsored SIVs as defined in FIN 46(R)-5.

185.    Because of Citigroup's explicit and implicit commitments to its affiliated SIVs, Citigroup was a "primary beneficiary" of the SIVs and was required to consolidate these entities on its financial statements beginning in 2004, and to disclose the carrying amount and classification of the consolidated assets that were collateral for the SIVs' obligations.  Even if Citigroup was not the "primary beneficiary" of the SIVs, Citigroup held a "significant variable interest" in the SIVs and was therefore required to disclose the nature of its involvement with the SIVs; when that involvement began; the nature, purpose, size, and activities of the SIVs; and Citigroup's maximum exposure to loss as a result of its involvement with the SIVs.

186.    In its Form 10-Q and Form 10-K filings for 2004, 2005, and 2006 and Form 10-Q filings for the periods ending March 31, 2007, June 30, 2007, and September 30, 2007, Citigroup

failed to comply with FIN 46(R).  First, Citigroup did not consolidate the financial results and liabilities of its seven affiliated SIVs as required.  Thus, for example, Citigroup's 2006 Form 10-K represented that the total assets of its consolidated VIEs was only $54.7 billion as of December 31, 2006, which excluded the assets of Citigroup's affiliated SIVs.  Second, even if it were not required to consolidate the SIVs, Citigroup was required to disclose the specific items of information required by FIN 46(R) concerning those SIVs because of Citigroup's "significant variable interest" in the SIVs.  Citigroup failed to include any such information.

187.    Disclosure of the information required by FASB Interpretation No. 46 regarding Citi's relationships with the SIVs would have been material information to investors, because those relationships exposed Citi to significant undisclosed risk.  For example, Citi's SIVs were heavily invested in various mortgage-related securities – including non-U.S. and U.S. RMBS, CDOs, and CMBS (commercial mortgage-backed securities), which together comprised between 22% and 28% of those SIVs' assets.  Thus, Citi's SIVs were subject to the risks that accompanied these securities.  Citi's SIVs were also highly leveraged, creating another risk.  According to detailed filings with the London Stock Exchange on September 6, 2007, Beta Finance was leveraged 14.24 times.

188.    Furthermore, because SIVs fund their operations by raising short-term debt and then use these funds to purchase long-term assets, there is a classic mismatching of the duration of assets and liabilities, with the result that SIVs are subject to significant "liquidity risk."  The ratings agencies, which rated the commercial paper issued by SIVs, explicitly analyzed liquidity risk in rating SIVs.  On March 13, 2002, Standard & Poor's published "Structured Investment Vehicle Criteria," which outlined all the criteria considered by Standard & Poor's in rating an

SIV.  Among the criteria, Standard & Poor's cited the SIV's liquidity risk, which was described as follows:

> Liquidity risk in a SIV arises in two scenarios. While most SIVs issue a mixture of CP [commercial paper] and MTNs [medium term notes], their weighted-average liability maturity is usually about four to six months, whereas the assets in the vehicle will have considerably longer average maturities. Secondly, some of the SIV's assets will require due diligence by potential purchasers, thereby increasing the sale period for such assets.

189.    By not complying with GAAP, Citigroup did not accurately disclose the risk to which Citigroup was exposed – valued at $100 billion in the second quarter of 2007 – as a consequence of its ties to the SIVs.

190.    In a December 13, 2007 press release, which was filed with the SEC as an attachment to a December 14, 2007 Form 8-K, the Company reported that it had "committed to provide a support facility that will resolve uncertainties regarding senior debt repayment currently facing the Citi-advised Structured Investments Vehicles ('SIVs')," and reassured investors that "[g]iven the high credit quality of the SIV assets, Citi's credit exposure under its commitment is substantially limited" and that the Company expected to incur "little or no funding requirement" for the SIVs.  These statements were untrue because the SIV assets were not "high credit quality" assets that subjected the Company to "substantially limited" credit exposure.

191.    As a result of its commitment announced on December 13, 2007, Citigroup included the SIVs' assets and liabilities on its balance sheet for the first time as of December 31, 2007.  In its 2007 Form 10-K, the Company stated that consolidation of the SIVs onto the Company's balance sheet had resulted in an *increase* of Citi's asset base of $59 billion.  This was untrue, as the values of the SIV assets were severely impaired.  On November 19, 2008, Citi disclosed that the SIVs were so impaired that it could not find a buyer.  Citi paid $17.4 billion to

67

wind down the SIVs and bring the assets onto its balance sheet, writing down those assets by another $1.1 billion at the same time.

### 4. Citigroup Failed To Consolidate Its Commercial Paper CDOs In Violation Of GAAP

192. Among the nearly $54 billion in CDO exposures that were not disclosed to investors prior to November 2007 were $25 billion in exposures relating to Commercial Paper CDOs. Beginning in 2003 and continuing until 2006, Citigroup had issued these CDOs with "liquidity put" features that bound the Company to provide liquidity if a CDO's value declined and the CDO could not refinance its maturing debt. In other words, Citi was bound to buy back these instruments precisely when they might be losing value.

193. On November 5, 2007, during the analyst conference call discussing the revised results for the third quarter of 2007, Citigroup disclosed for the first time that in conjunction with structuring a particular issue of Commercial Paper CDOs, Citigroup wrote put options or "liquidity puts" protecting the holders of the put options from any losses the Commercial Paper CDOs would incur. Citigroup's CFO, defendant Crittenden, stated[15]:

> [T]his was essentially a funding mechanism that was used as we structured CDOs up until I believe the end of 2005, so we would sell a structured CDO to a customer. We would provide a liquidity put essentially to that customer . . . [a]nd this was all backed by subprime collateral . . . [W]e decided actually to buy the commercial paper associated with that during the course of the summer and as a result, that came back on our books . . . And so that's what the $25 billion [a portion of the just disclosed $43 billion in CDOs] is made up of.

194. Citigroup disclosed in its 2007 Form 10-K that:

> [i]n certain CDO transactions underwritten by the Company during 2003-2006, the senior funding of the CDOs was in the form of short-term commercial paper. In order to facilitate the issuance of

---

[15] Transcript of Citigroup Special Conf. Call at 5 (Nov. 5, 2007)

> commercial paper by the CDO, the Company wrote a put option ("liquidity puts") to the CDO to benefit the commercial paper investors, which was accounted for as a derivative. The total notional amount of these written liquidity puts was approximately $25 billion.[16]

195.    Citigroup's Commercial Paper CDOs are VIEs subject to the consolidation rules set forth in FIN 46(R), CONSOLIDATION OF VARIABLE INTEREST ENTITIES, FASB Interpretation No. 46, as Citi eventually acknowledged in its 2007 Form 10-K. A Variable Interest Entity is defined by the FASB Interpretation No. 46 to include entities that have previously been referred to as special-purpose entities (SPEs) that are to be evaluated for consolidation under GAAP.

196.    FASB Interpretation No. 46 ¶ 2(a) states that a "variable interest entity refers to an entity subject to consolidation according to the provisions of this Interpretation." FASB Interpretation No. 46 ¶ 14 states that "[a]n enterprise shall consolidate a variable interest entity if that enterprise has a variable interest  . . . that will absorb a majority of the entity's expected losses."

197.    FASB Interpretation No. 46 ¶ B10 states that "written put options … are variable interests if they protect holders of other interests from suffering losses." And, "[t]o the extent the … written put options  . . . will be called on to perform in the event expected losses occur, those arrangements are variable interests ."

198.    Because the "liquidity puts" obligated Citi to protect the CDO investors from losses, they were variable interests that required consolidation of the CDOs on Citi's financial statements pursuant to FIN 46(R). Indeed, as a result of these puts, in the summer of 2007 Citi repurchased $25 billion in the Commercial Paper CDOs – which were backed by subprime

---

[16]  Citigroup, Annual Report (Form 10-K), at 91 (Feb. 22, 2008).

collateral – and added that $25 billion in exposure onto its books.  These repurchases, like the liquidity puts themselves, were not publicly disclosed until November 2007.

199.    Beginning in the fourth quarter of 2007 and continuing through the fourth quarter of 2008, Citigroup took $13.3 billion of total write-downs of its $25 billion in Commercial Paper CDOs, representing a 57% reduction in face value.  These write-downs demonstrate that the Company had been at risk for a majority of the Commercial Paper CDOs' expected losses when it issued the liquidity puts.

200.    Prior to November 2007, Citigroup failed to publicly disclose the liquidity puts, or the fact that they placed it at risk for the majority of the expected losses of the Commercial Paper CDOs.  Citigroup's omission was a violation of GAAP, as was its failure to consolidate the Commercial Paper CDOs' financial results on its annual and quarterly financial statements for 2004, 2005, and 2006 (as reported in its Form 10Q and 10K filings for those periods), and on its quarterly financial statements for the periods ending March 31, 2007 and June 30, 2007 (as reported on its Form 10Q filings for those periods), in violation of GAAP.

###     5.    Citigroup Overstated The Fair Value Of Its Subprime-related CDOs In Violation Of GAAP

201.    Citigroup's CDOs were largely collateralized by subprime RMBS.  Citigroup overstated the fair value of its CDOs with direct subprime exposures in its quarterly financial statements for March 31, 2007, June 30, 2007, September 30, 2007, in its annual financial statements in its 2007 Form 10-K, and in its quarterly financial statements for March 31, 2008, June 30, 2008, and September 30, 2008.

202.    SFAS No. 115, ACCOUNTING FOR CERTAIN INVESTMENTS IN DEBT AND EQUITY SECURITIES, states at ¶ 13 that "unrealized holding gains and losses for trading securities shall be

included in earnings." Thus, Citigroup was required by GAAP to write down the fair value of its CDOs with direct subprime exposure and include the write-downs in its reported earnings.

203.     Citigroup adopted SFAS No. 157, FAIR VALUE MEASUREMENTS, effective January 1, 2007. SFAS No. 157 ¶ 5 defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." SFAS No. 157 ¶ 22 "prioritizes the inputs to valuation techniques used to measure fair value into three broad levels. The fair value hierarchy gives the highest priority to quoted prices (unadjusted) in active markets for identical assets or liabilities (Level 1) and the lowest priority to unobservable inputs (Level 3)." SFAS No. 157 ¶ 28 also defines an intermediate type of observable inputs, Level 2, to include "a) Quoted prices for similar assets or liabilities in active markets; b) Quoted prices for identical or similar assets or liabilities in markets that are not active…; c) Inputs other than quoted prices that are observable for the asset or liability (for example, interest rates and yield curves observable at commonly quoted intervals, volatilities, prepayment speeds, loss severities, credit risks, and default rates); d) Inputs that are derived principally from or corroborated by observable market data by correlation or other means (market-corroborated inputs)."

204.     SFAS No. 157 ¶ 21 makes clear that "[v]aluation techniques used to measure fair value shall maximize the use of observable inputs and minimize the use of unobservable inputs." SFAS No. 157 ¶ 21 explains that:

> inputs refer broadly to the assumptions that market participants would use in pricing the asset or liability, including assumptions about risk, for example, the risk inherent in a particular valuation technique used to measure fair value (such as a pricing model) and/or the risk inherent in the inputs to the valuation technique. Inputs may be observable or unobservable:
>
> a.     Observable inputs are inputs that reflect the assumptions market participants would use in pricing the asset or

71

liability developed based on market data obtained from sources independent of the reporting entity.

b. Unobservable inputs are inputs that reflect the reporting entity's own assumptions about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances.

205. Citigroup's 2007 Form 10-K stated that "the Company accounts for its CDO super senior subprime direct exposure and the underlying securities on a fair-value basis with all changes in fair value recorded in earnings," and that the Company had "refined" its CDO valuation methodology during the fourth quarter of 2007 "to reflect ongoing unfavorable market developments." Citigroup further stated in its 2007 Form 10-K that its CDOs with subprime exposure were not subject to valuation based on observable transactions; were Level 3 assets subject to valuation based on significant unobservable inputs; and were classified in Level 3 of the fair-value hierarchy throughout 2007. Similarly, Citigroup's November 5, 2007 Form 10-Q stated that the super senior tranches of subprime-related CDOs were not subject to valuation based on observable market transactions. The November 5, 2007 Form 10-Q stated that the fair value of these senior exposures was "based on estimates about, among other things, future housing prices to predict estimated cash flows, which are then discounted to a present value."

206. Citi's valuation method for its CDOs was contrary to GAAP, as detailed below.

207. *First*, much of Citi's CDO inventory was comprised of CDOs Citi could not sell. Thus, these assets were unattractive to buyers at face value. Citi either knew or, upon reasonable investigation should have determined, that carrying these CDOs at face value did not reflect the "price that would be received" in a transaction between market participants, as required by FAS 157. In fact, it was not until November 2008 that Citi finally admitted it could not sell $80 billion worth of inventory and would need to reclassify the assets as "held to maturity," the

belated disclosure of which caused Citigroup's share price to drop more than 20%.  Even then, Citigroup waited until January 2009 to finally explain to investors which assets were being reclassified.

208.    **Second**, Citi did not minimize the use of the unobservable Level 3 inputs and maximize the use of observable Level 2 inputs.

209.    Citi utterly failed to use an available observable Level 2 input – the TABX index – when valuing Mezzanine CDOs.  This index was a readily available observable indicator of the fair market value of Citigroup's CDOs with subprime exposure, particularly Citigroup's Mezzanine CDOs.  Pursuant to FAS 157, Citigroup was required to value its Mezzanine CDOs using the Level 2 observable TABX index instead of the unobservable Level 3 inputs it did use. Comparison of Citi's Mezzanine CDOs to the TABX would have led the Company to write down these assets (and reflect these write-downs in its pre-tax income pursuant to FAS 115 ¶ 13).

210.    Citigroup held $8.3 billion of undisclosed Mezzanine CDOs on its books at par value as of March 31, 2007, June 30, 2007, and September 30, 2007.  With the residential real estate market in decline and the related RMBS market also suffering at that time, Citi's CDOs were not properly valued at par.  Indeed, during 2007 the TABX index for Mezzanine CDOs suffered substantial declines to approximately:

    (i)     85% of par as of March 31, 2007, or a 15% drop in value;

    (ii)    69% of par as of June 30, 2007, or a 31% drop in value; and

    (iii)   33% of par as of September 30, 2007, or a 67% drop in value.

211.    Accordingly, Citigroup was required by FAS 157 to write down the fair value of its $8.3 billion of Mezzanine CDOs by approximately:

(i)      15%, or $1.2 billion as of March 31, 2007;

(ii)     31%, or $2.6 billion as of June 30, 2007; and

(iii)    67%, or $5.6 billion as of September 30, 2007.

212.     Thus, as of September 30, 2007, the $8.3 billion in Mezzanine CDOs should have been valued at $2.7 billion, yet still Citi valued them at face value and did not take any write-downs, thereby overstated net income.

213.     In the fourth quarter of 2007, Citigroup belatedly wrote-down the $8.3 billion face value of its Mezzanine CDOs by 63%, or $5.2 billion.  This write-down was still less than what GAAP required based on the TABX declines during the first three quarters of 2007.  Moreover, Citi's fourth quarter results revealed that 52% of Citi's Mezzanine CDOs, with a face value of $9.0 billion, were from 2006 or later – the worst years for subprime CDOs.  And, according to the breakdown provided with the first quarter earnings for 2008, 94% of the mezzanine holdings were rated BBB *or lower.*

214.     Accordingly, Citigroup's failure to write-down the fair value of its Mezzanine CDOs as of March 31, 2007, June 30, 2007, September 30, 2007, and December 31, 2007, as required by SFAS No. 157, and to include the write-downs in pre-tax income, as required by SFAS No. 115, violated GAAP.

215.     The TABX was also relevant as a value indicator for Citigroup's Commercial Paper CDOs, High Grade CDOs, CDOs Squared, and the warehoused and unsold CDOs from its lending and structuring operations.  Eighty percent of Citi's supposed "high grade" CDOs were from the particularly toxic 2006 and 2007 vintages, and 41% were rated BBB or lower.  Even the best assets among the lot – the Commercial Paper CDOs – included a substantial quantity of subprime collateral.  The TABX decline required write-downs of Citi's super senior CDOs as

well.  Citigroup violated GAAP by failing to take such write-downs and by failing to take this Level 2 input into account when valuing these super senior CDOs.

216.    Citi's failure to use the ABX indices (such as the TABX) as valuation inputs for its CDOs in 2007 is completely indefensible, in part because during Citi's January 15, 2008 investor conference call, Defendant Crittenden admitted that the ABX indices were useful in valuing its CDOs.  Analyst Guy Moszkowski pressed him on the change: "you initially said that there was really nothing observable that you could use to mark these, and yet you did at the end say that you did somehow incorporate the ABX indices.  So maybe you can clarify for us a little bit how you did that."  Crittenden admitted that the ABX index was a "useful crosscheck."

217.    In addition, Citigroup's May 2, 2008 Form 10-Q disclosed that the Company had made two "refinements" to its valuation model for CDOs.  One of these two refinements was to use the ABX index as a source of the "discount rate" to apply against Citigroup's valuation model so as to reach a determination of fair value.  That discount rate, Citigroup further added, was one of two "primary drivers" of the ultimate fair value determination.  Citigroup should have been using the ABX index in valuing its CDOs back in 2007 as well, just as every other major investment bank with CDO exposure was doing.  *See, e.g.*, JPMorgan Chase, Annual Report (Form 10-K), at 113 (Feb. 29, 2008); Goldman Sachs Group, Form10-Q, at 66 (Apr. 9, 2008); Merrill Lynch & Co., Annual Report (Form 10-K), at 28 (Feb. 25, 2008); UBS, 2007 Annual Report (Financial Statements) 77 (2007); Morgan Stanley, Annual Report (Form 10-K), at 51 (Jan. 29, 2008).  Even after Citi belatedly started to use the ABX index, Citi's write-downs were grossly inadequate throughout 2008.  For example, although the relevant indices had lost nearly all their value by early 2008, Citi had still only written down its CDO portfolio by just under half by the end of the first quarter of 2008.

218.    Citigroup also failed to use its intimate knowledge of the mortgage product credit default swap (CDS) markets, which were providing clear, unambiguous pricing signals even for securities that were not trading.  Even if most CDOs were not "liquid" within the meaning of FAS 157 Level 1, the CDS market provided sufficient market data for Citigroup to be able to re-price its CDO portfolio on a regular basis as the credit crisis progressed, using Level 2 inputs.

219.    As discussed in more detail below, the United States Senate has convened a commission to study the causes of the financial crisis.  Known as the FCIC (the Financial Crisis Inquiry Commission), the Senate has focused on many issues, but in particular the role of derivatives in the crisis.  Goldman Sachs, in particular was asked to explain how it marked to market various CDOs insured by AIG in the second half of 2007 and first half of 2008.  In addition to live testimony, Goldman provided a written memorandum detailing how it marked its CDOs positions even in the absence of Level 1 inputs.

220.    Starting on July 27, 2007, Goldman made its first CDS collateral call on AIG to reflect the massive devaluation of various CDOs that had already occurred.  The process started back on May 11, 2007, when Craig Broderick at Goldman emailed several other Goldman individuals signaling that they "were in the process of considering making significant downward adjustments to the marks on their mortgage portfolio esp. CDOs and CDO squared" and that "this will potentially have a big P&L impact on us, but also to our clients due to the marks and associated margin calls on repos, derivatives and other products."  Thus, Goldman was aware as early as May, 2007 that they would have to adjust their marks down, and that it would negatively impact their own balance sheet.  It also meant that CDS counterparties, such as AIG, would be required to post collateral at a time when the credit markets were tightening.

221.     When Goldman made its collateral demand in July 2007 (emailing an invoice for $1.8 billion), AIG strongly objected.  But the FCIC investigation has disclosed that AIG was aware of the danger even before being contacted by Goldman.  For example, on July 11, 2007, Andrew Foster at AIG called Alan Frost (also at AIG) to warn about the falling CDO values, and "the problem that we're going to face is that we're going to have just enormous downgrades on the stuff we got" and AIG "will have to mark" its books and "we're . . . f***ed basically."

222.     Soon after Goldman's collateral call, AIG gave in and accepted lower marks.  Collateral calls then followed from SocGen on November 1, 2007, and another $2.8 billion call from Goldman on November 2, 2007.  By the end of November, AIG was facing calls from Goldman, SocGen, Merrill, Bank of Montreal, Calyon, and UBS, and AIG was forecasting a $5 billion impact.

223.     A CDS holder like Goldman typically has the right to demand collateral from its counterparty if the insured assets fall in value by a certain amount.  Therefore, a collateral call can only be made if the holder first determines the asset's mark.  The CDS counterparty can only comply with the collateral demand (in whole or in part) if it determines that the reduced mark is accurate.  These collateral calls at AIG, plus similar demands being made of other CDS counterparties throughout the world, established more than sufficient data for Citigroup to be able to value its CDO portfolio using Level 2 inputs.  Yet despite this market data, and despite being the world's largest CDO originator, Citigroup did not adjust its marks properly (or in some cases, at all).

224.     In a 9-page memorandum prepared for the FCIC, Goldman defended its CDO valuations.  In the memo, Goldman told the Senate that it was an active market maker in cash and credit default swap mortgage products.  "This market activity provided a strong foundation

for our marks," said Goldman.  In a similar way, Citigroup's market presence as the world's largest issuer of CDOs would provide a "strong foundation" and market insight into the true value of CDOs, even absent Level 1 market data.

225.    Also in Goldman's memo to the FCIC, Goldman admitted that during 2007 and 2008, "it was not unusual for there to be an absence of transactions in RMBS, CDO securities and derivatives."  Nevertheless, Goldman found useful data that allowed precise valuation of these products, including: transactions in comparable instruments, calculating implied prices based on derivative trades, and valuation of the collateral underlying the CDOs.  When valuing the underlying collateral, Goldman looked to the applicable ABX indices, which "represented the most liquid and observable proxy for the vintage and ratings of the RMBS underlying the AIG CDO positions."  As discussed in detail above, Citigroup utterly failed to mark its CDOs in accordance with the relevant indices corresponding to the collateral held in the various CDOs.

226.    The Goldman memo shows that, using the ABX indices to value the collateral in the CDOs, it was clear that 2007 and 2006 vintage CDOs were experiencing significant prices declines by July 2007, and that some 2005 vintages of subprime RMBSs – the types held in many of Citi's supposedly "high grade" CDOs – were also collapsing in value.  Goldman stated, "the observed transactions clearly substantiated widespread re-pricing of 2005 and earlier vintage CDOs in the market."

227.    Goldman also priced its CDOs based on "increasing delinquencies and clear credit deterioration in underlying subprime RMBSs" in 2007.  On October 17, 2007, Goldman observed a trade on the subordinate ALTS 2005-1A B tranche at 70 cents on the dollar, which "clearly demonstrated that market pricing at the time reflected a significant degree of stress for 2005 vintage high-grade CDOs" in general.  By the end of November, Goldman was even

marking 2004 vintage mezzanine CDOs at 68.  Yet Citigroup failed to adjust its marks even on the riskier 2006 and 2007 vintages.

228.     By the end of 2007, Goldman observed $90 million of the super senior class from TRAIN 3A A1, a 2003 vintage mezzanine CDO, trade at approximately 70 cents on the dollar. Even though this particular bond was not in the AIG portfolio, Goldman noted that "this observation clearly substantiated the fact that even highly seasoned super senior CDO tranches traded at a significant discount to par value at the time."

229.     **Third**, even if some of Citi's CDO portfolio could be said to be Level 3 assets, Citi relied entirely on flawed modeling to value them.  As Citi insiders would later tell the New York Times, the first problem with this model was in placing "blind faith" in the passing grades the rating agencies bestowed upon these complex instruments.  As late as the summer of 2007, Citi was relying on the judgment of the rating agencies that Citi's CDO holdings faced an "extremely low probability of default (less than .01%)," despite the enormous losses that had already occurred throughout the MBS market earlier in the year, and despite the fact that Citi's CDO holdings represented, in many cases, the worst of the worst in terms of likelihood of default.[17]  Moreover, although the CDOs had not been downgraded, hundreds of tranches of BBB-rated RMBS were downgraded in July 2007.  Further, a December 13, 2006 Fitch report issued a negative ratings watch for mezzanine CDOs, and in March 2007, Moody's warned that defaults and downgrades of RMBS would have magnified consequences for CDOs invested in these RMBS.  Moody's warned that the resulting downgrade in CDOs could be as much as ten notches, *e.g.*, from AAA down to BB+ (junk status).

---

[17]  *See* Eric Dash & Julie Creswell, *Citigroup Saw No Red Flags Even As It Made Bolder Bets*, N.Y. Times, Nov. 23, 2008.

230.    Citi's own analysis questioned the validity of the ratings, as indicated in a CDO prospectus dated March 28, 2007, which stated[18]:

> Credit ratings of debt securities represent the rating agencies' opinions regarding their credit quality and are not a guarantee of quality.  Rating agencies attempt to evaluate the safety of principal and interest payments and do not evaluate the risks of fluctuations in market value, therefore, ***they may not fully reflect the true risks of an investment.  Also, rating agencies may fail to make timely changes in credit ratings in response to subsequent events, so that an issuer's current financial condition may be better or worse than a rating indicates.  Consequently, credit ratings of the Collateral Debt Securities will be used only as a preliminary indicator of investment quality.***  (emphasis added)

231.    Citi also modeled its valuation on the discount rates for collateralized loan obligations ("CLOs"), which are securitized packages of corporate loans.  In other words, Citi compared AAA CDOs to AAA CLOs.  However, this method was flawed because defaults on subprime mortgages (and RMBS) were skyrocketing, but not for comparably-rated corporate bonds.[19]  Citi itself recognized the flaw in making such a comparison, specifically noting that "it would not be fair to compare the prices of ABS CDO triple-B bonds to CLO triple-B bonds, even if both transactions are performing admirably."[20]   Nevertheless, Citi used the AAA CLO discount rates, which resulted in smaller write-downs.

232.    Additionally, Citi's model did not account for the possibility – which had become a reality by 2007 – of a national housing downturn or the prospect that millions of borrowers would default on their mortgages.

233.    Additionally, in January 2008 Citi disclosed the existence of an additional $10.5 billion in CDO exposure.  These CDOs had been hedged under financial guarantee contracts

---

[18]   Armitage ABS CDO Prospectus, ¶ 18, Mar. 28, 2007.

[19]   *See* Carrick Mollenkamp & David Reilly, *Why Citi Struggles to Tally Losses – Swelling Write-Downs Show Just How Fallible Pricing Models Can Be*, WALL ST. J., Nov. 5, 2007, at C1.

[20]   Citigroup, *A GENERAL REVIEW OF CDO VALUATION METHODS*, at 7 (Feb. 15, 2006).

with monoline insurers Ambac Financial and MBIA, but when those counterparties suffered their own credit downgrades in late 2007, Citi was forced to make a $1.5 billion adjustment to account for the counterparty risk, which had the same impact as a write-down. Given that these insurers were already distressed in late 2007, Citi was required to take write-downs sooner, and to take a more significant write-down than the $900 million write-down taken in December 2007. Its failure to properly account for this counterparty credit risk related to its CDOs was also a violation of GAAP.

234. In the end, Citi's losses on its CDOs were so severe that they were a prime cause of the Company's near insolvency, which was prevented only through the government bail-out.

**6. Citigroup Overstated The Fair Value Of Its Total Assets In Violation Of GAAP**

235. Citigroup overstated the fair value of its total assets on its financial statements for 2006 and 2007 and on its quarterly financial statements for March 31, 2008, June 30, 2008 and September 30, 2008.

236. Pursuant to SFAS No. 115, ¶ 13 "[u]nrealized holding gains and losses for trading securities shall be included in earnings." Thus, GAAP required Citigroup to write down the fair value of its total assets, as measured in compliance with SFAS No. 157, and to include the write-downs in its earnings.

237. On November 4, 2007, Citigroup disclosed for the first time that it had approximately $55 billion of direct subprime exposures in its Securities and Banking division and that it anticipated taking write-downs in the range of $8 billion to $11 billion.

238. Over the next four quarters, Citigroup took a total of $40.8 billion of write-downs in its Securities and Banking division as follows:

       (i)      $17.2 billion for the fourth quarter of 2007;

(ii)      $12.1 billion for the first quarter of 2008;

(iii)     $7.1 billion for the second quarter of 2008; and

(iv)     $4.4 billion for the third quarter of 2008.

239.    The write-downs were on a variety of Citigroup's assets, including subprime related direct exposures, monoline credit value adjustments, highly leveraged finance commitments, Alt-A mortgages, ARS, commercial real estate, and SIVs.

240.    Citigroup's total assets as reported on its balance sheet were:

(i)      $2.19 trillion as of December 31, 2007;

(ii)      $2.20 trillion as of March 31, 2008;

(iii)     $2.10 trillion as of June 30, 2008; and

(iv)     $2.05 trillion as of September 30, 2008.

241.    Despite the massive write-downs Citigroup had already taken, the fair value of its total assets remained overstated and, therefore, GAAP required further write-downs (with the write-downs included in earnings).  Citigroup was required by SFAS No. 157 and SFAS No. 115 to write down the fair value of its total assets because the Company failed to maximize observable higher Level 2 inputs over the unobservable lower Level 3 inputs that it was using to value its total assets, and failed to implement proper controls to ensure the valuation models used with Level 3 inputs were accurate.

242.    In sum, Citigroup's failure to take adequate write-downs on the fair value of its total assets on its 2007 Form 10-K and on its Form 10-Q filings for the periods ending March 31, 2008, June 30, 2008 and September 30, 2008, as required by SFAS No. 157 and SFAS No. 115, violated GAAP and resulted in material overstatements of the Company's assets for those

periods. The overstatement of its assets also caused Citigroup's earnings and capital to be overstated.

### 7. Citigroup Failed to Disclose Its Exposures to Illiquid Auction Rate Securities

243. As described above, Citi had a practice of submitting cover or support bids for the ARS auctions in which it was the lead broker, whereby Citi would purchase the amount of ARS necessary to prevent a failed auction and hold the ARS in its inventory until it could sell those ARS in the secondary market between auctions.

244. Historically, Citi's support of its ARS auctions had not been a problem for the Company. It set a limit for capital available to purchase the ARS necessary to prevent failed auctions and its average ARS inventory, ranging from approximately $1 to $2 billion, stayed within that limit.

245. However, beginning in the summer of 2007, the ARS market began to deteriorate. Demand for ARS fell sharply, and failed auctions became more frequent. Exacerbating the impact of the overall credit crunch, a FASB decision as to how to book cash equivalents was impacting the ARS market. Whereas corporations previously had booked their ARS as cash equivalents, the FASB decision required reclassification of these assets as short-term instruments. This prompted an exodus from the ARS market by corporate holders, putting additional pressure on Citi to support the auctions itself in order to replace the shrinking corporate demand.

246. Additionally, Citi exacerbated the demand shortfall by increasing the supply through the underwriting of new issues, and taking over ARS from other broker-dealers who were struggling to support auctions in the deteriorating market.[21] By continuing to generate new

---

[21] SEC Compl. ¶ 37.

fees, Citi used its ARS underwriting activities to bolster its otherwise sagging profits.   Indeed, Citi did not stop underwriting new ARS issuances until November 2007.[22]

247.   In August 2007, auctions failed for $6 billion in ARS backed by complex investments such as MBS.   Increasingly, Citi had to purchase the ARS to prevent failed auctions, which stressed Citi's balance sheet.   By August 2007, the dollar amount of Citi's ARS inventory had reached the internal limit it had set.   Thus, Citi had to either raise the limit or stop supporting the auctions.

248.   According to a complaint filed by the SEC against Citi in December 2008, an email dated August 16, 2007 shows that senior Citi managers were concerned about the "current state of the auction rate market, [their] commitment to the auctions, its impact on [their] balance sheet and the effect of [their] actions on [their] clients" and acknowledged that their "actions will have broad-reaching implications to all of [Citi's] constituents, the market, and [its] franchise."[23] In particular, as acknowledged in an email dated August 19, 2007, the ramifications of allowing widespread failed auctions included the risk of lawsuits by Citi customers who had been sold ARS as alternatives to money market funds.[24]

249.   Given these risks, Citigroup decided in August 2007 to increase the balance sheet limit and continue to support the auctions.   It increased this limit several more times throughout the fall of 2007 and the beginning of 2008, in order to accommodate Citi's growing ARS inventory. By February 2008, the inventory (and balance sheet limit) had increased from approximately $4 billion to over $10 billion.[25]

---

[22] *Id.*

[23]  SEC Compl. ¶ 34.

[24]  SEC Compl. ¶ 35.

[25] SEC Compl.  ¶ 36.

250.    Another effect of the decreasing ARS demand was a general increase in the clearing rates issuers paid.  These rate increases generated complaints from issuers, who threatened to take future underwriting business elsewhere.[26]  To protect its issuer clients, Citigroup Global Markets advised some of these issuers to refinance their ARS into other types of financing.[27]

251.    While Citigroup Global Markets began warning issuers to avoid the ARS market, it continued to market ARS to investors.  To increase sales, Citigroup Global Markets increased sales commissions to its own brokers and those from other firms selling Citi-underwritten ARS.[28] Even within the Citigroup organization, however, the Smith Barney financial advisors who were encouraged to sell more ARS did not know that the push to sell certain municipals ARS was designed to help sell off Citi's own increasing inventory.[29]

252.    Despite the fact that Citi's ARS holdings had nearly tripled in the second half of 2007 while the growing illiquidity put Citi at risk of being sued by its clients, Citi did not disclose this risk in its November 5, 2007 Form 10-Q or its 2007 Form 10-K.

253.    In late January 2008 and early February 2008, several auctions for ARS failed for the first time in years.  On February 11, 2008, Citi stopped supporting its student loan ARS, and those auctions failed.  On February 12, Citi stopped supporting ARS with formulaic maximum re-set rates from a variety of issuers, and those auctions all failed.[30]  In total, more than 100 auctions failed, for a total of approximately $6 billion.  Thereafter, Citi allowed the rest of its

---

[26] Tex. Consent Order ¶ 30.

[27] Tex. Consent Order ¶ 32.

[28] Tex. Consent Order ¶ 33; SEC Compl. ¶¶ 40-42, 44-45; *In re Citigroup Auction Rate Secs. Litig.*, 08-cv-03095 (S.D.N.Y.), Third Consolidated Amended Complaint ("ARS Compl.) ¶ 99.

[29] SEC Compl. ¶ 42.

[30] SEC Compl. ¶ 71.

managed auctions to fail.  By February 14, 2008, 87% of the auctions conducted that day in the entire ARS market failed, and by the end of the month, the ARS market in general had seized, leaving investors with illiquid assets and issuers paying high re-set interest rates.

254.   In the immediate aftermath of the ARS market failures, analysts and investors focused on its impact on the issuers and on the investors who held ARS.  Various issuers, such as municipalities, hospitals, and other public entities, were suddenly faced with ballooning interest payments.  By the end of the February 2008, purchasers left holding illiquid ARS filed the first case against another broker-dealer, UBS.  Industry experts surmised that state and/or federal regulators were looking at the issue as well, especially since the SEC had previously investigated ARS broker-dealers in 2004-2006 (including Citi) and had noted its concerns that purchasers were not adequately informed of the risks of illiquidity.

255.   In mid-March 2008, reports surfaced that the SEC was looking at market failures in the municipal bond auction market.  By the end of March, the first class actions were filed against Citi and the Massachusetts securities regulator was investigating Citi's peers.  In mid-April, the Financial Industry Regulatory Authority ("FINRA") indicated it was investigating the ARS market, along with the SEC.

256.   In the meantime, Citi was dealing with its own retained inventory of ARS.  As an initial matter, Citi tried to sell the ARS it had accumulated.  With the market illiquid, however, it could only sell a small portion of its holdings.  By mid-April, it had managed to sell off only $3 billion of its ARS holdings.

257.   Additionally, Citi had to determine whether to write down the remaining ARS assets, and by how much.  As early as January 2008, Bristol-Myers Squibb's decision to take a $275 million impairment charge on its ARS drew attention in the financial press, since that

company had previously categorized those assets as short-term marketable securities.  By mid-February, other corporate ARS holders such as 3M and US Airways had already disclosed significant write-downs on their ARS holdings.

258.    Further, several of Citi's peers had publicly stated that they were writing down the ARS held by their clients.  In early April, UBS and Goldman Sachs indicated they would write down their clients' ARS holdings, using internal models to estimate a price in the absence of an actual market.  UBS also indicated it had marked down its own $11 billion in ARS holdings by $800 million.  Merrill Lynch marked down the values of the ARS in its own account, although it did not mark down its clients' holdings.[31]  In contrast, Citi took no position publicly on whether it was retaining its clients' holdings at face value.

259.    Citi did not disclose the extent of its own ARS holdings until it is issued the April 18, 2008 Form 8-K, announcing for the first time that Citi had an ARS inventory of $8 billion and had held $11 billion of illiquid ARS as of mid-February, of which $1.5 billion were already written down.

260.    Even after this disclosure, Citi continued to understate its exposure in relation to the ARS issues and the impact of its own ARS holdings on its capital adequacy.  It was not until August 2008 that Citi investors learned the extent of damage stemming from Citi's obligations to the clients left holding illiquid ARS.  Pursuant to a settlement with the SEC and New York State Attorney General, Citi agreed to repurchase $7.3 billion of ARS from its disgruntled clients.

261.    Citigroup's misrepresentations and omissions related to its ARS business violated GAAP and its duties under the SEC Regulations to report material information to investors.

---

[31] *See* Susanne Craig, et al., *The Auction-Rate Lockout – Values Tossed Around As Individual Investors Can't Get at Their Cash*, WALL ST. J., Apr. 3, 2008, at C1.

262.    Item 303 of Regulation S-K requires, among other things, that the registrant describe in the MD&A section of its Form 10-Q and 10-K filings "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Thus, the SEC requires management of a public company "to make full and prompt announcements of material facts regarding the company's financial condition."  Securities Act Release No. 33-5092.

263.    Because Citigroup was aware of a known trend in the collapse of its ARS business, and the inability to sell ARS securities on its books, and the investigations by the SEC and the New York Attorney General, these SEC Regulations required Citigroup to disclose its retained ARS and the facts under investigation.  This should have been done no later than the November 5, 2007 Form 10-Q.

264.    Furthermore, pursuant to SFAS No. 115 ¶ 13, "[u]nrealized holding gains and losses for trading securities shall be included in earnings."  Thus, GAAP required Citigroup to report and write down the fair value of its retained ARS and its exposure to the client ARS that it would soon be required to repurchase at face value, as measured in compliance with SFAS No. 157, and to include the write-downs in its earnings.

265.    Finally, Citi failed to record contingent liabilities for the foreseeable claims it was to face from its manipulation of ARS auctions. Citigroup was contingently liable for potential claims made by customers who were left holding illiquid ARS when the market seized, and from issuers whose securities were underwritten by Citigroup Global Markets between August 1, 2007 and February 11, 2008 and who paid fees to Citi to have these ARS refinanced or converted after

the market seized.[32]  In addition to the $7.3 billion Citi paid pursuant to the settlement with the SEC and the New York Attorney General to repurchase illiquid ARS, Citi was also required to compensate investors who sold illiquid ARS below par and its clients with immediate cash-flow demands who took out loans from Citi secured by the illiquid ARS.[33]  Further, Citi was obligated to work with institutional investors to address their liquidity needs and is still defending a private class action brought by ARS investors who were not fully compensated by the prior settlement or who were not eligible to receive compensation, such as investors who purchased Citi-underwritten ARS from other brokerage firms.[34]  The Company also paid $100 million in fines to state regulators.

266.    Under GAAP, specifically SFAS No. 5, a company is required to record contingent liabilities when the occurrence of a possible claim is probable and can be reasonably estimated.  At the time Citigroup artificially supported its ARS market, it was required to record a liability in compliance with GAAP for the amount it overcharged customers.  An estimate of the amount Citigroup overcharged customers should have been recorded by Citi during 2007 and 2008 when it manipulated the ARS auctions.  Because Citigroup was not complying with GAAP, its representations to investors to the contrary were false.

### 8.    Citigroup Overstated Its Capital Adequacy

267.    Capital adequacy is the level of capital a bank must hold to cover its exposure to the risk of its activities on and off balance sheet, and it is one of the primary metrics investors consider when evaluating the financial strength of institutions such as Citigroup.

---

[32] *See In re Citigroup Global Markets Inc.*, Att'y Gen. of N.Y., Bureau of Inv. Prot., Assurance of Discontinuance Pursuant to Executive Law § 63(15) ("AOD") ¶¶ 21-39 (Dec. 11, 2008).

[33] These clients were to be compensated for interest paid on these loans in excess of the interest received on the ARS during the duration of the loan.  AOD ¶ 30.

[34] AOD ¶¶ 37-39; ARS Compl. ¶¶ 16-22.

268.    A bank's Tier 1 capital ratio measures its ability to withstand substantial losses, and therefore provides investors and regulators with important information regarding the Company's overall financial strength.   A bank with a Tier 1 capital ratio of 6% or greater is considered "well capitalized."   Falling below that 6% threshold triggers regulatory scrutiny and raises a red flag to investors.

269.    Each Form 10-K and 10-Q that Citigroup filed during the Relevant Period, and indeed dating back at least as far as 2004, contained a discussion of Citigroup's "Tier 1 capital ratio" and stated that Citigroup's balance sheet was "strong" and "well capitalized" under regulatory guidelines.   In the 2007 Form 10-K, for example, Citigroup stated that it had "maintained its 'well-capitalized' position with a Tier 1 Capital Ratio of 7.12% at December 31, 2007."   In the Company's July 18, 2008 earnings release, Pandit assured investors that the "Tier Capital ratio [had] increased to 8.7%, and in its Form 10-Q for the third quarter of 2008, filed on October 31, 2008, Citi stated that it had "maintained its 'well-capitalized' position with a Tier 1 Capital Ratio of 8.19% at September 30, 2008."

270.    In fact, by no later than the end of the first quarter of 2006, Citigroup's balance sheet was neither strong nor well capitalized.   If appropriate write-downs had been taken on the Company's subprime-related assets, and if the Company's loan loss reserves had been increased as required by GAAP, its reported Tier 1 capital ratio would have been materially less than the 8.59% it reported at the end of 2006, less than 7.12% in 2007, and less than 8.19% at the end of September 2008, and investors would have realized that the Company's capital adequacy was in serious jeopardy.   By failing to take appropriate write-downs, the Company overstated its Tier 1 capital ratio and the overall adequacy of its capital in its Form 10-Q and 10-K filings from at least the first quarter of 2006 through the third quarter of 2008.

271.    As an examiner for the Federal Reserve Bank of New York concluded in an April 2008 annual inspection report that was sent to Defendant Pandit and the Citigroup board of directors regarding calendar year 2007:

> Senior management did not use sufficient discipline in managing balance sheet usage, which led to liquidity and capital management issues.   Even when **clear warning signs** were present that substantial balance sheet growth, due to a rapid pace of acquisition activity, was straining the firm's capital position, limits were not enforced.  . . . Senior management allowed business lines largely unchallenged access to the balance sheet to pursue revenue growth.[35] [emphasis added]

272.    On November 17, 2008, Citi suddenly announced that it would no longer measure the fair value of $80 billion of its assets, including its CDOs.  This announcement led to a dramatic drop in the prices of the Company's Securities, as it revealed that Citi's assets were grossly overvalued and that the Company lacked the capital to absorb the charges to its income that would occur if it properly marked those assets to their fair value.  Less than a week later, the federal government was forced to guarantee $326 billion of Citi's riskiest assets to prevent the Company from collapsing.

273.    In addition, the SEC has now identified Citigroup as one of the worst abusers of a balance sheet "window dressing" ruse called Repo 105, discussed in more detail below.  Repo 105 transactions were used by Citigroup at the end of each quarter for the explicit purpose of managing the balance sheet and ensuring that various metrics, including the Tier 1 capital ratio, appeared stronger than it really was.

---

[35] Fed Report at 6.

### C.    DEFENDANTS PRINCE, PANDIT AND CRITTENDEN SIGNED FALSE SARBANES-OXLEY CERTIFICATIONS

274.    Each of Citi's Form 10-K and Form 10-Q filings during the Relevant Period included certifications under the Sarbanes-Oxley Act (the "Sarbanes-Oxley Certifications") signed by Crittenden, as well as either Prince (for filings before November 5, 2007) or Pandit (for filings since December 2007), certifying that the signatory had reviewed the filing and that it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."  These certifications were untrue because the Company's Form 10-K and 10-Q contained the untrue statements and material omissions described herein.

### D.    ADDITIONAL UNTRUE STATEMENTS AND OMISSIONS

275.    In addition to the untrue statements and omissions in the Company's financial statements, Defendants made a number of untrue statements and omissions in the textual portions of the Company's SEC filings, and in press releases, analyst conference calls, interviews, and other public statements during the Relevant Period.  Among other things, Defendants failed to disclose, or inaccurately represented, Citi's continued significant exposure to subprime, Alt-A and other high-risk loans.

276.    Citigroup filed its Form 10-Q for the first quarter of 2004 (ending March 31, 2004) on May 5, 2004.   In this 10-Q, the Company made the following disclosure[36]:

> Variable Interest Entities
>
>          *        *        *
>
> In addition to the VIEs that are consolidated in accordance with FIN 46-R, **the Company has significant variable interests in certain other VIEs that are not consolidated because the Company is not the primary beneficiary.**  These include multi-

---

[36]  Form 10-Q for the period ending Mar. 31, 2004, at 74-75.

seller finance companies, collateralized debt obligations (CDOs), structured finance transactions, and numerous investment funds.

\*        \*        \*

[T]he total assets of unconsolidated VIEs where the Company has significant involvement is $119.8 billion and $116.6 billion at March 31, 2004 and December 31, 2003, respectively, including **$8.2 billion and $7.9 billion in investment-related transactions,** $3.2 billion and $6.0 billion in mortgage-related-transactions, $10.0 billion and $8.5 billion in CDO-type transactions, $6.3 billion and $0.2 billion in trust preferred securities, and $92.1 billion and $94.0 billion in structured finance and other transactions.

277.    The above-quoted disclosures in Citigroup's Form 10-Q for the first quarter of 2004 were repeated in each of the Company's Form 10-Q and Form 10-K filings through the second quarter of 2007, although beginning in the 2005 Form 10-K, the figures showing assets of unconsolidated VIEs were presented in table format.[37]   All of these disclosures were materially false and misleading because Citigroup was required to consolidate the unconsolidated SIVs from 2004 forward, in light of the Company's implicit obligation to support these entities.   Even if consolidation was not required in each of the referenced reporting periods, Citi's disclosures were nonetheless misleading in omitting to disclose the necessary level of detail regarding the Company's exposure and involvement with the SIVs to allow an independent assessment of the risks posed by the Company's involvement, as required by FIN 46(R).   Indeed, the term "SIV" does not appear at all until the Company's Form 10-Q for the third quarter of 2007, filed on November 5, 2007.

---

[37]  The disclosures in the subsequent filings contained the same text, with figures adjusted accordingly.  *See* Form 10-Q for the period ending June 30, 2004, at 79-80; Form 10-Q for the period ending Sept. 30, 2004, at 84-85; 2004 Form 10-K, at 104-05; Form 10-Q for the period ending Mar. 31, 2005, at 79-80; Form 10-Q for the period ending June 30, 2005, at 83-84; Form 10-Q for the period ending Sept. 30, 2005, at 89-90; 2005 Form 10-K at 132-33; Form 10-Q for the period ending Mar. 31, 2006, at 90; Form 10-Q for the period ending June 30, 2006, at 107-08; Form 10-Q for the period ending Sept. 30, 2006, at 112-13; 2006 Form 10-K, at 147; Form 10-Q for the period ending Mar. 31, 2007, at 101; and Form 10-Q for the period ending June 30, 2007, at 66-67.

278.     In a July 31, 2006 article appearing in American Banker magazine, Bill Beckmann, President and Chief Operating Officer of the Company's CitiMortgage residential mortgage unit, explained that the Company was going to offer subprime loans only to high-quality borrowers who had the ability to repay the loans, and that the Company's various mortgage lending arms would screen for risk:[38]

> Mr. Beckmann called the rollout of interest-only nonprime ARMs "entirely consistent" with the past statements [that Citi would refrain from offering alternative products such as interest-only and no documentation loans, to subprime borrowers]. He said Citi would not offer interest-only loans "deep into the nonprime space" – only down to 620 FICO scores.  And, he stressed, "we're not going to make a loan on an affordability basis.  We're going to make a loan because we believe it's right for a customer because we think they can pay it back."

279.     The above statements, which are attributable to Citigroup by virtue of Beckmann's high-level position at the Company, were materially false and misleading when made, in the following respects:

a.      Although Beckmann discussed Citi's intent to limit lending to situations where the borrower could re-pay the loan, he did not disclose that the Company was decreasing loan originations through its own staff and instead was increasing its reliance on correspondent channels for new loans.  As discussed above, loans originated by these correspondent channels regularly involved borrowers with questionable abilities to pay back their mortgages, thereby bringing Citi well into the "deep" subprime space of borrowers with FICO scores below 620.  In fact, 16% of Citi's mortgage portfolio was comprised of loans in this category by the end of 2007.

---

[38] Jody Shenn, *New CitiMortgage Primed for Nonprime*, AM. BANKER, July 31, 2006.

b.      Citigroup knew that it was already accumulating mortgages that borrowers were having trouble repaying.  At least as early as mid-2006, Citigroup was encountering mounting defaults among its correspondent channel loans, which eventually led Citi to demand repurchases from these lenders.  Also, by mid-2006 Citigroup's warehouse lending division, First Collateral Services, a subsidiary of CitiMortgage, saw an increase in the volume of defective, stale loans it had acquired via warehouse credit lines extended to mortgage brokers, and which were often re-sold to CitiMortgage.

(i)      In a December 2006 Mortgage Banking article, Mr. Beckmann made the following statements:[39]

We are growing at double-digit rates in an industry that is contracting a bit.  And the thing I'm probably the most proud of [is], we're not giving away the shop to grow.  To the contrary:  By the public data we can see, we're outperforming the industry in terms of profits per loan.

280.    This statement, which again is attributable to Citigroup given Mr. Beckman's position with the Company, was materially false and misleading when made for at least three reasons:

a.      Beckmann omitted to disclose that Citi's growth was largely due to its increasing willingness to make or purchase risky loans that other lenders were avoiding.  For example, Citigroup increasingly relied on correspondent channels for loan production, which regularly involving borrowers with questionable abilities to pay back their mortgages.

b.      At least as early as mid-2006, Citigroup was increasingly saddled with defective correspondent channel loans in early payment default, as was its warehouse lending division.

---

[39] Robert Stowe England, *Citi Mortgage On the Move*, MORTGAGE BANKING, Dec. 2006 (emphasis added).

c.      Citigroup was only able to display impressive growth and increasing revenues by failing to timely recognize known and probable impairments to its mortgage portfolio, as demonstrated by the Company's deliberate delay in pursuing litigation arising from defective loans and its failure to take adequate charges to increase its loan loss reserves.

281.    With respect to bulk loan purchases, the December 2006 Mortgage Banking article further stated:

> "There are loans that maybe we wouldn't feel comfortable with [putting] in our portfolio, but the Street is happy with.  So, we'll have one bid for a customer and we'll parse the loans, some to [our] portfolio and some to CGM, which will package it and sell to the Street," says Beckmann.

> *  *  *

> In the past, "a correspondent might show us a pool of $100 million and we'd say, 'We'll take $70 million,'" Beckmann says.  Then, however, "Someone else might be willing to take $90 million," leaving Citigroup at a potential disadvantage in acquiring the bulk purchase.

> "Now, Citi can bid more robustly and not get stuck with the kicks – the loans we didn't want to take, but that someone else might feel happy with," says Beckmann. "So, now we have a combined strength of what we're happy to put in our portfolio at CitiMortgage and what Capital Markets Group is willing to purchase," he says.

282.    These statements were false and misleading because they gave investors the impression that Citigroup was able to pass off bad mortgages through securitizations.  However, as Citigroup would later reveal, it was building up an increasing inventory of stale loans, and was finding itself unable to resell ever-greater numbers of deficient mortgages bought from its correspondent channels.

283.    On January 19, 2007, Citigroup filed a Form 8-K, attaching a press release of the same date that announced earnings for the fourth quarter of 2006 (ending December 31, 2006)

and also included limited financial information for the full year 2006.  The Form 8-K was signed by defendant Gerspach, and quoted CEO Prince as stating that the Company's 2007 priorities included "remaining highly disciplined in credit management."  This statement was false and misleading, because "remaining disciplined" was not possible when the Company had not been disciplined in its credit management to begin with.  Citigroup had engaged in risky subprime lending in order to fuel the growth of its consumer lending portfolio and to generate mortgages that could be packaged into RMBS.  Indeed, that growth in subprime lending was one reason Citi was able to increase its global consumer assets under management in the fourth quarter by 17%, as reported in the Form 8-K.

284.   The January 19, 2007 Form 8-K also reported that the Company faced a "generally stable" consumer credit environment, and the financial data supplement filed as Exhibit 99.2 to the January 2007 Form 8-K reported a $2.1 billion charge for provision of loan losses for the fourth quarter of 2006, resulting in a total allowance for credit losses of $8.94 billion.  The Company also reported income of $5.13 billion for the fourth quarter of 2006, and income of $21.25 billion for the full year 2006.  Citi also reported total assets of $1.883 trillion, which incorporated the $8.940 billion allowance for loan losses, and total liabilities of $1.76 trillion.  These figures are misleading for many of the same reasons as the 2006 Form 10-K.  As detailed above, the credit environment was deteriorating throughout 2006, and Citigroup was required to increase its loan loss reserves by a greater amount to accommodate the changing circumstances.  Citi's credit reserves actually decreased during the fourth quarter of 2006, while net credit losses rose, resulting in a lower loan loss reserve percentage at the end of that quarter.  Thus, Citi's loan loss reserves were understated and its assets were overstated.  Additionally, because Citi was required to take a greater charge to achieve the appropriate reserve level, Citi's

income was overstated.  The figures for total assets and total liabilities were also misleading because the balance sheet failed to include the Commercial Paper CDOs and the assets and liabilities of the SIVs that Citi was required to consolidate.

285.   In its 2006 Form 10-K, which was filed on February 23, 2007, Citigroup stated the following with respect to its "Allowance for Loan Losses"[40]:

> For consumer loans . . . each portfolio of smaller-balance, homogeneous loans – including consumer mortgage, installment, revolving credit, and most other consumer loans – is collectively evaluated for impairment.  **The allowance for credit losses attributed to these loans is established via a process that estimates the probable losses inherent in the portfolio based upon various analyses. These include migration analysis, in which historical delinquency and credit loss experience is applied to the current aging of the portfolio, together with analyses that reflect current trends and conditions**. (emphasis added)

286.   These statements – which were repeated in Citigroup's 2007 Form 10-K – were false and misleading because the Company's impairment analysis ignored recent trends such as downturns in the housing market, and did not legitimately evaluate "probable losses inherent in the portfolio."

287.   The 2006 Form 10-K also assured investors that Citi had sound risk management policies to ensure that the risks of delinquency of its lending portfolios were offset through various means:

> The Company provides a wide range of mortgage and other loan products to its customers. **In addition to providing a source of liquidity and less expensive funding, securitizing these assets also reduces the Company's credit exposure to the borrowers. The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust**. [emphasis added]

---

[40]  Citigroup Annual Report (Form10-K), at 111 (Feb. 23, 2007).

288.    The 2006 Form 10-K also stated that Citi mitigated risk in its mortgage portfolio by selling most of the loans it originates:

> As with all other lending activity, this exposes Citigroup to several risks, including credit, liquidity and interest rate risks. **To manage credit and liquidity risk, Citigroup sells most of the mortgage loans it originates, but retains the servicing.** [emphasis added]

289.    In reality, however, Citigroup remained exposed to substantial subprime-related risk through its interests in CDOs and RMBS, and thus had not mitigated or transferred those risks.

290.    Citigroup materially misrepresented its CDO-related exposure throughout the Relevant Period.   For example, the 2006 Form 10-K included information regarding the Company's CDO-related exposure.  The "Off Balance Sheet Arrangements" section stated:

> OFF-BALANCE SHEET ARRANGEMENTS
>
> \*       \*       \*
>
> Mortgages and Other Assets
>
> The Company provides a wide range of mortgage and other loan products to its customers. **In addition to providing a source of liquidity and less expensive funding, securitizing these assets also reduces the Company's credit exposure to the borrowers. The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust**.
>
> \*       \*       \*
>
> Creation of Other Investment and Financing Products
>
> \*       \*       \*
>
> The Company packages and securitizes assets purchased in the financial markets in order to create new security offerings, including arbitrage collateralized debt obligations (CDOs) and synthetic CDOs for institutional clients and retail customers, which match the clients' investment needs and preferences. Typically

these instruments diversify investors' risk to a pool of assets as compared with investments in individual assets.

*     *     *

See Note 22 to the Consolidated Financial Statements on page 143 for additional information about off-balance sheet arrangements. (emphasis added)

291.    Citigroup's CDO-related disclosures in the "Securitizations and Variable Interest Entities" section of the 2006 Form 10-K (the "Note 22" referred to in the immediately preceding quote) stated:

**Securitizations and Variable Interest Entities**

The Company primarily securitizes credit card receivables and mortgages. Other types of assets securitized include corporate debt securities, auto loans, and student loans.

*     *     *

... **The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchaser of the securities issued by the trust**.

*     *     *

Variable Interest Entities

*     *     *

The following table represents the carrying amounts and classification of consolidated assets that are collateral for VIE obligations, including VIEs that were consolidated prior to the implementation of FIN 46-R under then existing guidance and VIEs that the Company became involved with after July 1, 2003:

| In billions of dollars | December 31, 2006 | December 31, 2005 |
| --- | --- | --- |
| Cash | $    .5 | $  0.4 |
| Trading Account Assets | 31.6 | 29.7 |
| Investments | 10.1 | 6.1 |
| Loans | 6.8 | 9.5 |
| Other Assets | 5.7 | 4.7 |
| Total assets of consolidated VIEs | $54.7 | $50.4 |

100

\*     \*     \*

In addition to the VIEs that are consolidated in accordance with FIN 46-R, the Company has significant variable interests in certain other VIEs that are not consolidated because the Company is not the primary beneficiary.   These include multi-seller finance companies, collateralized debt obligations (CDOs), structured finance transactions, and numerous investment funds….

\*     \*     \*

The Company also packages and securitizes assets purchased in the financial markets in order to create new security offerings, including arbitrage CDOs and synthetic CDOs for institutional clients and retail customers, which match the clients' investment needs and preferences. **Typically, these instruments diversify investors' risk to a pool of assets as compared with investments in an individual asset.**   The VIEs, which are issuers of CDO securities, are generally organized as limited liability corporations. The Company typically receives fees for structuring and/or distributing the securities sold to investors.  In some cases, the Company may repackage the investment with higher rated debt CDO securities or U.S. Treasury securities to provide a greater or a very high degree of certainty of the return of invested principal. A third-party manager is typically retained by the VIE to select collateral for inclusion in the pool and then actively manage it, or, in other cases, only to manage work-out credits. The Company may also provide other financial services and/or products to the VIEs for market-rate fees. These may include: the provision of liquidity or contingent liquidity facilities; interest rate or foreign exchange hedges and credit derivative instruments; and the purchasing and warehousing of securities until they are sold to the SPE.  **The company is not the primary beneficiary of these VIEs under FIN 46-R due to its limited continuing involvement and, as a result, does not consolidate their assets and liabilities in its financial statements.**

In addition to the conduits discussed above, **the following table represents the total assets of unconsolidated VIEs where the Company has significant involvement**:

| In billions of dollars | December 31, 2006 | December 31, 2005[1] |
|---|---|---|
| **CDO-type transactions** | **$ 52.1** | **$ 40.7** |
| Investment-related transactions | 122.1 | 78.0 |

| | | |
|---|---|---|
| Trust preferred securities | 9.8 | 6.5 |
| **Mortgage-related transactions** | **2.7** | **3.1** |
| Structured finance and other | 41.1 | 63.1 |
| Total assets of significant unconsolidated VIEs | $227.8 | $191.4 |

(1) Reclassified to conform to the current period's presentation.

\*       \*       \*

As mentioned above, **the Company may, along with other financial institutions, provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs.  The Company may be a party to derivative contracts with VIEs, may provide loss enhancement in the form of letters of credit and other guarantees to the VIEs, may be the investment manager, and may also have an ownership interest in certain VIEs.  Although actual losses are not expected to be material**, the Company's maximum exposure to loss as a result of its involvement with VIEs that are not consolidated was $109 billion and $91 billion at December 31, 2006 and 2005, respectively. For this purpose, maximum exposure is considered to be the notional amounts of credit lines, guarantees, other credit support, and liquidity facilities, the notional amounts of credit default swaps and certain total return swaps, and the amount invested where Citigroup has an ownership interest in the VIEs …. (emphasis added)

292.   The above-quoted disclosures in Citigroup's 2006 Form 10-K, which were repeated in the Company's Form 10-Q for the first quarter of 2007, filed on May 4, 2007, and in its Form 10-Q for the second quarter of 2007, filed on August 3, 2007,[41] were materially incorrect and misleading for several reasons.

(i)       First, they made it appear as though Citigroup's CDOs were distinct from its mortgage-related transactions and mortgage securitizations, when in

---

[41]   The disclosures in the May 4, 2007 Form 10-Q and August 3, 2007 Form 10-Q contained the same text, with figures adjusted accordingly.  *See* May 4, 2007 Form 10-Q at 42, 98-101; August 3, 2007 Form 10-Q at 42, 63-67.

fact Citigroup's CDOs were collateralized primarily by subprime and Alt-A mortgages.

(ii)    Second, they indicated that the effect of Citigroup's mortgage securitization activities was to **reduce** Citigroup's exposure to mortgage borrowers' credit risk.   While the mortgage securitizations themselves may have transferred credit risk from Citigroup to the purchasers of the RMBS, what Citigroup did not disclose was that its own CDOs were among the largest purchasers of those RMBS.   Moreover, Citigroup was the largest purchaser of the subprime-backed CDOs that it underwrote. Thus, through its substantial retained interest in those CDOs, Citigroup therefore effectively remained subject to the very risks that it claimed it had transferred away from itself.

(iii)   Third, the 2006 Form 10-K portrayed the CDOs as being structured to "diversify investors' risk to a pool of assets as compared with investments in an individual asset."   In truth, however, Citigroup's CDOs were not diversified, but rather were based on concentrations of RMBS bearing similar subprime risk profiles.   Moreover, the degree of correlation – *i.e.*, the lack of diversification – actually increased for the more senior tranches of the CDOs.   As the primary purchaser of those CDOs, including the super senior tranches, Citigroup was subjected to those concentrated risks.

(iv)    Fourth, they did not disclose that the Company was engaged in a practice of repackaging unsellable tranches into new CDOs, in an effort – largely unsuccessful – to offload the growing risks that they carried.   Nor did they

disclose that Citigroup was amassing an ever-growing supply of unsellable, increasingly high-risk CDOs.

(v)   Fifth, while the 2006 Form 10-K contained a chart listing the total assets of the various VIEs (including CDOs and SIVs) that were not consolidated on the Company's financial statements, there was no disclosure of the extent of Citigroup's interest – which was substantial – in those VIEs or in their underlying assets. The Company represented that "actual losses are not expected to be material," and stated in hypothetical terms that it "may also have an ownership interest or other investment in certain VIEs" and that it had only "limited continuing involvement" with its VIEs. These statements were materially incomplete and misleading because, in fact, Citi owned tens of billions of dollars worth of the super-senior tranches from the subprime-backed CDOs the Company had underwritten in recent years, and thus had substantial exposure as a result of its investments in VIEs. Additionally, given Citigroup's financial and other commitments to many of these VIEs (including SIVs), Citi was required to consolidate them on its financial statements under GAAP or, at a minimum, to provide the information required by FIN 46(R).

(vi)   Sixth, Citigroup's statement that it "may … provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs" was incomplete and misleading because it omitted to disclose that, in fact, the Company had written liquidity puts when it structured the Commercial Paper CDOs that would require it to repurchase those CDOs in the event

of a liquidity issue.  In light of these liquidity puts, the Company was required to retain these CDOs on its balance sheet when they were issued, and to take write-downs in relation to those CDOs no later than the quarter ended June 30, 2007, given the status of the RMBS and CDO markets at that time.

293.    In addition, the 2006 Form 10-K reported that Citi's had only "limited continuing involvement" with certain VIEs, and thus had no obligation to consolidate them.[42]  The 2006 Form 10-K also reported that the Company's maximum exposure to these off-balance-sheet VIEs was $109 billion as of December 31, 2006.[43]  These statements were untrue because, as discussed previously, these unconsolidated VIEs included the SIVs Citi would later consolidate as a result of its commitment to prevent them from failing.  As a result, Citigroup was obligated to consolidate those SIVs on its financial statements under GAAP.  Its failure to do so resulted in understatement of the Company's assets and liabilities, and masked the severity and magnitude of the risk that impairment of the SIVs' assets would impair the Company's capital adequacy. This undisclosed risk ultimately materialized, and the Company was forced to absorb the $17.4 billion cost of unwinding the SIVs when their assets became so impaired that they could not be sold.

294.    On an analyst conference call on April 16, 2007, Defendant Prince stated on behalf of Citigroup that the Company was being "very diligent in managing our credit exposures."  He stated further:

> Our fourth big job this year is to manage through the credit cycle.
> We're a bank; we're in the risk business.  We're not immune to
> credit cycles.  We're not immune to credit deterioration, and **we're**

---

[42]  Citigroup Annual Report (Form 10-K), at 93 (Feb. 23, 2007).

[43]  *Id.* at 147.

> **managing this side of our business very carefully in light of that external environment**.  I feel good about the composition of our portfolios, not only in the corporate and sovereign area but especially in the U.S. mortgage area where we have avoided the riskier products at some cost to revenues in prior years, and I think we're seeing that play out in the results we have on the credit side.  Gary [Crittenden] will take you through the details of that in a moment including the increase in the reserves to stay ahead of the trends we see in the credit environment, but **I assure you that we remain very diligent in managing our credit exposures**. (emphasis added)

These statements were false because Citigroup was not "managing this side of the business very carefully" and was not "very diligent in managing [its] credit exposures."  Additionally, Citi did not avoid "riskier products" given its massive exposure to large portfolio of subprime mortgages.

295.    On July 20, 2007, during Citigroup's second quarter 2007 earnings conference call, Defendant Crittenden reassured investors that the Company was reducing its subprime exposures, stating:[44]

> Now let me spend a minute talking about two topics, the subprime secured lending market and our leveraged lending activities.  Our subprime exposure in Markets and Banking can be divided into two categories …  The first is secured lending and the second is trading.  With regards to secured lending, we have been actively managing down our exposure for some time.  We had $24 billion in assets at the end of 2006.  It was at $20 billion at the end of the first quarter and $13 billion at the end of the second quarter.

296.    Crittenden made similar statements in a recorded telephone announcement regarding Citi's October 1, 2007 pre-earnings release and in a conference call following the October 15, 2007 earnings release, stating on behalf of Citigroup that the Company had reduced its exposure to subprime CDOs from $24 billion at the beginning of the year to $13 billion at the end of June.  But this was not true.  Citigroup in actual fact retained a much larger volume of subprime securitized assets, primarily CDOs, on its balance sheet.  Just a few weeks later, on

---

[44] Transcript of Citigroup Earnings Conf. Call at 7 (July 20, 2007).

November 4, 2007 that Citi revealed an additional $43 billion in CDO exposures, and yet another $10.5 billion came to light in January 2008.  By making partial disclosures in July and October 2007 that seemed complete, Citi gave its investors false comfort that they knew the limits of the exposure.

297.    Additionally, on the October 1, 2007 recorded call, Crittenden falsely claimed that the Company "typically ha[d] sold the lowest rated tranches of the CDOs and held onto most of the highest rated tranches, where historically values ha[d] been stable" and only declined during the summer when rating agencies changed their methodology and instituted certain downgrades.[45]  In reality, Citi frequently retained the riskiest tranches, which it then attempted to repackage in yet another CDO issue to avoid being stuck with these undesirable assets.  The transcript from this call, which Crittenden reviewed and approved, was incorporated in a Form 8-K filing on October 1, 2007.

298.    On September 12, 2007, Defendant Freiberg gave a presentation at the Lehman Brothers Financial Services Conference (the "Sept. 12, 2007 Lehman Conference"), during which he made a number of false and misleading statements on behalf of the Company, including:

(a)    portrayal of the growth in Citi's subprime lending business as a positive indicator of future value:

> If you look at CitiFinancial, and this again, this is the consumer finance company, it is a subprime lender. It's essentially - about half its portfolio is unsecured, about half its portfolio is secured, and that business is growing at a very nice clip. It was growing again in the low single digits on an organic basis if we look back 1.5 - 2 years ago.  It's now growing its asset base 9 or 10%, maybe

---

[45]  Citigroup, Oct. 1, 2007 Recorded Call Transcript (Form 8-K, Ex. 99.2), at 3 (Oct. 1, 2007); Transcript of Citigroup Earnings Conf. Call at 7 (Oc. 15, 2007).

a little bit higher on a consistent basis. It's a good leading indicator of basically future value.[46];

(b)      boasting that Citi's subprime business was "actually doing quite well":

. . . you can look at essentially at CitiFinancial over the last several years and what you see is that it basically was trending between plus or minus couple of percentage points of growth and that would be organic growth because we weren't really acquiring during that period of time. **And if you look over the last three or four quarters, there is a sustained improvement and growth in revenue, and we would expect this to be again highly sustainable trend . . . So very good business for us.** And for those of you who have kind of read the presentation that we put up, what's interesting about this business, I think, has a lot to do along with our history, our competency, but also the business model, it is very much a face to face, I am in my store and get to know your type model that our delinquencies in this business today are actually at the same level or maybe even a little bit lower than they were a year ago, and this is effectively almost exclusively in subprime lending business, and again half real estate, half non-secured. So the characteristic here would have been, god, how is it doing, this is almost $40 billion worth of the lending, **it's actually doing quite well.**[47] (emphasis added);

(c)      stressing that Citigroup's mortgage lending was primarily conducted on a face-to-face basis, and proclaiming that subprime was a "terrific" category that was not experiencing stress:

But again, what's important about these portfolios for Citi because you can see essentially the difference between the industry, which used to be in the 270s is now basically pierced the 400s, on its way to 5% or 500 basis points past due, is that **the model we run, again, it's a face-to-face model**. We underwrite every nickel of this paper. Early stage collections happen in our branches. It's essentially almost exclusively fixed paper. It's not variable, it's not teaser, it's not exotic. **And so, what you can take away is that the subprime is a terrific category**. You can do extremely well, but you can't basically go off the farm and do things that basically make not a great deal of sense. I thought it was an interesting chart for this group because it's squarely in that

---

[46] Transcript of Lehman Brothers Financial Services Conference at 3 (Sept. 12, 2007).

[47] *Id.* at 4-5.

category and we've been in this business for a long period of time. **And when you would expect stress, we haven't really seen it**.[48] (emphasis added);

(d)      exaggerating about the subprime portfolio's "very good" performance:

And then the other extreme, which again is the pleasant surprise, when you think there would be a fire which is in our subprime portfolio, it actually looks very good.[49]  (emphasis added);

(e)      underscoring Citigroup's purportedly careful application of "conscious and cautious" lending criteria and its correspondingly low representation in risky high-LTV and subprime second mortgage loans:

> If you look at the top left first mortgage, the first mortgage portfolio, the matrix really is loan to value and FICO score as an indicator at least to credit quality as well as how much risk or how much exposure have you taken to the underlying asset. So obviously, what you would like to do is have basically low - **you would like to basically have your loan to value being low and your FICO score being high. And if you look at our first mortgage business, largely speaking, that's how it distributes. And if you were going to basically isolate a row and a category on where you would be most exposed, it would be clearly the LTV greater than 90**, which is the bottom row cascading out across essentially the - cascading out across the FICO range.  **And you can see though that we have relatively basically speaking low representation within those ranges**.  But again, we are in a category where you make or lose money on the tail, so you always have to be conscious and cautious of that.

> On the second mortgage side, what you can see is that **we tended not to be a lender of basically subprime second mortgage.**[50] (emphasis added).

299.    The foregoing statements from the September 12, 2007 Lehman Conference were materially false and misleading when made, for multiple reasons:

---

[48] *Id.* at 7.

[49] *Id.* at 10.

[50] *Id.* at 7.

(i)     Citigroup's expansion of its subprime business did not lead to true growth; its subprime business was not doing "quite well" and was not a "terrific category"; and its subprime portfolio did not look "very good."

(ii)    Citigroup was increasingly moving away from the face-to-face retail production, contrary to Freiberg's statement, and toward relying primarily on correspondent channels for loan production.  By 2007, Citigroup relied on correspondent channels for loan production amounting to $94 billion.  As a leading analyst observed, these sources represented the "lowest of the low quality channels," as they regularly involved borrowers with questionable abilities to pay back their mortgages.  Citigroup was not underwriting "every nickel of this paper," and Citigroup's numerous litigations involving deficient loans demonstrates that Citigroup was barely reviewing its loans.

(iii)   Citigroup's touted growth rate and revenues were inflated by the Company's delay in recognizing known and probable impairments to its mortgage portfolio, as evidenced in the Company's deliberate delay in enforcing its rights and pursuing litigation arising from blatantly defective loans.  Citigroup, at least as early as mid-2006, was increasingly saddled with defective correspondent channel loans in the form of first payment defaults, early payment defaults, and other fundamental underwriting problems, which led to Citigroup demanding loan repurchases from its correspondent lenders and, eventually (but belatedly) suing them.  Similarly, Citigroup recklessly purchased $2.7 billion in loans from

Accredited Home Lenders on March 15, 2007, with a substantial number of these loans immediately demonstrating impairment and deficiencies, including early payment defaults, yet it did not file suit until May 2008. Even after attempting to securitize these loans into RMBS, Citigroup was stuck with over $800 million in these Accredited Home Lenders loans, as well as some of the RMBS securities for which Citigroup could not find a willing buyer.

(iv)    Citigroup had not applied "conscious and cautious" lending criteria and did not enjoy a correspondingly low representation in risky high-LTV and subprime second mortgage loans.    To the contrary, Citigroup, unbeknownst to the public, had been loosening its lending criteria in the second and third quarters of 2007 without making cost adjustments to compensate for the increased risks.    With respect to second mortgages, Citigroup misled investors by failing to disclose that a majority of those mortgages had very high LTV ratios, leading indicators of loans' riskiness.

300.    Defendants' assurances that Citi was unaffected by the subprime mortgage crash were later proven to be blatantly false.    On October 1, 2007, merely two weeks after Freiberg's rosy public statements at the Lehman Conference, Citi admitted that it would have to increase its loan loss reserves by $1.9 billion and faced increased credit costs of $2.6 billion, mostly due to its consumer lending portfolio.    In the fourth quarter of 2007, Citi announced still another increase in its reserve build of $3.8 billion, $2.4 billion of which was in the U.S. consumer lending business.    Additional losses attributable to Citi's mortgage lending were announced throughout 2008.

301.   On October 19, 2007, Citigroup issued a one-page fact sheet about its seven SIVs, stating that it "has no contractual obligation to provide liquidity facilities or guarantees to any of the Citi-advised SIVs."  This statement, while perhaps literally true, was materially misleading because Citigroup omitted to disclose that it had an implicit commitment to provide a liquidity backstop for these SIVs to ensure they would not fail.

302.   In a November 4, 2007 press release, Citigroup disclosed for the first time its "net" exposure to $43 billion of CDOs, together with an estimated write-down of $8 billion on those instruments.  In its Form 10-Q for the third quarter of 2007, filed on November 5, 2007, Citigroup stated that the $43 billion in CDOs were "not subject to valuation based on observable market transactions," and thus were valued based on estimates of future housing prices.  The quoted statement was not true, as there were observable, relevant indicators of the CDOs' value: the ABX indexes at the triple-B tranche level, and the TABX index at the super senior level. Both had indicated a substantial loss of value as early as February 2007, which Citigroup had not begun to record until November 2007.

303.   The November 5, 2007 Form 10-Q also stated that the $8 billion in write-downs of its CDOs "followed a series of rating agency downgrades of sub-prime U.S. mortgage related assets and other market developments, which occurred after the end of the third quarter" – *i.e.*, Citi attributed the write-downs to events occurring in October 2007.  Similarly, on a November 5, 2007 analyst conference call, Defendant Crittenden represented on behalf of Citigroup that the November 4, 2007 write-down was a reflection of credit rating downgrades of subprime RMBS and CDOs and declines in the ABX indices at the triple-A level, both of which occurred in October 2007 and purportedly "drove down the value then of the super senior tranches as well, something that had not occurred during the course of the first nine months of the year."  These

statements were materially false and misleading because, in fact, the values of the super senior tranches had been materially impaired by February 2007, and had suffered additional, significant declines during the months that followed.  In addition, Crittenden's attribution of the write-downs to declines in the ABX triple-A index was disingenuous and misleading because that index bears no relationship to the value of the super senior CDO tranches.  Rather, that index is a measure of the value of triple-A rated RMBS, whereas the super senior CDO tranches are populated by lower-rated RMBS.  The index with relevance to the super senior tranches – the TABX – had been in decline throughout 2007.

304.   The November 5, 2007 Form 10-Q also included statements regarding the Company's CDO and SIV exposure that repeated those made in Citi's 2006 Form 10-K, May 4, 2007 Form 10-Q, and August 4, 2007 Form 10-Q, with minor changes to describe and define the SIVs more precisely, but which otherwise were similarly inaccurate and incomplete, as follows:

OFF-BALANCE SHEET ARRANGEMENTS

\*      \*      \*

Mortgages and Other Assets

The Company provides a wide range of mortgage and other loan products to its customers.  In addition to providing a source of liquidity and less expensive funding, securitizing these assets also reduces the Company's credit exposure to the borrowers.

\*      \*      \*

Creation of Other Investment and Financing Products

The Company has established SIVs, which issue junior notes, medium-term notes and short-term commercial paper to fund the purchase of high quality assets.  The SIVs provide a return to their investors based on the net spread between the cost to issue the short-term debt and the return realized by the medium-term assets.  The Company acts as an investment manager for the SIVs, but is not contractually obligated to provide liquidity facilities or guarantees to the SIVs.

* * *

The SIVs have no direct exposure to U.S. sub-prime assets and have approximately $70 million of indirect exposure to sub-prime assets through CDOs which are AAA rated and carry credit enhancements.

The Company packages and securitizes assets purchased in the financial markets in order to create new securities offerings, including arbitrage CDOs and synthetic CDOs for institutional clients and retail customers, which match the clients' investment needs and preferences.

* * *

Typically these instruments diversify investors' risk to a pool of assets as compared with investments in individual assets.

At September 30, 2007 and December 31, 2006, unconsolidated CDO assets where the Company has significant involvement totaled $84.2 billion and $52.1 billion, respectively.

See Note 13 on page 68 for additional information about off-balance sheet arrangements.

305.    Citigroup's CDO-related disclosures in the "Securitizations and Variable Interest Entities" section of the November 5, 2007 Form 10-Q (the "Note 13" referred to in the immediately preceding quote) stated[51]:

**Securitizations and Variable Interest Entities**
The Company primarily securitizes credit card receivables and mortgages.  Other types of assets securitized include corporate debt securities, auto loans, and student loans.

* * *

**The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchaser of the securities issued by the trust.**

* * *

**Variable Interest Entities**

---

[51]  *Id.* at 68-73.

114

*       *       *

The following table represents the carrying amounts and classification of consolidated assets that are collateral for VIE obligations, including VIEs that were consolidated prior to the implementation of FIN 46-R under existing guidance and VIEs that the Company became involved with after July 1, 2003:

| In billions of dollars | Sept. 30, 2007 | December 31, 2006[1] |
|---|---|---|
| Cash | $ 1.7 | $ 0.5 |
| Trading account assets | 24.5 | 16.7 |
| Investments | 27.0 | 25.0 |
| Loans | 9.5 | 6.8 |
| Other assets | 4.2 | 5.7 |
| **Total assets of consolidated VIEs** | $66.9 | $54.7 |

(1) Reclassified to conform to the current period's presentation.

*       *       *

**In addition to the VIEs that are consolidated in accordance with FIN 46-R, the Company has significant variable interests in certain other VIEs that are not consolidated because the Company is not the primary beneficiary.  These include asset-backed commercial paper conduits, structured investment vehicles (SIVs), collateralized debt obligations (CDOs), structured finance transactions, and numerous investment funds.**

**The following table represents the total assets of unconsolidated VIEs where the Company has significant involvement:**

| In billions of dollars | Sept. 30, 2007 | December 31, 2006 |
|---|---|---|
| Asset-backed commercial paper (ABCP) conduits | $ 73.3 | $ 66.3 |
| Structured investment vehicles (SIVs) | 83.1 | 79.5 |
| Other investment vehicles | 27.0 | 42.6 |
| **Collateralized debt obligations (CDOs)** | 84.2 | 52.1 |
| **Mortgage-related transactions** | 11.9 | 2.7 |

| Trust preferred securities | 11.7 | 9.8 |
|---|---|---|
| Structured finance and other | 52.2 | 41.1 |
| **Total assets of significant unconsolidated VIEs** | $343.4 | $294.1 |

\*     \*     \*

The company also packages and securitizes assets purchased in the financial markets in order to create new security offerings, including arbitrage CDOs and synthetic CDOs for institutional clients and retail customers, which match the clients' investment needs and preferences.

\*     \*     \*

**Typically, these instruments diversify investors' risk to a pool of assets as compared with investments in an individual asset.** The VIEs, which are issuers of CDO securities, are generally organized as limited liability corporations. The Company typically receives fees for structuring and/or distributing the securities sold to investors. In some cases, the Company may repackage the investment with higher rated CDO securities or U.S. Treasury securities to provide a greater or a very high degree of certainty of the return of invested principal. A third-party manager is typically retained by the VIE to select collateral for inclusion in the pool and then actively manage it, or, in other cases, only to manage work-out credits. The Company may also provide other financial services and/or products to the VIEs for market-rate fees. **These may include: the provision of liquidity or contingent liquidity facilities;** interest rate or foreign exchange hedges and credit derivative instruments; and the purchasing and warehousing of securities until they are sold to the SPE. **The Company is not the primary beneficiary of these VIEs under FIN 46-R due to its limited continuing involvement and, as a result, does not consolidate their assets and liabilities in its financial statements.**

\*     \*     \*

**As mentioned above, the Company may, along with other financial institutions, provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs. The Company may be a party to derivative contracts with VIEs, may provide loss enhancement in the form of letters of credit and other guarantees to VIEs, may be the investment manager, and may also have an ownership interest in certain VIEs.** The Company's maximum exposure to loss as a result of its

involvement with VIEs that are not consolidated was $141 billion
and $109 billion at September 30, 2007 and December 31, 2006,
respectively.  For this purpose, maximum exposure is considered
to be the notional amounts of credit lines, guarantees, other credit
support, and liquidity facilities, the notional amounts of credit
default swaps and certain total return swaps, and the amount
invested where Citigroup has an ownership interest in the VIEs. . .
(emphasis added)

306.   The above statements were untrue and misleading in that they (a) appeared to

draw a distinction between Citi's CDOs and its mortgage-related transactions; (b) indicated that

Citi's securitization activities reduced the Company's exposure to mortgage-related risk; (c)

indicated that the CDOs diversified the pool of risk; (d) failed to disclose that Citi had been

repackaging unsold tranches of CDOs; (e) and stated that Citi had no contractual obligation to

support the SIVs yet also stated that it had provided $10 billion in liquidity to the SIVs, thus

demonstrating that the non-contractual obligation to back-stop these entities was the

determinative factor that eventually caused the Company to consolidate them.

307.   In a December 13, 2007 press release, filed with the SEC on a Form 8-K filing

dated December 14, 2007, Citigroup announced that it would bring approximately $49 billion of

SIV assets onto its balance sheet.  The Company maintained that one of the "key" reasons why it

consolidated its SIVs was because "[g]iven the high credit quality of the SIV assets, Citi's credit

exposure under its commitment is substantially limited."  The Company further assured investors

that it expected to incur "little or no funding requirement" for the SIVs, and expected to "return

to its targeted capital ratios by the end of the second quarter of 2008."  These statements led

investors to believe that the SIV assets were not impaired, when in fact they contained RMBS

and other subprime mortgage-backed assets that were severely impaired and not of "high credit

quality."  The Company knew or should have known that the impairment was likely to deepen

during 2008 (which, in fact, it did).  Thus, Citi's credit exposure as a result of its consolidation of the SIVs was not "substantially limited," but was actually quite significant.

308.    On January 15, 2008, Citigroup issued a press release announcing its preliminary financial results for 2007.  In the announcement, Citi disclosed a $17.4 billion write-down on its subprime-related direct exposures – nearly twice the maximum write-down claimed just two months earlier.  Citi also disclosed that the Company was holding an additional $10.5 billion in exposure to subprime-backed CDOs.  Because the Company had purchased insurance on this $10.5 billion of CDO securities, the Company described them as "hedged exposures."  However, the Company failed to disclose that the hedges depended on the solvency of counterparties such as Ambac and MBIA, and thus investors were not made aware that this counterparty risk exposed the Company to a much higher risk of additional losses on the newly-disclosed $10.5 billion of exposure.

309.    During the Company's fourth quarter 2007 earnings conference call held on January 15, 2008, when asked by an analyst to estimate the size of the Company's Alt-A portfolio, Defendant Crittenden replied:

> So on the Alt-A, we haven't split that out as a separate category.  If it were a category that we anticipated that would be a substantial risk, I would have put it on the list of risks that I stepped down through at the end of the conversation.  We don't given the size of the position and the risk associated with it, we would not put it in the category that went on that list of other issues that I had enumerated.

310.    Crittenden further indicated that the Company's decision not to split out the Alt-A exposure was a function of its size.  These statements regarding the size of Citigroup's Alt-A exposure were materially false and misleading.  In fact, just a few months later, on April 18, 2008, during the first quarter earnings conference call, Crittenden would admit that Citigroup was holding $22 billion in Alt-A RMBS exposure as of December 31, 2007, and $18.3 billion as

of March 31, 2008.  The Company also disclosed $1 billion of write-downs on Alt-A mortgages. A Credit Suisse analyst report that day identified the Alt-A RMBS exposure as "newly disclosed."  In addition, in January 2009, when the Company disclosed the breakdown of the $301 billion in loan guarantees, it reported that it had $11.4 billion in Alt-A securities that were covered by these guarantees.

311.    The 2007 Form 10-K did not disclose any exposure to Alt-A mortgages at all, and thus materially understated the Company's losses and materially overstated the value of the Company's assets.

312.    The 2007 Form 10-K also contained numerous statements – similar to those in prior SEC Filings – suggesting that the Company's involvement in mortgage securitization activities had the effect of *reducing* its exposure to subprime risk.  For example, the Company stated that its involvement in cash CDOs was "typically limited to investing in a portion of the notes or loans issued by the CDO and making a market in those securities."  For synthetic CDOs, the Company stated that "a substantial portion of the senior tranches of risk is typically passed on to CDO investors."  In terms of its mortgage lending activities, the Company stated that "to manage credit and liquidity risk, Citigroup sells most of the mortgage loans its originates, but retains the servicing rights."  Similarly, the Company stated that its mortgage and student loan securitizations were "primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust."  What Citi failed to disclose is that it was packaging subprime mortgages into RMBS, and that Citi's own CDOs – in which it retained significant undisclosed interests – were among the largest purchasers of these RMBS. Thus, the Company's mortgage securitizations were not truly transferring subprime-related risk away from Citi.

313.    The 2007 Form 10-K and the Company's April 18, 2008 earnings release were materially untrue and incomplete for the additional reason that they failed to disclose the Company's exposure as a result of the ARS market disruption.  The April 18, 2008 earnings release, which was filed as an attachment to a Form 8-K of the same date, disclosed (for the first time) that Citi had accumulated billions of dollars in ARS during the third and fourth quarters of 2007, amounting to $11 billion by February 2008.  This disclosure omitted material information: that the Company faced significant liability exposure based on pending ARS customer lawsuits and regulatory investigations.  Only a few months later, in August 2008, the Company disclosed that it was repurchasing $7.3 billion in ARS from its customers and had reached a settlement with regulators, resulting in a $100 million fine.  Citigroup should have known well before it issued the 2007 Form 10-K that the ARS market was deteriorating, that it was building an unsustainable inventory of its own ARS, and that its assets would be impaired as a result of the inevitable collapse of the ARS market.

314.    Citigroup's April 18, 2008 earnings release and Form 8-K were also materially incomplete and/or untrue because the write-downs Citi announced on that date were inadequate. Citi had written down its CDO portfolio by just under half, while the relevant indices had lost nearly all their value by early 2008.  While Citigroup had assured investors in its January 15, 2008 earnings release and 2007 Form 10-K that it had "refined" its CDO valuation methodology "to reflect ongoing unfavorable market developments," in actual fact its valuation methodology failed to take into account the substantial decline in these indices.

315.    In an interview reported in an April 28, 2008 *BusinessWeek* article, Pandit rejected calls for a breakup of Citigroup.  He stated: "You couldn't design a better footprint or get a better set of assets if you had to build a bank from scratch . . . . This is clearly the right

model."  Given the severe impairment of Citigroup's mortgage-related assets at that time, this statement was materially false and misleading.

316.    In the Company's July 18, 2008 earnings release, which was filed as an attachment to a Form 8-K of the same date, the Company announced its second quarter financial results and Defendant Pandit underscored that "write-downs in our Securities and Banking business [which included the Company's CDOs and SIVs] decreased by 42%" and that Citigroup had "reduced legacy assets substantially."  The earnings release further assured investors that the Company's "Tier 1 Capital ratio increased to 8.7%," substantially above the 6% benchmark for "well-capitalized" status.  On August 1, 2008, Citigroup filed a Form 10-Q that reiterated the second quarter financial results and again stated that the Company had maintained its "well-capitalized" status.  These statements portrayed the Company as being on the road to recovery, when in fact the Company's mortgage-related assets were so severely impaired that it would have to be rescued by the federal government only a few months later.  Contrary to Defendants' statements, the Company was far from "well capitalized" in the summer of 2008, and its Tier 1 capital ratio would have been less than 6% if appropriate write-downs had been taken.

317.    On September 21, 2008, Defendant Pandit told the *New York Times* that Citi was "a pillar of strength in the markets," and reported that funds from competitors' coffers had flowed in to Citigroup.  "That's a great place to be', [Pandit said], smiling."  With respect to calls to break up Citigroup, Pandit stated that a stand-alone Citigroup investment bank might not have survived.[52]   Meanwhile, however, Citigroup's capital adequacy was in serious jeopardy due to the impairment of billions of dollars in subprime-related assets.  On October 14, 2008, this "pillar of strength" accepted $25 billion from the federal government's TARP fund.

---

[52] Julie Creswell & Eric Dash, *Citigroup Above the Fray?*, N.Y. TIMES, Sept. 21, 2008.

## VII.   THE TRUE FACTS ARE SLOWLY REVEALED

### A.   OCTOBER 2007:  CITIGROUP MAKES PARTIAL BUT INCOMPLETE DISCLOSURES CONCERNING ITS GROWING LOSSES AND SUBPRIME EXPOSURE

#### 1.   October 1:  Citi Issues Pre-Earnings Release

318.   In the fall of 2007, the consequences of Citi's undisclosed exposures to the subprime mortgage market began to surface.  On October 1, 2007, almost three weeks before its scheduled quarterly earnings release, Citi announced that it expected a decline in net income of roughly 60% from the third quarter of 2006, an estimate subject to finalization of third quarter figures.  This announcement came as a surprise to investors, because less than three months earlier, on July 20, 2007, Citi had announced record second quarter net income of $6.23 billion, or $1.24 per share, up 18% from the second quarter of 2006.  Thus, Citigroup had initially appeared to be stronger than its peers who were faltering as the financial crisis hit.

319.   Citi attributed its poor third quarter 2007 results to "dislocations in the mortgage-backed securities and credit markets, and deterioration in the consumer credit environment."[53]  In particular, the drop was attributed to weak performance in fixed-income credit market activities, write-downs in leveraged loan commitments, and increases in consumer credit costs.  Despite this news, Defendant Prince stated in the press release that the Company expected to return to a "normal earnings environment" in the fourth quarter.[54]  As discussed below, however, the worst was yet to come.  The third quarter of 2007 would turn out to be Citi's last profitable quarter until the first quarter of 2009.

320.   In its global consumer lending unit, Citi reported an increase in credit costs of approximately $2.6 billion compared to the prior year third quarter, caused by continued

---

[53]  Press Release, Citigroup, Citi Expects Substantial Decline in Third Quarter Net Income (Oct. 1, 2007).

[54]  *Id.*

deterioration in the credit environment, portfolio growth, and acquisitions.  Roughly one-fourth of the increase (approximately $650 million) was due to higher net credit losses, and the other three-fourths were attributed to a $1.95 billion increase in loan loss reserves – more than four times the $465 million increase in reserves taken in the prior quarter.

321.    In a pre-recorded message Citi posted on its website on October 1, 2007, Defendant Crittenden explained the factors necessitating the increases in loss reserves, all of which were related to the housing market downturn and broader credit crunch.  For example, Crittenden noted that the reserve build was partially necessitated by losses inherent in the portfolio, but not yet visible, such as borrowers making payments slightly later than usual or even into the grace period, which signals the possibility of future delinquencies.  Crittenden also noted macro-economic variables such as declining residential sales as another reason for increasing the reserves, as well as higher delinquency rates in the Company's overall mortgage portfolio.

322.    While Citi conveyed the impression that the conditions requiring the increased reserves had only recently developed, the Company's loss reserves had actually been inadequate far longer.

**2.      October 15, 2007:  Citi Announces Third Quarter Results**

323.    On October 15, 2007, Citi formally released its third quarter results, reporting net income of $2.2 billion, or $0.44 per share, a drop of 60% from the prior year third quarter – as predicted in the October 1, 2007 press release.  However, in the two-week span between the earnings preview and the actual report, total write-downs increased from roughly $2.6 billion to roughly $2.9 billion.  Citi attributed this $300 million difference to a "refinement of [its]

calculations" as it went through the quarter-ending closing process.[55]   Additionally, the charge to build loan loss reserves increased by $290 million from $1.95 billion to $2.24 billion, reflecting accelerating delinquencies in the Company's U.S. mortgage portfolio during the month of September.  Thus, Citi's fortunes had declined by approximately $600 million in that two-week period.

324.    In the conference call with analysts held later that day, Prince acknowledged that although the general market dislocation had caused some of the Company's problems, "some of [the Company's] losses in structured credit and credit trading were greater than would have been expected from that market dislocation and simply reflect poor performance."[56]   Crittenden echoed Prince, noting that "there is no question that [Citi] underperformed certain competitors even considering turbulent market conditions."[57]

**B.    EARLY FALL 2007:  CITI MAKES PARTIAL BUT INCOMPLETE DISCLOSURES REGARDING ITS SIV EXPOSURE**

325.    In August 2007, as the credit markets tightened based on fears of sub-prime mortgages and securities backed by such mortgages, SIVs globally were confronted with a one-two punch.  On the one hand, the short-term commercial paper market dried up, restricting the SIVs' ability to re-borrow to finance their operations.  On the other hand, the SIVs were unable to divest their assets because of investor fears as to the quality of these assets given the problems with sub-prime mortgages.  Citi's SIVs did not escape these problems.

---

[55] Transcript of Citigroup Earnings Conf. Call at 3 (Oct. 15, 2007).

[56] *Id.* at 2.

[57] *Id.* at 7.

326.    On September 5, 2007, the Wall Street Journal published an article which stated that, although few investors realized it, banks such as Citi could find themselves burdened by affiliated SIVs that had issued tens of billions of dollars in short-term commercial paper:[58]

> Citigroup, for example, owns about 25% of the market for SIVs, representing nearly $100 billion of assets under management. The largest Citigroup SIV is Centauri Corp., which had $21 billion in outstanding debt as of February 2007, according to a Citigroup research report.  There is no mention of Centauri in its 2006 annual filing with the Securities and Exchange Commission.

> Yet some investors worry that if vehicles such as Centauri stumble, either failing to sell commercial paper or suffering severe losses in the assets it holds, Citibank could wind up having to help by lending funds to keep the vehicle operating or even taking on some losses.

> Citigroup has told investors in its SIVs (which stands for Structured Investment Vehicles) that they are sound and pose no problems.

> "Quite simply, portfolio quality is extremely high and we have no credit concerns about any of the constituent assets," said a recent letter from Paul Stephens and Richard Burrows, directors in Citigroup's London-based group that oversees the bank's SIVs. "Citi's SIVs remain robust and their asset portfolios are performing well."

> A Citigroup spokesman declined to comment on the bank's SIV disclosures or potential exposure that it might face from them.

327.    Over the weekend of October 13 and 14, 2007, press reports circulated that several major banks, including Citi, Bank of America and JPMorgan Chase, had been meeting for at least three weeks to create a rescue fund of up to $100 billion (to be called the "Master Liquidity Enhancement Conduit") to bail out the SIVs.  According to the Wall Street Journal:[59]

---

[58]   David Reilly et al., *Conduit Risks Are Hovering Over Citigroup: If the Vehicles Go Sour, Rescues Could Be Costly; 'Bank Has No Concerns'*, WALL ST. J., Sept. 5, 2007.

[59]   Carrick Mollenkamp, et al., *Big Banks Push $100 Billion Plan to Avert Crunch*, WALL ST. J., Oct. 13, 2007, at A1.

> The new fund is designed to stave off what Citigroup and others see as a threat to the financial markets world-wide: the danger that dozens of huge bank-affiliated funds will be forced to unload billions of dollars in mortgage-backed securities and other assets, driving down their prices in a fire sale. That could force big write-offs by banks, brokerages and hedge funds that own similar investments and would have to mark them down to the new, lower market prices.

*     *     *

> In recent weeks, investors have grown concerned about the size of bank-affiliated funds that have invested huge sums in securities tied to shaky U.S. subprime mortgages and other assets. Citigroup, the world's biggest bank by market value, has drawn special scrutiny because it is the largest player in this market.

328.    In essence, the rescue fund would have been used to purchase the assets held by SIVs, including Citi's seven SIVs, and allow those SIVs to be unwound. According to the Wall Street Journal report:

> The plan is encountering resistance from some big banks. They argue that Citigroup is asking others to help bail out its affiliates and an industry-wide bailout isn't needed. …

> The new fund represents a way for Citigroup and other banks to "outlast the current market conditions that are so dry right now," says Jaime Peters, an analyst at Morningstar Inc.

329.    By sponsoring a $100 billion rescue plan to buy the assets from the SIVs and thereby allowing the SIVs to be wound down, Citi effectively admitted that it was liable for the losses of the SIVs all along. By agreeing to take first line losses on the assets purchased by the rescue fund, Citi made explicit its previously implicit commitment to back-stop the SIVs. Unlike JPMorgan Chase and Bank of America, who had little or no exposure to SIVs and sponsored the fund in order to earn fees, Citi sponsored the fund in order to protect its exposure to its seven affiliated SIVs.

330.    According to an October 15, 2007 Reuters article entitled *Banks set up fund to bail out investment vehicles*, since hitting an all-time high of $1.183 trillion in early August, the U.S. asset-backed commercial paper market had shrunk by nearly 25 percent during an unprecedented nine consecutive weeks of contraction.  In short, the liquidity risk to which SIVs were peculiarly subject was now materializing and SIVs globally were starting to fail.

331.    On Monday, October 15, 2007, the details of the ill-fated rescue plan were announced before the market opened.  Under the plan, the rescue fund would have purchased highly rated assets from the SIVs and sold short term debt such as commercial paper to help finance the purchases.  However, the sponsoring banks would have been the first to take losses if the new fund suffered losses on its assets.[60]

332.    During the Company's third quarter 2007 earnings conference call later on October 15, 2007, Citi confirmed its financial commitment to its affiliated SIVs.  During the conference call, Citi revealed that it had been buying commercial paper from some of its SIVs and that this was one of the reasons that Citi's balance sheet had deteriorated, including a decline in Citi's reported Tier 1 capital ratio from 7.9% to 7.4% during the course of the third quarter, falling below Citi's target of 7.5%.  As Citi's CFO, Defendant Crittenden, stated on the call:[61]

> Both the Tier 1 capital ratio and the [Total Common Equity] to risk weighted managed assets ratio reflect the impact of acquisitions and **additional assets such as certain leveraged loans and commercial paper which came onto our balance sheet during the quarter.**  [emphasis added][62]

333.    Yet, during that same call, Defendant Crittenden once again asserted on behalf of Citi that the Company would only consolidate those SIVs to which it had "some kind of

---

[60]  *See* Dan Wilchins, *Banks set up fund to bail out investment vehicles*, REUTERS, Oct. 15, 2007.

[61]  *See also* David Wighton, *Citigroup still failing to stop the SIV sceptics*, FT.com (Oct. 22, 2007) (available at http://us.ft.com/ftgateway/superpage.ft?news_id=fto102220071806549804).

[62]  Transcript of Citigroup Earnings Conf. Call at 5-6 (Oct. 15, 2007).

contractual commitment."  This falsely stated Citi's obligation under GAAP to consolidate the

SIVs if Citi had made an explicit *or implicit* guarantee to support the SIVs.  Citi did not reveal

that it was implicitly committed to support the SIVs, even without a contractual commitment.

C.   **NOVEMBER 2007:  CITI MAKES PARTIAL BUT INCOMPLETE DISCLOSURES REGARDING ADDITIONAL CDO EXPOSURE AND MASSIVE WRITE-DOWNS, AND SHAKES UP ITS MANAGEMENT TEAM**

1.   **November 4, 2007 Press Releases**

a.   **Citi's Overall Picture; Prince Resigns**

334.   On October 31, 2007 and November 1, 2007, Citi announced that it was

convening an emergency board meeting over the weekend beginning November 2, to discuss its

problems.   On Sunday, November 4, 2007, Citi issued a press release announcing that its

Chairman and CEO, Charles Prince, was resigning and that Robert Rubin would become

Chairman of the Board.  Citi also designated Sir Win Bischoff, who had been Chairman of Citi

Europe, to act as CEO.

b.   **CDOs**

335.   In another press release on November 4, 2007, Citi disclosed that its subprime-

related direct exposure as of September 30, 2007 was approximately $55 billion, and not the

$11.4 billion that it had previously disclosed to investors.  Citigroup's $55 billion exposure

"consisted of (a) approximately $11.7 billion of subprime related exposures in its lending and

structuring business, and (b) approximately $43 billion of exposures in the most senior tranches

(super senior tranches) of collateralized debt obligations which are collateralized by asset-backed

securities (ABS CDOs)."  Of this $55 billion exposure, Citigroup estimated that it would have to

write down between $8 billion and $11 billion.

336.   The $11.7 billion of subprime exposure in the lending and structuring business

represented a reduction from the $13 million that reportedly existed as of June 30, 2007.

However, the $43 billion of CDO exposure had never before been disclosed at all.  In fact, $25 billion of this new exposure was added to Citi's books during the summer, when it repurchased the Commercial Paper secured by CDOs pursuant to the liquidity put that accompanied this particular securitization.  Crittenden conceded that the remainder of the $43 billion exposure had accumulated over time.  Yet this subprime exposure was not disclosed in the third quarter earnings release issued on October 15, 2007, the pre-earnings release issued on October 1, 2007, or any other Company disclosures that preceded it.

337.    This announcement of Citi's substantial subprime exposure, coming so soon after the Company's recent reassurances, took investors and Wall Street analysts by complete surprise. Deutsche Bank reported that "Citi . . . disclosed (we think for the first time) an additional $55B of mortgage-related structured product exposure, mostly of super senior tranches of CDOs ($43B) …"  JPMorgan reported that "[t]he majority of the exposure against which Citi is taking a charge has never been disclosed before, not even in its 3Q earnings call even to indicate its existence, which is very surprising."  On Monday, November 5, Citi's share price fell almost 5% to $35.90, and fell further by the end of the week, down to $33.10.

338.    Citi justified the November 2007 write-downs as necessary in the wake of a series of rating agency downgrades of subprime mortgage-related assets, which had occurred after the end of the third quarter of 2007.  Citi asserted that some assets were not subject to valuation based on observable market transactions, and that Citi had therefore determined their fair value based on estimates of, among other things, future housing prices, as well as discount rates updated to reflect the rating agencies downgrades of sub-prime mortgage-related assets.

339.    Citi also stated that if sales of the super senior tranches of ABS CDOs were to occur in the future, the sales might represent observable market transactions that could be used to

determine the value of Citi's super senior tranches.  But the fact that the these assets were not selling was itself an indicator that they were priced too high.  Moreover, even if some portion of these CDOs were AAA-rated, they were backed by subprime assets, which themselves were rapidly deteriorating.

### 2.  Citi Discloses Support Of SIVs In Form 10-Q For Third Quarter 2007

340.    Citi filed its Form 10-Q for the third quarter of 2007 on November 5, 2007, before the market opened.  In this filing, Citi disclosed that it had provided $10 billion of financing to its SIVs in previous weeks to shore up those funds, and that the SIVs had drawn $7.6 billion of credit as of October 31.  But despite this action, Citi insisted that it would "not take actions that will require the Company to consolidate the SIVs."[63]

### D.    DECEMBER 2007:  CITI ADMITS OBLIGATION TO CONSOLIDATE SIVS

341.    During November 2007, Citi started to hint that its SIVs were worth closer to $66 billion than the $83 billion previously reported.  In light of these developments, ratings agencies started to downgrade Citi's SIVs.  One SIV, Dorada, was downgraded to Caa3, while SIVs with Aaa ratings were placed on review.  The reason for the downgrades was not just the deterioration of the market values of the SIVs, but also "the sector's inability to refinance maturing liabilities," according to Moody's.

342.    Citi named Defendant Pandit as CEO on December 11, 2007.  Two days later, on December 13, 2007, Citi issued a press release stating that it was "committed to provide a support facility that will resolve uncertainties regarding senior debt repayment currently facing the Citi-advised Structured Investment Vehicles."   Citi thus acknowledged the need to consolidate the SIVs onto its balance sheet.  In addition, in the December 13 press release, Citi

---

[63]  Citigroup, Form 10-Q, at 7 (Nov. 5, 2007).

stated that the combined assets of the SIVs actually totaled only $49 billion, not the $66 billion reported just one month earlier, which itself was a reduction from the $83 billion reported a few months before that.

E.    **JANUARY 2008:  CITI DISCLOSES ADDITIONAL WRITE-DOWNS**

1.    **Citi Reports Record Losses**

343.    On January 15, 2008, Citi reported that its fourth quarter write-downs for the subprime assets totaled $18.1 billion, and reported a net loss for the quarter of $9.83 billion, or $1.99 per share – the worst performance in the Company's history.  Citi's losses were attributed to the significant increase in credit costs, comprised mostly of $6.1 billion in net credit losses and a $6 billion loan loss reserve build, necessitated by the rising delinquencies that had brought the Company's loan loss reserve ratio to dangerously low levels, particularly in light of the escalating losses Citi was seeing in its consumer lending portfolio.

344.    Citi announced the layoffs of more than 20,000 employees as a result of the deterioration of its business and cost-cutting due to the size of its losses.  In addition, Citi had to raise $12.5 billion in capital and cut its dividend by 41%.  Citi also announced that its Tier 1 capital ratio had fallen to 7.12%, down from 8.2% in the first quarter of 2007.  As a result of this news, the stock price fell from $29.06 to $26.94, more than 7%, and by January 22, the price had fallen further to $24.40.

2.    **CDOs**

345.    In the January 15, 2008, earnings release, Citigroup disclosed an additional $17.4 billion in write-downs in its sub-prime related exposure related to CDOs, with the current value estimated at $37.3 billion.  Additionally, Citi disclosed the existence of an additional $10.5 billion in CDO exposure, now bringing the total to approximately $66 billion.  These CDOs were supposedly hedged under financial guarantee contracts with monoline insurers Ambac Financial

and MBIA.  However when those counterparties suffered their own credit downgrades in late 2007, Citi was forced to reveal their existence and make a $1.5 billion adjustment to account for the counterparty risk, which had the same impact as a write-down.

346.    Citi's disclosure came as a particular surprise to investors given that during the November 5, 2007 earnings call, Citi had downplayed the risk associated with the monoline insurers.  Defendant Crittenden had stated that Citi had not quantified the risk but conceded that they are "important counterparties . . . and there is obviously potentially secondary and tertiary exposures that potentially could exists [sic] for the company."  When analyst Guy Moszkowski pressed for an amount of potential disclosure, Crittenden simply answered that the Company had not disclosed that information.[64]

347.    The Company explained in the January 15, 2008 earnings release that its CDO exposures (high grade and mezzanine) were not subject to valuation based on observable transactions and that it therefore determined fair value based on estimates.  Citi noted that it had refined its valuation methodology "to reflect ongoing unfavorable market developments.  The methodology takes into account both macroeconomic factors, including estimated housing price adjustments over the next four years . . . and microeconomic factors, including loan attributes, such as age, credit scores, documentation status, loan-to-value (LTV) ratio, and debt-to-income (DTI) ratio."[65]  However, since these assets were supported by subprime mortgages with rapidly increasing delinquency rates, the assets were essentially illiquid.  Moreover, the market indices for similar securities had lost virtually all their value by early 2008, and Citi was required to write down its CDOs accordingly.

---

[64]  Transcript of Citigroup Special Conf. Call at 6 (Nov. 5, 2007).

[65]  Press Release, Citigroup, Reports Fourth Quarter Net Loss of $9.83 Billion, Loss Per Share of $1.99, at 12 (Jan. 15, 2008).

348.    During the January 15, 2008 earnings conference call, analyst Meredith Whitney of Oppenheimer questioned Crittenden regarding Citi's valuation approach.  Whitney questioned why Citi was valuing the mezzanine portion of its CDO holdings at $0.43 on the dollar, when the Company had admitted it did not expect a rebound in that market.  She noted that Citi's price seemed to be "above where the strike prices are, or if there is a strike price, where the market's has indicated."[66]  Crittenden's response was simply that the Company took the reductions it thought were appropriate and that their values seemed to be in the range with other investors or institutions who were valuing their portfolios.[67]

349.    While Citi continued to assert that there were no observable factors to use in valuing the CDOs, Defendant Crittenden explained during the January 15, 2008 earnings conference call that Citi had in fact begun to use the ABX indices as a reference point, as a "crosscheck against [its] cash flow model . . . [to] uncover any inconsistencies."[68]  Further, as discussed above, other market participants considered the various indices, particularly the TABX index, as a barometer of the CDOs' value.

### 3.    Consumer Lending, Including Mortgages

350.    The other significant source of Citi's losses was the $12.7 billion in credit costs, including $6.1 billion in net credit losses and a $6 billion loan loss reserve build.  The $2.6 billion increase in net credit losses was largely attributable to the increased losses in U.S. consumer credit costs, stemming from increased delinquencies on first and second mortgages, unsecured personal loans, credit cards and auto loans.  The consumer banking costs included a net charge of $2.3 billion to increase loan loss reserves.

---

[66]  Transcript of Citigroup Earnings Conf. Call at 17 (Jan. 15, 2008).

[67]  *Id.* at 17.

[68]  *Id.* at 13.

351.    The necessity for a sharp increase in reserves was clear.  In the fourth quarter of 2006, the loan loss reserve ratio for U.S. consumer credit had dropped to 0.96% (compared to an average of 2%) and was still only at 0.99% in the second quarter of 2007.  Even after the large increase in the third quarter, the ratio had only increased to 1.29%, and it was only after the $3.3 billion infusion in the fourth quarter that the U.S. ratio once again surpassed 2.0%.[69]  However, even this increase was conservative, given that delinquency rates (defined as more than 90 days past due) for first mortgages had jumped from 1.38% in the third quarter of 2006 to 2.56% by the end of 2007.  For loans with a FICO score of less than 620, which represented 10% of the Company's U.S. consumer mortgage portfolio, the delinquency rate had reached 7.83% by the fourth quarter of 2007.[70]  As Crittenden pointed out in the January 15, 2008 earnings conference call, the delinquency rate for loans with FICO scores less than 620 was triple that of the overall first mortgage portfolio.[71]

352.    In an implicit acknowledgement that its credit standards had been too lax, Citi announced that its loan originations had declined 16%, reflecting modified loan approval criteria and curtailment of activity with third-party loan originators.  As Crittenden explained during the January 15, 2008 earnings conference call, moderating Citi's loan growth was part of the Company's risk mitigation strategy.  "The shift in origination mix, along with tightened underwriting criteria have resulted in an improved quality of originations."[72]  Crittenden also indicated that Citi had eliminated certain product offerings, undermining the Company's previous claims that its portfolio mix was appropriate.

---

[69]  CITIGROUP, FOURTH QUARTER 2007 EARNINGS REVIEW 9 (Jan. 15, 2008).

[70]  *Id.* at 10.

[71]  Transcript of Citigroup Earnings Conf. Call at 6 (Jan. 15, 2008).

[72]  *Id.* at 6.

### F.    APRIL 2008:  CITI REVEALS NEW SOURCES OF PROBLEMS

#### 1.    First Quarter Results Show Improvement, But Continued Problems

353.    On April 18, 2008, Citi issued a press release, which it filed as an exhibit to a Form 8-K filing on the same day, announcing its results for the first quarter of 2008.  The Company posted a net loss of $5.1 billion, or $1.02 per share, compared to a profit of $1.01 per share generated in the first quarter of 2007.  The Company reported write-downs of approximately $12 billion, down from roughly $16 billion in the fourth quarter of 2007, beating many analysts' projections.  These write-downs included $6 billion on sub-prime-related direct exposures, $1.5 billion on ARS inventory, and $1 billion, net of hedges, on Alt-A mortgages.  Citi also announced credit costs of $6 billion, consisting of $3.8 billion in net credit losses and a $1.9 billion net charge to increase loan loss reserves.

354.    Despite the extent of the loss reported for the first quarter of 2008, these results represented an improvement over the last quarter of 2007.  The Company heralded its "record earnings in transaction services," and Pandit stated that "[d]espite the negative factors in the broader markets, we continue to see strong momentum throughout the organization with robust volumes in many of our products and regions."  Further, Pandit claimed that the Company had "taken decisive and significant actions to strengthen [its] balance sheet," including raising $30 billion in capital in December and January.  Crittenden stated that there would be no additional dividend cuts or further equity raising, leading analysts and investors to conclude that the worst was over.  As a result, and in conjunction with the pledge of no future equity raises or dividend cuts, the Company's stock price increased after the earnings were reported.

355.    In truth, however, the Company faced substantial undisclosed risks and exposures, including real threats to its capital adequacy.  Its first quarter write-downs should have been far greater than they were.  For example, although the relevant indices had lost nearly

all their value by early 2008, Citi had still only written down its CDO portfolio by just under half.

## 2.   First Mention of Significant Exposure Of Alt-A Loans

356.   The April 18, 2008 press release and Form 8-K were the first disclosures by Citi of a significant exposure to Alt-A loans, necessitating write-downs of $1 billion, leaving the Company with $18.3 billion in exposure.  As recently as January 15, 2008, Citi had denied that its Alt-A losses posed a substantial risk.[73]   Analyst Susan Roth Katzke of CreditSuisse commented that this new exposure was "[w]orthy of note."[74]

## 3.   Partial But Incomplete Disclosures Regarding ARS

357.   In the April 18, 2008 press release and Form 8-K, Citi also announced for the first time that it had been holding illiquid ARS as a result of failed auctions and deterioration in the credit markets.  In February it had held $11 billion of ARS, but it had managed to reduce its inventory to $8 billion by mid-April.  The Company also took $1.5 billion in write-downs on its ARS inventory.

358.   Analysts specifically noted that this ARS exposure had never before been disclosed, despite the significant write-downs now announced.  As with the Alt-A exposure, Susan Roth Katzke of CreditSuisse saw the new category of exposure as noteworthy.

359.   Although Citi disclosed its own ARS exposure, it did not disclose the potential significant liability associated with the various regulatory investigations underway, or the private suit already filed by Citi's clients who were left holding billions of illiquid ARS.  Crittenden merely said that the Company was taking steps to provide liquidity for its customers.

---

[73] *See* Transcript of Citigroup Earnings Conf. Call at 16-17 (Jan. 15, 2008).

[74] Susan Roth Katzke, *Citigroup First Impressions*, Credit Suisse Equity Research, Apr. 18, 2008, at 2.

### G.  JULY 2008:  CITI TAKES MORE WRITE-DOWNS

360.    Citi released its second quarter earnings for 2008 in a press release and Form 8-K dated July 18, 2008, reporting a net loss of $2.2 billion, or $0.49 per share.  The Company disclosed an additional $7.2 billion in write-downs in securities and banking, including $3.4 billion in CDOs, bringing the total exposure to $22.5 billion.  Citi also reported write-downs of $585 million on highly leveraged finance commitments, $545 million on commercial real estate positions, and $325 million on Alt-A mortgages.  Yet, these write-downs were still inadequate.

361.    Citi noted that its negative revenues were partially offset by a $197 million *gain* on its ARS inventory, and omitted to disclose the potential ARS-related liability it faced in light of the pending government investigations or private lawsuits its clients had commenced. Investors would only learn of this exposure when the SEC and New York Attorney General announced their settlement with Citi.

### H.  AUGUST 2008:  SEC ANNOUNCES ARS SETTLEMENT; CITI IS FORCED TO DISCLOSE ARS EXPOSURE STEMMING FROM CLIENT LOSSES

362.    On August 7, 2008, a settlement was announced between Citi, the SEC, the New York Attorney General, and other state regulators regarding their investigations into the ARS market.  Citi announced its commitment to repurchase $7.3 billion of its clients' ARS.  Citi estimated that the pre-tax difference in value between the purchase price and market value for the ARS then eligible for repurchase was $500 million and that the impact on its balance sheet would be "de minimus."  However, this assertion was based on an unfounded assumption that Citi would eventually resell the ARS at or near face value.  Citi eventually took an additional $612 million in write-downs on its ARS holdings.

363.    Citi also reported that it would work with its clients to provide interim liquidity. For individuals, small institutions, and charities, the Company would provide non-recourse

loans, up to the par amount of their ARS.  For its institutional investor clients, Citi would use its best efforts to facilitate issuer redemptions or to use other means to address liquidity concerns. Citi also disclosed that it was paying $100 million in fines, with $50 million paid to the State of New York and the other $50 million to other state regulatory agencies.

I.   **SEPTEMBER 2008:  CITI ATTEMPTS TO REASSURE MARKET OF ITS VIABILITY, DESPITE FINANCIAL SECTOR TURMOIL**

364.   In early September, 2008, Lehman Brothers was on the verge of collapse and needed a strategic buyer or government intervention in order to survive.  However, Lehman did not find a buyer and the government chose to let the company fail.

365.   To calm market and employee fears, Pandit issued a letter to Citi employees, which the Wall Street Journal published on September 15.  In the letter, Pandit claimed that the Company had managed its critical priorities well over the past year, and that Citi had "tremendous capacity to make commitments to [its] clients."  Pandit also encouraged employees to remind their clients (and shareholders) that Citi had established a very strong capital base and had a strong cash position.

366.   In an interview for a September 21, 2008 article, Pandit told the New York Times that the Company had been a "pillar of strength in the markets" during the recent turmoil.  Pandit also stated that there was no reason to break up the Company into smaller units.  Pandit proclaimed:  "If there's anything I'm right about 100 percent it's the strategy we're on and what we're doing."[75]  Crittenden was quoted in the same article, putting a positive spin on the remaining $22 billion of subprime and mortgage-related securities on Citi's balance sheet, noting that most of the securities pre-dated 2006, "when mortgage lending practices really went off the rails."

---

[75] Julie Creswell & Eric Dash, *Citigroup:  Above the Fray?*, N.Y. TIMES, Sept. 21, 2008.

138

J.    OCTOBER 2008

1.    First TARP Installment

367.    On October 3, 2008, President Bush signed the Emergency Economic Stabilization Act of 2008 (H.R. 1424), commonly known as "the bail-out bill," which gave the Secretary of the Treasury up to $750 billion to purchase "distressed" (*i.e.*, subprime) bank assets in order to restore liquidity and stabilization to the U.S. economy.  The bill created the federal government's Troubled Asset Relief Program ("TARP"), and funds loaned to banks became known as TARP funds.  On October 14, 2008, Citigroup received a $25 billion infusion in TARP funds.

2.    Third Quarter Results Show Still More Write-Downs, With SIVs And Alt-A Securities As Primary Sources

368.    On October 16, 2008, Citi released its third quarter 2008 earnings in a press release and Form 8-K.  The Company announced that quarterly losses had increased from $2.2 billion to $2.8 billion, with loss per share increasing from $0.49 to $0.60.  With these results, it was apparent that Citi had not sustained the slight improvement seen in the second quarter earnings report released in July.

369.    Again, Citi's poor performance was the result of write-downs in the securities and banking operations (totaling $4.4 billion), as well as $4.9 billion in net credit losses, $1.1 billion of which was due to residential real estate losses in North America, and a $3.9 billion charge to increase loan loss reserves.

370.    While Crittenden had emphasized in his interview for the September 21, 2008 New York Times article that "most" of Citi's remaining subprime exposure was in assets pre-dating 2006, substantial exposure to toxic assets issued in or after 2006 remained.  Additionally, although Citi had managed to trim its exposure to subprime CDOs, the losses from its Alt-A

holdings had grown, with a $1.153 billion write-down, its largest yet for these assets and more than triple the amount taken in the second quarter.  Citi disclosed that on holdings of Alt-A assets with a $20.7 billion face value, Citi had already taken write-downs of approximately 35%, leaving it with $13.6 billion in exposure.  Of this remaining exposure, nearly $10 billion was from the troubled period of 2006 and later, and therefore likely to face additional substantial write-downs.  Additionally, Citi was now classifying $10.2 billion of the $13.6 billion as "available for sale," meaning that Citi was no longer applying mark-to-market rules for these assets, as a way to avoid recognizing some of the associated losses the Company had incurred.

371.    Citi also disclosed a $2 billion write-down on its SIV holdings, leaving the Company with $27.5 billion in exposure.

372.    Further, by this time, the losses stemming from Citi's ARS exposure had grown.  Citi's revenues were reduced due to a $612 million write-down related to the Company's ARS settlement, and the third-quarter earnings reflected the previously-announced $100 million fine.

### K.    NOVEMBER 2008

#### 1.    Citi Discloses Reclassification Of $80 Billion In Assets

373.    On November 17, 2008, Citigroup disclosed that it was reclassifying $80 billion in various unspecified assets by designating these assets as "held to maturity," "held for sale," or "held for investment."   This meant that the assets would no longer be marked to market in each reporting period, and the Company would not be required to take large write-downs with each decline in market value.  In essence, this reclassification was an acknowledgment that the reclassified assets had so little value that the Company could not afford to write them down.  Citi did not disclose what assets were included in this $80 billion.

374.    On the same date, Citigroup held a "Town Hall" meeting, in an attempt to reassure its employees.  At that meeting, Pandit explained that the Company had reduced its

risky assets while putting the Company "in a very strong capital position," and that the Company was "very well positioned from a capital standpoint to weather future potential challenges." To the contrary, less than a week later the Company had to be rescued from collapse with a $326 billion federal government bail-out. As *The Wall Street Journal* reported on November 24, 2008, "[e]ven as they assured employees and investors last week that the company was on sound financial footing, Citigroup executives and directors knew they needed to do something fast to stabilize their company."

> **2.     Citi Announces Plan To Dismantle SIVs And Purchase Remaining $17.4 Billion, Yet Reasserts Strength**

375.   On November 19, 2008, Citi revealed publicly that the SIVs were so impaired that it could not find a buyer. Citi announced plans to dismantle its SIVs and repurchase their remaining $17.4 billion in assets in what was billed as a "nearly cashless" transaction. The Company disclosed that the assets of the SIVs had been valued at $21.5 billion as of September 30, 2008, and that the decline reflected sales and maturities of $3.0 billion and a decline in market value of $1.1 billion – in just that six-week period.

376.   Citi's decision to repurchase these assets was part of the Company's program of providing support to the SIVs. The Company indicated that the fair value of its support was $6.5 billion but that it expected to be repaid upon completion of the transaction. Citi also indicated that it would record these assets as available for sale. In other words, Citi was again avoiding the mark-to-market rules that would have entailed additional write-offs on the SIV assets.

377.   The market reacted harshly to this news, with Citi's stock price tumbling 23% by the close of trading on November 19.

378.   In the wake of this news, Defendants' public statements remained steadfastly upbeat. In a statement released on November 19, Pandit stated that the Company was "entering

2009 in an even stronger position than [it] entered 2008," noting its stronger capital base and liquidity and the reduction in expenses and exposure to risky assets.  Pandit emphasized Citi's long-term operating earnings power.[76]

### 3. Federal Government Rescues Citi, With Government Guaranteeing $306 Billion Of Assets And Providing $20 Billion Cash Infusion

379.    Despite Citi's attempts to reassure the market that it remained solvent, it could not restore confidence.  Citi's Board of Directors called an emergency meeting on Friday, November 21, 2008, and the Board spent the weekend negotiating a bail-out plan with various federal agencies.[77]

380.    Ultimately, the weekend negotiations led to an announcement of a $326 billion bail-out package, announced on the evening of Sunday, November 23, 2008.  Pursuant to the agreement reached with the U.S. Treasury, the Federal Reserve Board, and the FDIC, the Treasury would invest $20 billion in TARP funds in Citi preferred stock.  In exchange for an additional $7 billion in preferred stock issued to the U.S. Treasury and the FDIC, the federal government would guarantee $306 billion of securities, loans, and commitments.  The hundreds of billions of dollars of assets requiring the government's guarantee included assets backed by residential and commercial real estate, including subprime-related assets.

### L. JANUARY 2009: DETAILS OF BAIL-OUT REVEAL TRUE WEAKNESSES OF MORTGAGE-RELATED ASSETS AND CONTENTS OF $80 BILLION RECATEGORIZED IN NOVEMBER

381.    On January 9, 2009, Citi announced that it was pursuing a plan to sell its Smith Barney brokerage unit.  Among the plans under discussion was a plan to create a joint venture with Morgan Stanley, despite Pandit's previous commitment to keeping the Company whole.

---

[76] *See* David Enrich, *Citi's Slide Deepens as Investors Bail Out – Shares Drop 23% as SIV Move, Analyst's Warning Spook Market*, WALL ST. J., Nov. 20, 2008, at C1.

[77] *See* Bradley Keoun, *Citigroup Gets U.S. Rescue from Toxic Losses, Capital Infusion*, BLOOMBERG, Nov. 24, 2008.

382.    In light of the government pressure on Citi to raise additional capital and analyst predictions of another loss for the first quarter of 2009, observers saw a deal with Morgan Stanley as likely.  By January 11, 2009, the terms of a proposed deal had been made public.  The plan called for Morgan Stanley to pay $2 billion to $3 billion (or possibly more) for a controlling stake in Smith Barney.  By January 12, a deal had apparently been reached, pursuant to which Morgan Stanley would pay $2.5 billion for a 51% stake in Smith Barney.

383.    That same day, a Wall Street Journal article reported on Citi's continuing troubles.  Fourth quarter losses were expected to be billions of dollars greater than previously anticipated.  Citi was expected to post an operating loss of at least $10 billion when it announced its fourth-quarter earnings on January 22, 2009, marking the Company's fifth consecutive quarterly loss.  Such losses would bring the Company's total 2008 losses to over $20 billion and would put it on track to post its worst year since its predecessor, City Bank of New York, was founded in 1812.

384.    On January 15, 2009, Citi filed a Form 8-K, detailing the terms of the $326 billion federal bail-out.  For the first time, Citi itemized the $301 billion[78] in assets that the government would guarantee.  These assets included $191.6 billion in consumer loans, including $154.1 billion in first and second mortgages, $11.4 billion in Alt-A RMBS, and $22.4 billion in unfunded second mortgage commitments.  The guarantee also covered $6.4 billion of the SIV assets that Citi had purchased.

385.    On January 16, 2009, after days of news coverage regarding the impending deal with Morgan Stanley and the possible creation of a new entity to house the toxic assets, Citi announced its fourth quarter results for 2008, with an $8.29 billion net loss, putting the

---

[78]  In the Form 8-K, Citigroup indicated that the original $306 billion commitment had been reduced to $301 billion, based on adjustments in valuations of certain assets.  *See* Citigroup, Summary of Terms of USG/Citigroup Loss Sharing Program (Form 8-K, Ex. 99.1) (Jan. 15, 2009).

Company's total losses for the year at a staggering $18.72 billion.  This quarterly loss was twice the analyst consensus.

386.    Citi also announced that it would reorganize into two business lines focused on banking and other financial services.  As part of its reorganization plans, Citi announced its intention to sell its CitiFinancial consumer-lending business and Primerica Financial Services life-insurance unit.

## VIII.   LOSS CAUSATION

387.    Plaintiff were damaged as a result of Defendants' untrue statements and omissions as set forth herein.  During the Relevant Period, Defendants issued a series of misrepresentations (and omitted material facts) relating to, *inter alia*, (i) the credit quality of Citigroup's mortgage and leveraged lending portfolios; (ii) the extent to which Citigroup was protected from subprime losses as a result of the Company's purportedly conservative underwriting standards; (iii) the amount and value of Citigroup's subprime-related holdings in its trading portfolios; (iv) the extent to which Citigroup was exposed to a substantial degree of risk in connection with the downturn in the real estate and capital markets; and (v) the extent to which Citigroup was exposed to a substantial degree of risk in connection with its role in sponsoring and selling auction rate securities.

388.    As a result of Defendants' misrepresentations and omissions of material facts, the prices of Citigroup's Securities were artificially inflated from October 12, 2005 until January 15, 2009.

389.    In reliance on Defendants' false statements and omissions and/or on the integrity of the market for the Securities, Plaintiff purchased Securities at artificially inflated prices during the Relevant Period.  But for Defendants' misrepresentations and omissions, Plaintiff would not

have purchased Securities at the artificially inflated prices at which they traded prior to January 16, 2009.

390.    As Defendants' various misrepresentations and omissions were gradually revealed through a series of partial corrective disclosures beginning on October 15, 2007, the price of Citigroup stock steadily declined, ultimately falling by a total of 92% as of January 16, 2009. Citigroup debt securities also lost significant value as investors began to price in a real risk of insolvency in the wake of the partial corrective disclosures.  These price declines were remarkable in an environment of declining interest rates, when bond prices otherwise should have risen.  Citigroup subordinated debt fell the most, and some debt securities lost almost half their value in response to Citigroup's gradual and piecemeal disclosure of the truth.

391.    The declines in the Securities' prices between October 15, 2007 and January 16, 2009, including, but not limited to, the declines summarized below, are directly attributable to the market absorbing information correcting Defendants' misrepresentations and omissions (and/or the materialization of risks that Defendants failed to disclose).

392.    Plaintiff suffered economic losses as the price of Citigroup's Securities fell in response to the issuance of partial corrective disclosures and/or the materialization of risks that Defendants had failed to disclose, as summarized herein.

393.    On October 15, 2007, news implicating Citi's commitment to the SIVs surfaced and Citi released its third quarter earnings.  Over the weekend of October 13 and 14, 2007, press reports had circulated regarding the rescue fund that several major banks, including Citi, were exploring to bail out the SIVs.  Under the plan, whose details were announced before the market opened on Monday, the rescue fund would have purchased highly rated assets from the SIVs and sold short term debt such as commercial paper to help finance the purchases.  However, the

sponsoring banks would have been the first to take losses if the new fund suffered losses on its assets. Thus, Citi effectively admitted that it was liable for the SIV losses all along.

394.    At the Company's third quarter 2007 earnings conference call later that day, Citi indirectly confirmed its financial commitment to its affiliated SIVs.   During the call, Citi revealed that it had been buying commercial paper from some of its SIVs and that this was one of the reasons Citi's balance sheet had deteriorated.   The call also revealed that despite Citi's assurances just a month earlier that its subprime mortgage portfolio looked "pretty good," its reported net income for the quarter had declined 57% from a year earlier because of, in part, a write-down of subprime mortgage losses totaling $1.56 billion (pre-tax and net of hedges) that Citi had "warehoused for future collateralized debt obligation … securitizations" and a $2.24 billion charge to increase loan loss reserves.[79]

395.    In reaction to all of this news, Citi's stock price plummeted $3.09 per share or 6.45% over the immediately following two trading days, from $47.87 on Friday October 12, 2007 to $44.79 on Tuesday, October 16, 2007, for a loss of market capitalization of over $15 billion.

396.    On October 19, 2007, the New York Times published an article detailing Citi's quiet attempts to shore up the finances of its affiliated SIVs, revealing that Citi had been disguising its commitments.   On October 19, 2007, Citi's stock price declined another $1.47 to close at $42.36, for an additional loss of market capitalization of approximately $7.3 billion.

397.    On Wednesday, October 31, 2007 and Thursday, November 1, 2007, Citi announced that it was convening an emergency weekend board meeting, which was followed by news that Citi might replace its management team.   As a result, Citi's stock price declined 10.4%

---

[79]   Ciitgroup Press Release, "Citigroup Reports Net Income of $2.2 Billion, Earnings Per Share of $.44" (Oct. 15, 2007).   Citigroup announced a further $5.24 billion in write-downs, relating to losses in other parts of its business, for a total write-down of approximately $6.8 billion.

from the close of $42.11 on Tuesday, October 30, 2007, to $37.73 on Friday, November 2, 2007, representing a loss in market capitalization of nearly $22 billion in two trading days.

398.    On Sunday, November 4, 2007, Citi issued two dramatic press releases.  In the first, Citi disclosed an additional $43 billion in CDO exposure and write-downs of $8 to $11 billion on its CDOs.  In the second, the Company announced the abrupt resignation of CEO Prince, effective on Monday, November 5.  On the news of Prince's sudden resignation and the increased exposure and write-downs, Citi's stock fell 4.85% to $35.90 at the close on November 5.  By the end of the week, November 9, the stock was down to $33.10.  Various Citi debt securities also started to fall in price, reflecting increasing concern among investors that default by Citi was no longer impossible.  According to an event study conducted by Raymond Wolff, Ph.D., a financial economist with the SEC, the November 4, 2007 disclosures caused a statistically significant decline in Citigroup's bond prices.

399.    On January 15, 2008, in announcing its fourth quarter 2007 results, Citi admitted to investors that its subprime losses would result in a fourth quarter loss of nearly $10 billion. During the two month period from October 12, 2007 to January 15, 2008, Citi's stock price had fallen from $47.87 to $26.94.  Over the next four trading sessions after the January 15 announcement (January 16, 17, 18, and 22, 2008), the stock price fell further as the market fully digested the details of the fourth quarter loss, temporarily bottoming out at $24.40 on January 22, 2008.

400.    The situation continued to deteriorate, particularly in the second half of 2008.  For example, on August 7, 2008, when the SEC and New York Attorney General announced the settlement regarding the ARS investigation, Citi's stock price declined from $19.70 on August 6 to a closing price of $18.47 on August 7.

401.    Throughout August and September 2008, the stock price hovered between $18 and $22, climbing back up to $23.00 on October 1, 2008 – a high that has not been reached since.  The price then began a steady decline.  Although Citi's stock price briefly increased from $15.75 to $18.62 on October 14, 2008, when the first infusion of TARP funds was announced, those gains could not be sustained.  On October 15, 2008, the stock closed at $16.23, down almost 13%.

402.    On October 16, 2008, Citigroup announced its third quarter results: a net loss of $2.8 billion (and $3.4 billion from continuing operations), largely due to another $4.4 billion in write-downs in the Securities and Banking division.  In reaction, the stock price fell from $16.23 to $15.90, and closed at $14.88 on Friday, October 17.  In all, during that week, Citi's stock dropped 20% from a closing price of $18.62 on October 14 to $14.88 by October 17, nearly twice the drop in the S&P financial index during that time.

403.    On November 17, 2008, Pandit held an employee Town Hall meeting where he revealed that $80 billion of assets would no longer be valued, causing the stock price to drop from $9.52 to $8.89, nearly a 7% decline.  The next day, the price dropped further, down to $8.36.

404.    Then, on November 19, 2008, Citi announced that it would have to unwind its SIVs and take a $17.4 billion hit to do so.  On this news, Citi's stock price dropped over 23% in *one day*, down to $6.40.  By the end of the week, on Friday, November 21, the stock had fallen to $3.77 from its high on Monday of $9.52 – a 61% drop in five days.  Moreover, the trading volume increased dramatically over the course of the week, from approximately 168 million shares on November 17, to nearly 342 million shares on November 19, up further to almost 725 million on November 20, and finally hitting the 1 billion mark on November 21.  Citi bond

prices also plummeted in response to the news, in varying degrees based on degrees of default risk based on the priority of the securities.  For example, from November 17, 2008 to November 21, 2008, the Depositary Shares fell from $66.52 to $39.82, before recovering some of their value.

405.    As Citi was on the verge of collapse, the federal government stepped in to engineer a rescue.  On the evening of Sunday, November 23, 2008, the $326 billion rescue package was announced.  The market reacted positively to this news, with the stock closing up from $3.77 to $5.95.

406.    Citi's stock price improved on this rebound over the next two weeks, generally closing between $6.50 and $8.50, yet not enough to return to the November 17 closing price of $8.89.  Then, on December 11, 2008, with the disclosure of the SEC's complaint (which revealed Citi's prior knowledge of the ARS risks), Citi's stock fell from $8.30 per share to $7.57, a decline of almost 9%.

407.    In early January 2009, the situation deteriorated further.  Over the weekend of January 10-11, and then on Monday, January 12, several articles appeared in the business press indicating that Citi's condition was precarious.  First, the articles discussed Citi's upcoming release of its fourth quarter results, noting that some analysts expected Citi to announce a loss of up to $10 billion, far higher than the $4.1 billion previously estimated by analysts, surpassing the $9.8 billion reported in the fourth quarter of 2007, and approximately the amount of the losses incurred in the three previous quarters together.[80]  Additionally, these articles reported that the deal for Morgan Stanley to take a majority interest in Citi's Smith Barney brokerage unit was likely to be announced that week.  This news signaled to investors that Citi was desperate to

---

[80]  *See* David Enrich, *Citi Board Backs CEO as Outlook Worsens*, WALL ST. J., Jan. 12, 2009.

generate capital, since Smith Barney was still profitable and Pandit had previously indicated that he had no interest in spinning off that part of the Company.

408.    In reaction to this news, Citi's stock price dropped from $6.75 to $5.60, with nearly 3 million shares traded, twice the volume of the previous day.  Although the price recovered slightly to close at $5.90 on Tuesday, a BusinessWeek article appearing on Wednesday, January 14, 2009, noted that Citi's key problem – its toxic assets – had yet to be addressed, and could be worth as much as $150 billion.[81]  Citi's investors reacted to this news with another sell-off, with over 500 million shares traded, compared to 274 million the day before.  The price dropped from $5.90 to $4.53, a 23% decline, and fell further on January 15, closing at $3.83.

409.    On January 16, 2009, Citi released its results for the fourth quarter of 2008, reporting a loss of $8.29 billion, worse than the $4 billion predicted.  In response to this news, Citi's price fell again, down to $3.50.

410.    Between December 11, 2008, and January 16, 2009, Citi's stock price fell approximately 58%, from $8.30 to $3.50, more than double the drop experienced by Citi's peers in the Standard & Poor's financial index during that time.  Citi also achieved the dubious distinction of having the worst performance for two years in a row (2007 and 2008) among large U.S. banks, according to the KBW Bank Index.[82]

411.    Likewise, as a direct result of the market learning the truth of Citi's finances, the value of the most junior subordinated Citi debt securities was eventually cut almost in half, and even the senior Citi Notes lost value, despite a massive reduction in interest rates in 2007 and

---

[81]  Mara Der Hovanesian, *Citigroup: Let the Breakup Begin*, BUS. WK., Jan. 14, 2009.

[82]  *See* Bradley Keoun & Christine Harper, *Citi May Book $10 Billion Gain on Morgan Stanley Deal*, BLOOMBERG, Jan. 12, 2009.

2008, which otherwise should have raised Citi's corporate bond prices. For example, the Fed's discount rate fell from 6.25% to 0.5% during the Relevant Period. That Citi's bond prices fell in this environment reflected investors' fears of an increasing likelihood of a Citi default in response to Citi's belated disclosures of the truth.

412.   In total, from October 12, 2007 through January 16, 2009, Citigroup's stock fell almost 93%, from $47.87 to $3.50. In comparison, the stock prices of its peers, as measured by the Standard & Poors financial index, fell only 72%.

413.   From January 1, 2007 through January 16, 2009, Citi's stock fell 93%, while the S&P Financial Index fell only 73.2% and the Dow Jones Industrial Average (of which Citi was component during this period) fell only 34.6%. Over the same period, JP Morgan fell 50.1% and Goldman Sachs declined by 64.9%. Even another troubled bank, Bank of America, did not fare as poorly as Citi, with its stock falling by 84.5% – still 900 basis points better than Citi. The following charts illustrate these differences in performance:





414.    In testimony before the United States Senate FCIC (discussed in more detail below), Defendant Prince admitted that Citi's write-downs of CDOs and related securities were a "substantial" cause of the collapse of Citi's share price relative to other banks.  Specifically, he testified: "Citi's write-downs on these specific securities totaled some $30 billion over a period of six quarters.  And I believe it is fair to say that this factor alone made a substantial part of the difference between Citi's ultimate problems and those of other banks."

415.    At the same hearing, Robert Rubin confirmed the same: "In my view, there were two primary causes of these problems [at Citi].  First, Citi, like other financial institutions, suffered large losses due to the financial crisis . . . the losses in Citi's businesses, other than CDOs were roughly comparable to peer firms.  Second, Citi suffered distinctively high losses as a result of its retention of so-called super senior tranches of CDOs."  Rubin further emphasized that "these losses were a substantial cause of the bank's financial problems and led to the assistance of the United States government."

## IX.   TOLLING OF THE STATUTE OF LIMITATIONS FOR PLAINTIFF'S NON-FRAUD-BASED CLAIMS

416.   The statutes of limitations for Plaintiff's claims under the Securities Act were tolled by the filing of (i) the putative class action captioned *Saltzman v. Citigroup, Inc., et al.*, No. 07-cv-9901 (S.D.N.Y.) (filed November 8, 2007), which was later consolidated with other related class actions under the caption *In re Citigroup Inc. Securities Litigation*, Master File No. 07-cv-9901 (SHS) in the United States District Court for the Southern District of New York; and (ii) the putative class action captioned *Louisiana Sheriffs' Pension and Relief Fund, et al. v. Citigroup, Inc., et al.*, No. 602830/08 (filed on September 30, 2008) in the Supreme Court of New York, which was later removed to federal court and consolidated under the caption *In re Citigroup Inc. Bond Litigation*, Master File No. 08-cv-9522 (SHS).   Each of the Defendants against whom Plaintiff's Securities Act claims are asserted was named as a defendant in one or more of these actions, and Plaintiff falls within the definition of the class(es) on whose behalf the class actions were filed and remain pending.   The class actions assert the same or substantially similar claims to those asserted by under the Securities Act, and the filing of those actions was sufficient to put Defendants on notice of the wrongdoing with which they are charged herein.

417.   No tolling of the statutes of limitations is required for Plaintiff's claims under English law, because those claims have been asserted within the applicable limitations period.

## X.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT ONE
### For Violations Of Section 11 Of The Securities Act
**(Against Defendants Citigroup, Citigroup Global Markets, Armstrong, Belda, David, Derr, Deutch, Ramirez, Liveris, Mulcahy, Parsons, Rodin, Ryan and Thomas)**

418.   Plaintiff repeats and realleges each and every allegation above as if fully set forth herein, except any allegations that the Defendants made the untrue statements and omissions

intentionally or recklessly. For the purposes of this Count, Plaintiff expressly disclaims any claim of fraud or intentional misconduct.

419. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, against Defendants Armstrong, Belda, David, Derr, Deutch, Ramirez, Liveris, Mulcahy, Parsons, Rodin, Ryan and Thomas (the "Section 11 Individual Defendants") and Citigroup and Citigroup Global Markets.

420. Plaintiff asserts Section 11 claims based on its purchases of the Securities that were offered in the U.S. Offerings, including securities purchased in those offerings and those purchased in the open market, all of which are traceable to the Registration Statement/Prospectus.

421. The effective date of the Registration Statement/Prospectus for purposes of a particular security is the date of the prospectus or prospectus supplement for that security, and the Registration Statement/Prospectus is deemed to have been re-published on that date.

422. Citigroup Global Markets was the sole or primary underwriter of the securities issued in the U.S. Offerings pursuant to the Registration Statement/Prospectus. Citigroup Global Markets failed to make a reasonable and diligent investigation of the accuracy and completeness of the statements contained and incorporated in the Registration Statement/Prospectus. It did not possess reasonable ground to believe, as of the effective date of the registration statement for each offering, that the statements contained and incorporated in the Registration Statement/Prospectus were true and that there was no omission of material fact required to be stated in order to make the statements therein not misleading.

423. Each of the Section 11 Individual Defendants was a director of Citigroup on the effective date of the Registration Statement/Prospectus for one or more of the Securities at issue

in this Count.  Listed below are the Securities, effective dates, and the Defendants who were

directors of Citi on each effective date:

| Security | Effective Date | Defendants Who Were Directors |
|---|---|---|
| 5.875% Notes Due 2037 (ISIN US172967EC18) | June 5, 2007 | Armstrong, Belda, David, Derr, Deutch, Ramirez, Liveris, Mulcahy, Parsons, Rodin, Thomas |
| 6.125% Notes Due 2018 (ISIN US172967ES69) | May 20, 2008 | Armstrong, Belda, Derr, Deutch, Ramirez, Liveris, Mulcahy, Parsons, Rodin, Ryan, Thomas |
| 5.50% Notes Due 2012 (ISIN US172967EJ60) | August 31, 2007 | Armstrong, Belda, David, Derr, Deutch, Ramirez, Liveris, Mulcahy, Parsons, Rodin, Ryan, Thomas |
| 6.5% Notes (ISIN US172967EU16) | August 19, 2008 | Armstrong, Belda, David, Derr, Deutch, Ramirez, Liveris, Mulcahy, Parsons, Rodin, Ryan, Thomas |

424.    Additionally, each of the Section 11 Individual Defendants except Ryan signed

the Registration Statement/Prospectus.

425.    The Section 11 Individual Defendants failed to make a reasonable and diligent

investigation of the accuracy and completeness of the statements contained and incorporated in

the Registration Statement/Prospectus.  The Section 11 Individual Defendants did not possess

reasonable ground to believe, at the time of the Offerings, that those statements were true and

that there was no omission of material fact required to be stated in order to make the statements

therein not misleading.

426.    The prices of the Securities were substantially and artificially inflated during the

Relevant Period as a result of the untrue statements and omissions of material fact alleged herein,

and Plaintiff was harmed thereby when they purchased these Securities at inflated prices.

427.    When purchasing the Securities at issue in this Count, Plaintiff relied on the

Registration Statement/Prospectus and the documents incorporated by reference therein as being

true and complete in all material respects, and did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements or omissions of material facts.

428.    By reason of the foregoing, Citigroup, Citigroup Global Markets, and the Section 11 Individual Defendants are liable to Plaintiff for violations of Section 11 of the Securities Act.

### COUNT TWO
### For Violations Of Section 12(a)(2) Of The Securities Act
### (Against Citigroup And Citigroup Global Markets)

429.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein, except any allegations that the Defendants made the untrue statements and omissions intentionally or recklessly.   For the purposes of this Count, Plaintiff expressly disclaims any claim of fraud or intentional misconduct.

430.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), against Defendants Citigroup and Citigroup Global Markets, arising out of Plaintiff's purchases of 6.125% Notes and 6.5% Notes in the U.S. Offerings.

431.    Each of the U.S. Offerings was a public offering.

432.    The 6.125% Notes and 6.5% Notes purchased by Plaintiff in the U.S. Offerings were offered for sale by Citigroup.  Citigroup offered, sold, and solicited Plaintiff's purchase of these securities by the use of means or instruments of transportation or communication in interstate commerce or of the mails.  It did so through, *inter alia*, preparation and filing of the prospectuses and prospectus supplements, and by having its wholly-owned subsidiary (Citigroup Global Markets) serve as primary underwriter of the Offerings.  In offering and soliciting the sale of securities in the Offerings, Citigroup was motivated by its own financial interests, as it was the recipient of the proceeds from the sale of the securities.

433.    Citigroup Global Markets was the sole or primary underwriter of the offerings of the 6.125% Notes and 6.5% Notes.  As such, it offered, sold and solicited Plaintiff's purchase of

these securities by the use of means or instruments of transportation or communication in interstate commerce or of the mails.  In doing so, Citigroup Capital Markets was motivated by its own financial interests and those of its parent, Citigroup.

434.    Upon information and belief, Plaintiff purchased 6.125% Notes and 6.5% Notes directly from Citigroup and/or Citigroup Global Markets in the offerings.

435.    As alleged in detail herein, the prospectuses and prospectus supplements for the U.S. Offerings, and in particular the SEC filings incorporated by reference therein, contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

436.    Citigroup and Citigroup Global Markets did not make a reasonable and diligent investigation and did not possess reasonable grounds for believing that the prospectuses and prospectus supplements and the statements incorporated therein were true and did not omit to state a material fact required to be stated therein or necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

437.    Plaintiff did not know, nor in the exercise of reasonable diligence could it have known, of the untruths and omissions in the prospectuses and prospectus supplements and/or in the documents incorporated therein by reference, at the time Plaintiff acquired 6.125% Notes and 6.5% Notes in the U.S. Offerings.

438.    By reason of the foregoing, Citigroup and Citigroup Global Markets are liable to Plaintiff for violations of Section 12(a)(2) of the Securities Act.

**COUNT THREE**

**Control Person Liability Pursuant To Section 15 Of The Securities Act**
**(Against Defendants Pandit, Crittenden, Druskin, Maheras, Klein And Gerspach**
**Based On Violations Of Sections 11 and 12(a)(2) Of The Securities Act By Citigroup)**

439.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein, except any allegations that the Defendants made the untrue statements and omissions intentionally or recklessly.  For the purposes of this Count, Plaintiff expressly disclaims any claim of fraud or intentional misconduct.

440.    This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, against Defendants Pandit, Crittenden, Gerspach, Druskin, Maheras and Klein (collectively, the "Section 15 Individual Defendants").

441.    As alleged above, Citigroup violated Sections 11 and 12(a)(2) of the Securities Act with respect to the Registration Statement/Prospectus and prospectus supplements for the U.S. Offerings, all of which contained or incorporated untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading.

442.    The Section 15 Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Citigroup, including the content of its financial statements and other statements that were incorporated by reference in the Registration Statement/Prospectus and the prospectuses and prospectus supplements for the U.S. Offerings, within the meaning of Section 15 of the Securities Act.

443.    Pursuant to Section 15 of the Securities Act, the Section 15 Individual Defendants are jointly and severally liable with and to the same extent as Citigroup, for Citigroup's violations of Sections 11 and 12(a)(2) of the Securities Act.

## COUNT FOUR
### Control Person Liability Pursuant To Section 15 Of The Securities Act
### (Against Defendant Citigroup Based On Violations Of Sections 11 and 12(a)(2)
### Of The Securities Act By Citigroup Global Markets)

444.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein, except any allegations that the Defendants made the untrue statements and omissions intentionally or recklessly.  For the purposes of this Count, Plaintiff expressly disclaims any claim of fraud or intentional misconduct.

445.    This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, against Citigroup.

446.    As alleged in detail herein, Citigroup Global Markets violated Sections 11 and 12(a)(2) of the Securities Act.

447.    Citigroup Global Markets is a wholly-owned subsidiary of Citigroup, and serves as Citigroup's brokerage and securities arm.  As a result, Citigroup had the power to influence and control, and did influence and control, directly or indirectly, the activities and decision-making of Citigroup Global Markets.

448.    Pursuant to Section 15 of the Securities Act, Citigroup is jointly and severally liable with and to the same extent as Citigroup Global Markets, for Citigroup Global Markets' violations of Sections 11 and 12(a)(2) of the Securities Act.

## XI.    NON-FRAUD CLAIM UNDER ENGLISH LAW

### COUNT FIVE
### For Violations of Section 90 of the Financial Services and Markets Act 2000, As Amended
### (Against Defendant Citigroup)

449.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein, except any allegations that the Defendants made the untrue statements and omissions

intentionally or recklessly. For the purposes of this Count, Plaintiff expressly disclaims any claim of fraud or intentional misconduct.

450. This Count is brought pursuant to Section 90 of the Financial Services and Markets Act 2000 ("FSMA 2000"), as amended by Statutory Instrument 2005 No. 1433 (the "Prospectus Regulations 2005") against Citigroup, seeking damages in relation to Plaintiff's purchase and/or acquisition of the classes of securities that were offered in the European Offerings, including purchases in the offerings and in the secondary market. These securities were issued pursuant to Base Prospectuses and supplements thereto which were issued by Citigroup to Plaintiff and other potential investors.

451. By their terms, the Base Prospectuses and supplements for the European Offerings are governed by English law.

452. Citigroup made misrepresentations in the Base Prospectuses and supplements by incorporating by reference SEC filings that contained misrepresentations of material fact, as alleged herein, and omitted matters that were required to be included.

453. Section 90 of the FSMA 2000, as amended by Section 6 of the Prospectus Regulations 2005, provides for compensation to investors who purchased securities to which a prospectus or supplementary prospectus applies, and who suffered loss as a result of any untrue or misleading statement in the prospectus or supplementary prospectus, or an omission of information required to be included by the FSMA 2000.

454. The Base Prospectuses and supplements thereto were approved by Luxembourg's *Commission de Surveillance du Secteur Financier* (the "CSSF"). Luxembourg is a member of the European Economic Area (the "EEA"), and the CSSF is the competent authority in

Luxembourg with authority to approve prospectuses under Article 18 of the Prospectus Directive (the "PD") as implemented in Luxembourg.

455.    Prospectuses approved by the competent authority in any EEA member state are treated in the same way as those approved by the FSA if the relevant competent authority provides a certificate of approval and a copy of the approved prospectus to the FSA.

456.    Citi applied for a certificate of approval under Article 18 of the PD as implemented in Luxembourg, to be issued by the CSSF to the FSA in the United Kingdom. Pursuant to Article 18 of the PD, the CSSF is required to provide, and upon information and belief did provide, a certificate of approval and a copy of the approved Citigroup prospectus to the FSA.  The Base Prospectuses and supplements are thus treated as having been approved by the FSA.

457.    Plaintiff acquired securities to which the Base Prospectus and supplements apply.

458.    Plaintiff suffered loss as a result of the misrepresentations and omissions.

459.    Citigroup is responsible for the content of the Base Prospectuses and supplements, and is strictly liable for the misrepresentations contained or incorporated therein and for omitting matters that were required to be included.

460.    By reason of the foregoing, Citigroup is liable to Plaintiff for compensation as provided by Section 90 of the FSMA 2000, as amended.

## XII.    ADDITIONAL FACTUAL ALLEGATIONS PERTINENT TO PLAINTIFF'S FRAUD-BASED COUNTS

461.    The allegations set forth below relate exclusively to Counts Six and Seven of the Complaint: Plaintiff's claims against Citigroup, Prince, Pandit, Crittenden, Freiberg, Druskin, Maheras, Klein, Gerspach and Tildesley (collectively, the "Fraud Defendants") pursuant to

Sections 10(b) and 20(a) of the Exchange Act.  Plaintiff also incorporates by reference the allegations set forth above in ¶¶ 1-415 for purposes of these counts.

A.    THE FRAUD DEFENDANTS' SCIENTER

462.    As alleged above, Citigroup issued SEC filings, press releases, and other public statements throughout the Relevant Period that contained material untrue statements and omitted material information.  The Fraud Defendants' positions at Citigroup, their knowledge of the true facts, their actual issuance of and/or control over Citigroup's materially false and misleading statements, and their motives to commit fraud, give rise to a strong inference that they acted with scienter – *i.e.*, that they knew or recklessly disregarded the false and misleading nature of their statements to investors, and that they knowingly or recklessly deceived Plaintiff in connection with Plaintiff's purchase and sale of Citigroup securities during the Relevant Period.

463.    The Fraud Defendants also knew or recklessly disregarded that the misleading statements and omissions contained in Citigroup's public statements would adversely affect the integrity of the market for its Securities and would cause the price of those Securities to be artificially inflated.  The Fraud Defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon Plaintiff.

1.    **The Fraud Defendants Knew That Citi's Mortgage Portfolio Contained High-Risk Subprime Loans That Would Lead To Large Losses**

464.    Both before and during the Relevant Period, the Fraud Defendants knew that Citi's loan portfolio was steadily deteriorating, leading to increased defaults and substantial, inescapable losses.

465.    Until 2008, Citi was an industry leader in extending subprime mortgages and refinancings.  However, Citi's subprime loans were extended based on shoddy underwriting and, often, abusive and predatory terms, thereby heightening the risk that a significant number of the

borrowers would ultimately default.  Citi's loan portfolio also ballooned by an increased reliance on purchases of loans from correspondent lenders who specialized in loans to high-risk borrowers on terms likely to lead to default.

466.    The Fraud Defendants knew that for the loans Citi had originated, the quality of its underwriting did not protect the Company from significant subprime (and Alt-A) losses.  By the end of 2006, subprime borrowers made up 25% of Citi's $160.9 billion mortgage portfolio, with Citi originating roughly $40 billion in subprime loans in the third quarter of 2006 alone. Moreover, given that the subprime loans originated in late 2006 were, according to Citi, the "poorest credits,"[83] it was clear to the Fraud Defendants that Citi was likely to suffer major losses from its nonprime loans.

467.    Additionally, Citi's high volume of loans with an LTV ratio of 90% or greater created a further point of vulnerability, which the Fraud Defendants knew about but did not disclose.  Similarly, as of December 2007, Citi held roughly $63 billion in second mortgages, with over 50% of these loans having an LTV over 80%, and over one-third having an LTV ratio over 90%.

468.    The Fraud Defendants knew that Citi's consumer banking operations were seeing mounting losses as early as mid-2006, and that Citi was therefore required to increase its loan loss reserves as early as the fourth quarter of 2006.  Additionally, the Fraud Defendants knew that the dollar amount of Citi's reserves had declined during 2006, and that in its consumer banking operations, the loan loss reserve ratio exceed the Company's actual losses throughout 2006.

---

[83] *Citigroup*, THE SUBPRIME CRISIS: AN OVERVIEW 21 (Mar. 3, 2008).

469.    On January 26, 2007, Citigroup's Fixed Income Research group issued a report titled *Explaining 2006: Worst Vintage in Subprime History*, which concluded that the subprime mortgages forming the bulk of the collateral for Citigroup's retained, supposedly "super senior" CDOs, were at high risk of default.   At a January 31, 2007 Citigroup Financial Services Conference, Defendant Prince stated, "we've never written any of the riskier products like option ARMs and interest only.   It's not that we wrote it and dumped it on some poor soul, we didn't write it."   However, much of the collateral behind Citi's CDO portfolio consisted of these "riskier products."   Thus, Citigroup was the "poor soul" that other banks were dumping their risky assets onto – assets whose risks were well known to Citigroup's top executives from the beginning of the Relevant Period.

470.    The trend grew more pronounced during 2007, when Citi's delinquencies (*i.e.*, loans more than 90 days past due) increased substantially.   In its U.S. consumer mortgages, the delinquency rate within its first mortgage portfolio increased from 1.38% in the third quarter of 2006 to 2.54% by the fourth quarter of 2007.   Significantly, the delinquency rate for subprime loans (with FICO less than 620) had jumped to 7.83%; Citi held approximately $24 billion of these high-risk loans.   Similarly, within its second mortgage portfolio, the delinquency rate increased from 0.25% in the third quarter of 2006 to 1.38% at the end of 2007.   For loans with an LTV of 90% or greater, that rate was even higher, 2.48%.   Roughly $21 billion of Citi's $63 billion second mortgage portfolio were these higher-risk loans.[84]

471.    Although the subprime storm had clearly started to gather by the beginning of 2007, Prince admitted to the *Financial Times* in July 2007 that Citi was still engaged in its dangerous subprime dance.   In a now infamous interview, he said, "When the music stops, in

---

[84]   *See* Citigroup Annual Report (Form 10-K), at 50-51 (Feb. 22, 2008).

terms of liquidity, things will get complicated.  But as long as the music is playing, you've got to get up and dance.  We're still dancing."  On November 4, 2007, the UK's Telegraph opined that "[t]hose words are now being carved on his corporate gravestone."

472.    In sum, the Fraud Defendants knew that Citi's losses were increasing and that due to the composition of its mortgage portfolio, those losses were sure to increase.  Yet they continued to misrepresent the extent of risk and failed to increase Citi's loan loss reserves, thereby overstating the Company's income by billions of dollars and concealing from investors that the Company expected loan losses.

473.    Further, the Fraud Defendants were aware of mounting losses in mortgages the Company had purchased through correspondent channels, as well as loans purchased from lenders in financial distress, such as Accredited Home Lenders ("Accredited").  Indeed, in its zeal to make a quick profit, Citi had set itself up with a portfolio that was destined to suffer large long-term losses, primarily through its greater reliance on correspondent lenders.  The Company had increased the volume purchased through correspondent channels from $69 billion in 2005 to $94 billion in 2007, and these loans exhibited higher delinquency rates.  Accordingly, Citi saw mounting losses through these channels, and in 2007 and 2008 filed more than two dozen lawsuits against these lenders.  Notably, however, the documents filed in these actions reveal that Citi had begun seeing substantial problems with the loans it had purchased by mid-2006.  Thus, while Citi eventually filed suit to force certain correspondent lenders to repurchase defective loans, it waited over a year between making the first demand for repurchase and filing suit.  In the most striking example, Citi filed suit against Michigan Mutual in May of 2008, yet had first demanded repurchase of the loans in July of 2006.

474.    Similarly, in mid-March 2007, Citi purchased a $2.7 billion package of mortgage loans from Accredited, without conducting pre-closing due diligence on the loans in the portfolio.  As it turned out, hundreds of loans had clear deficiencies.  As Citi stated in its complaint filed against Accredited, nearly 7,000 of the 15,000 loans Citi purchased from Accredited were "impaired by missing, incorrect, or defective documentation."[85]  Citi recognized many of the problems with the Accredited portfolio by mid-2007.  For example, Citi claimed in its complaint that a significant number of the loans suffered early payment default, meaning payments were delinquent in the first 90 days.[86]  Because – by definition – these defaults became apparent quickly, Citi knew of them by mid-June 2007, *i.e.*, 90 days after the mid-March purchase from Accredited.  Additionally, Citi alleged in its complaint against Accredited that "[b]y mid-November 2007, it had become apparent to both Plaintiff and Defendant that the Mortgage Loan Pool transferred eight months before was worth at least $75 million less than what Plaintiff paid for it."[87]  Despite knowing that these problems with Accredited were already percolating, the Fraud Defendants continued to conceal those problems – and associated losses likely to occur – and Citi did not bring suit against Accredited until April 2008.

475.    Upon information and belief, during the November 5, 2007 conference call, when Defendant Crittenden discussed $4.2 billion in subprime loans that had been purchased at "appropriate prices" during the prior six months, which were "performing loans,"[88] the $4.2 billion improperly included the loans purchased from Accredited.

---

[85]   *Citigroup Global Markets Realty Corp. v. Accredited Home Lenders, Inc.*, 08-cv-3545 (RJH) (DCF), First Amended Complaint ("Accredited Compl.") ¶ 39.

[86]   Accredited Compl. ¶ 98.

[87]   *Id.*

[88]   *See* Transcript of Citigroup Special Conf. Call at 3 (Nov. 5, 2007).

### 2. The Fraud Defendants Knew Citi Was Exposed To Losses Via Its Subprime Holdings

476. From at least the end of 2006, the Fraud Defendants knew that the downturn in the subprime market would adversely affect the assets created with the underlying subprime loans. First, they knew Citi could not sell the warehoused RMBS that were awaiting securitization, but repeatedly avoided disclosing this exposure to Citi's investors. Second, they knew Citi held unsold tranches of the CDOs it had sponsored, yet quarter after quarter, assured the market that Citi had sold off the risk associated with these subprime-related assets. Third, with its insider knowledge as to how the CDOs were structured, Citi knew that its CDOs could not be sold at face value, and that their value was falling throughout 2007. Fourth, Citi knew that its Commercial Paper CDOs contained liquidity puts thus exposing the bank to billions of dollars of undisclosed subprime risk. And fifth, Citi was the third-largest originator of synthetic CDOs in the world, had almost unparalleled access to information related to the both the short and long sides of the CDO trade, and thus knew better than most banks that its CDOs were overvalued throughout 2007 and 2008. Despite this knowledge, the Fraud Defendants deliberately withheld information regarding Citi's exposure until the requisite write-downs were so extreme that Citi could no longer avoid them.

### a. The Fraud Defendants Knew The CDOs Were Not Structured To Withstand The Collapse Of The Housing Market

477. As the world's largest issuer of RMBS-backed CDO securities in 2007, Citi understood better than any other bank the modeling used to create these assets. The Fraud Defendants understood that certain assumptions were made in order to assess the likely losses, which were necessary in order to create the different tranches, with each tranche's rating reflecting the expected loss.

478.    The underlying assumptions were premised on optimistic conditions that did not exist.  For example, Citi's model assumed that housing prices would rise by 6% annually, but by late 2005, housing prices had already begun to fall, and that assumption was no longer valid. Nonetheless, Citi continued to use this outdated model in assessing its CDO exposure at least until the end of 2006, although it was clear to others within the Company and the industry that those assumptions were no longer valid.

479.    The Fraud Defendants knew that the projected losses were only reasonable if the underlying assumptions were accurate.   Once the optimistic assumptions regarding housing prices were no longer operative, the Fraud Defendants knew that the losses would be far more drastic than those projected when the CDOs were created – and rated.  Thus, the losses would easily spread beyond the BBB-rated tranches, and the so-called super senior tranches were far from immune to the overall market decline.  In essence, the ratings were no longer valid.  The Fraud Defendants knew they could no longer assume the ratings were a reliable indicator of the projected losses, but disregarded that fact in order to avoid making the necessary disclosures and taking the necessary write-downs.

480.    Indeed, it appears that Citi worked with rating agencies to manipulate the debt ratings of its CDOs and then Citi used these ratings to overvalue the assets on its balance sheet. A 2007 report, cited in an article by professor John Coffee, Jr. of Columbia University, indicates that the conflicts of interest between investment banks such as Citigroup and the ratings agencies led to massive and improper inflation in the ratings provided to CDOs.[89]  The article reports that corporate bonds rated Baa by Moody's, which is the lowest investment grade rating, had a default rate of 2.2% from 1983 to 2005.  On the other hand, CDOs given the same Baa rating by

---

[89] John Coffee, Jr., *Grade Inflation*, Nat'l L.J., Sept. 10, 2007, at 12.

Moody's had a default rate of 24% over the same period – more than 10 times higher than the bond default rate.  According to Professor Coffee, the only possible explanation for this rate differential is that the ratings agencies, because of their conflict of interest, significantly inflated the ratings provided to CDOs at the behest of giant investment banks such as Citi.  Citi, because of its central involvement in the ratings process, knew that many of its CDOs were not investment grade, but it continued to carry them on its books as if they were – with no disclosure of the increased risks to investors.

481.    Additionally, Citi's valuation model was premised on a degree of correlation among CDOs that was unrealistically low.  The reality was that the correlation was much higher than that assumed in the model, and the losses were more likely to occur, were more likely to be substantial, and were more likely to reach even the super senior tranches.  No later than early 2007, the Fraud Defendants were aware of how the CDOs were likely to perform and that the Company's portfolio was likely to sustain heavy losses.

482.    Furthermore, other CDO underwriters knew of the increasing risks facing CDOs by at least early 2007.  For example, HSBC had already starting taking massive write-downs to its CDO portfolio by February 2007.  Likewise, in March of 2007, UBS conducted a secret experiment, attempting to sell a representative sample of its CDO portfolio, and discovered that market prices would have averaged 50 cents on the dollar (although UBS suppressed this information).  It is inconceivable that Citi and its senior executives were unaware of the risks facing RMBS-backed CDO securities, when Citi was the largest issuer of those securities.

b.     **The Fraud Defendants Knew Citi's CDOs Were Not Immune
To The Market Downturn**

(1)     **Citi Publicly Acknowledged Risks Associated With
CDOs**

483.    Citi knew that its CDOs were likely to suffer from massive defaults in the
subprime arena.  During an annual credit conference in Monaco in early March 2007, Citi's head
credit strategist, Matt King ("King"), explained to investors that ABS CDOs exposed them to
subprime mortgage-related risks through extremely concentrated and highly correlated
underlying subprime collateral.  King explained that, as a result, the risk of CDO losses due to
subprime risks extended *even to the super-senior tranches* of CDOs.  King noted that some
banks had set aside reserves to cover subprime losses, and that Citi was "deeply suspicious" of
banks "with exposures in that space who have not declared anything like the same degree of
provisioning."  Meanwhile, Citi itself had not set aside reserves to cover its own massive,
undisclosed subprime exposures, including those pertaining to its CDO holdings.

484.    In late March 2007, Citi's quantitative credit strategy and analysis group, headed
by King, issued a report (the "March 2007 Report") concluding that recent subprime mortgage
performance put senior CDO tranches at uniquely severe risk, and recommending that investors
sell their senior tranches or hedge their risk through credit default swaps.  The March 2007
Report was spurred by two recent events in the subprime mortgage market: (1) the release of data
evidencing unprecedentedly poor performance of recent subprime mortgages; and (2) falling
prices for RMBS and CDO tranches, including the ABX and TABX indices.  The March 2007
Report observed that many RMBS and CDO tranches were now being sold at a discount, and
that the secondary market for such instruments was starting to exhibit a wide divergence between
bid and offer prices.

485.   The thesis of the March 2007 Report was twofold and correct on each count. First, the March 2007 Report concluded that the *senior* tranches of subprime-backed CDOs were uniquely exposed to severe risk as a result of subprime mortgage performance, and uniquely susceptible to severe credit ratings downgrades.  Second, the March 2007 Report stated that these senior tranche CDO risks had not yet been fully "priced in" by the market:

> Sub-prime has been one of the main focal points of the recent selloff ... But we reckon the effect on CDOs of ABS may be more interesting than that on sub-prime itself — and considerably less priced in.

486.   The March 2007 report explained that the uniquely severe risks faced by senior CDO tranches were a result of the fact that ABS CDOs were collateralized primarily by mezzanine tranches of subprime RMBS (i.e., the BBB tranches). While any individual RMBS tranche was somewhat diversified — insofar as it contained subprime mortgages from multiple geographic regions — the pile-up of such tranches as the asset base for CDOs actually meant that CDO assets were *not* diversified, but rather all largely the same:  "As we see it, this creates a classic 'ball in bowl' phenomenon, in which either no ABS tranches get downgraded, or a great many do."

487.   No later than April 2007, Citi added new disclosures to the prospectuses for the CDOs it structured and sold.  Aware of its disclosure obligations with respect to potential CDO investors, Citi noted that recent trends in the RMBS market had rendered CDOs increasingly vulnerable to the following factors and risks:  (1) housing price downturn; (2) increasing mortgage defaults; (3) increase in adjustable mortgage rates resetting to levels that would trigger defaults; and (4) inability of borrowers with adjustable mortgages to refinance due to higher interest rates, stricter lending standards, and price declines.  Given its own massive CDO

holdings, Citi clearly knew that its *own* portfolio was also vulnerable to these same risks, yet it made no disclosures of those CDO holdings or risks to its own investors.

488.    Additionally, Defendant Crittenden acknowledged in November 2007 that CDOs from 2006 or later were particularly weak.  While this comment was made in order to emphasize the relative strength of Citi's pre-2006 holdings, it shows that Crittenden, and the Company, were aware that Citi's 2006 and later vintage CDOs had lost value well before Citi disclosed the exposure and took the write-downs.

**(2)    Aware Of Market Developments, Citi Tried To Protect Itself**

489.    Because Citi was a major participant in the securitization market, the Fraud Defendants were aware of the downturn in the TABX index and its utility in predicting losses in the super senior CDO tranches.  Despite this knowledge, Citi repeatedly assured investors that it was not vulnerable to subprime losses.  Even when Citi finally disclosed the existence of the CDOs it had been holding, it continued to deceive the public about the quality of those assets and true likelihood that write-downs would be necessary.  Instead, Citi relied on the "super senior" label and AAA-rating to justify the delay in disclosing these assets and in taking appropriate write-downs, and implemented a strategy in which it took incremental, but insufficient and untimely, write-downs.  Citi knew that taking incremental write-downs was nothing more than a postponement of the inevitable, which allowed Citi to conceal the truth about its exposures and delay acknowledging the damage done to its balance sheet from these toxic assets.

490.    Aware of the risks associated with its super-senior CDO tranches, in the second half of 2006 and early 2007 Citi also stepped up its efforts to hedge away those risks by purchasing insurance (in the form of credit default swaps) from insurers such as Ambac.  As discussed above, in January 2008 Citi disclosed the existence of an additional $10.5 billion in

172

CDO exposure.   These CDOs had been hedged under financial guarantee contracts with monoline insurers Ambac Financial and MBIA, but when those counterparties suffered their own credit downgrades in late 2007, Citi was forced to make a $1.5 billion adjustment to account for the counterparty risk, which had the same impact as a write-down.

491.   Investors later learned that Citi started to hedge its retained CDOs starting in May 2006 with its $2.5 billion Diversey Harbor ABS CDO.  By the end of June of the following year, Citi had purchased hedges on more than $13 billion of retained risk in several different CDOs, despite the fact that Citi only retained ostensible "super senior" tranches.  These massive (and until 2008, undisclosed) hedges strongly support the inference that Citi was aware of the problems posed by retained "super-senior" risk at least by May 2006.

492.   Citi's knowledge of the risks associated with the Commercial Paper CDOs is further evidenced by Citi's extensive use of special purpose entities to conceal these CDOs from investors.  For example, on or before February 9, 2007, Citi arranged an SPE called Foraois Funding Ltd., which entered into a CDS arrangement related to one of Citi's Commercial Paper CDOs (Grenadier Funding CDO).  In essence, Citi paid its own SPE for credit protection in exchange for swapping off the credit risk of the liquidity put.  Naturally, Foraois could only serve as a counterparty for this risk if it had funding, which was provided through the SPE's sale of tranched securities collateralized by the CDS premiums that Citi agreed to pay to the SPE. The necessary funding was obtained by the sale of junior Foraois tranches to *other Citi CDOs*. This circular transaction and others like it clearly evidence Citi's knowledge of the risks posed by the Commercial Paper CDOs and Citi's actions intended to conceal those risks from investors.

493.    In July 2007, the Fraud Defendants also took steps – belatedly – to monitor Citi's credit risk.  Defendant Prince began to hold daily meetings – attended by Crittenden, Druskin, Klein and Maheras – to assess Citi's CDO exposure .  Any risk that merited daily meetings of the highest-level executives to assess Citi's exposure was surely a risk that a reasonable investor would find material.  Yet for four months, the Fraud Defendants did not disclose even the existence of these assets, much less the degree of risk associated with them.

### (3)    Synthetic CDOs

494.    Citi was well aware by the end of 2005 that major Wall Street banks (including itself) were so concerned about the default risk of subprime RMBS that they refused to write any more credit default swaps on these assets, despite huge demand by investors looking for ways to short the subprime markets.

495.    While Citi was not willing after 2006 to insure the risk that these assets might default, it was willing to act as an intermediary between the short investors and other investors who had not yet figured out how impaired the assets had become.  The solution was to create "synthetic CDOs."

496.    These synthetic CDOs, one of which (the Abacus 2007-AC1) was the subject of civil fraud charges against Goldman Sachs, are comprised entirely of credit default swaps designed with reference to "select" subprime RMBSs.  In the case of the Abacus synthetic, the SEC charged that the reference assets were "selected" by the short investor because they were so likely to fail, but Goldman failed to disclose this fact to the long investors.  The SEC is reportedly now investigating other synthetics to determine if the long investors were misled in a similar way.

497.    The reference assets in these synthetics are largely subprime RMBS that had similar characteristics to other RMBSs that comprised CDOs retained on Citi's balance sheet.  In

fact, many of the reference assets were actually Citigroup RMBSs.  For example, in the now-infamous Abacus 2007 AC1 synthetic CDO, 6.7% of the reference assets were issued by Citigroup Mortgage Loan Trust, Inc. (CMLTI), more than almost any other issuer.

498.    Furthermore, from 2004 to 2007, banks arranged approximately $132 billion of synthetic CDOs globally, and more than half of this amount was arranged in 2006 alone, according to data obtained from Citigroup by *The Wall Street Journal*.  Of this number, Citigroup arranged more than 10%, or $14.6 billion, more than any other U.S. bank.  Citigroup thus had greater insight than any other U.S. bank by the end of 2006 into exactly how impaired its subprime-related CDOs and RMBSs were, and yet failed to mark down these assets in conformity with the knowledge it had.

### (4)    Repackaged CDOs

499.    Throughout 2006, Citi's basic CDO strategy was to create CDOs, sell the junior tranches, including mezzanine tranches and equity, and disclose to investors that it had only retained, at most, the "super senior" tranches.  On average, 36% of Citigroup CDO securitizations during this period were junior tranches.  By the end of 2006, however, this business model stopped working, and Citi was unable to unload the junior tranches.  Citi's response not only establishes scienter as to Citi's knowledge of the deteriorating market for CDOs by late 2006, but also establishes that Citi knew that even its "super senior" tranches were overvalued throughout all of 2007 and 2008.

500.    Citi's solution to the meltdown in the CDO market was to take the unwanted junior tranches and use them to create new "High Grade" CDOs.  The term "High Grade" was meant to convey the idea that these CDOs were somehow *safer* than the CDOs from which the assets were picked: in the original CDO, the underlying assets were typically BBB-rated mezzanine subprime RMBSs, but in the securitization, even the junior tranches were rated A or

AA.  Because the new CDOs were comprised of A or AA assets, not BBB, they were called "High Grade" despite the fact that they were comprised of *junior* tranches of a CDO that was comprised entirely of medium-grade-rated assets.

501.    In the new "High Grade" CDO, Citi called the top 60% or so of the securitization "super senior" and retained them on its books without disclosing to investors that these tranches were actually composed of unwanted junior tranches of other CDOs, which in turn were typically comprised of risky subprime RMBSs.  If the junior tranches of the new CDO could not be unloaded, Citi would repackage them yet again and start the cyclical process yet again.  The chart below illustrates the process Citi utilized in 2006 and 2007 to recycle junior tranches that could not be sold:



502.    Citigroup was not the only bank that followed the practice of creating "High Grade" CDOs partially out of unwanted junior tranches of other CDOs.  From 2005 to 2007, the

Basel Committee on Banking Supervision concluded that 19% of High Grade CDOs' assets, on average, were comprised of these junior tranches. But at Citigroup, during the same period, the figure was approximately 35%. In some Citigroup High Grade CDOs, the percentage exceeded 50%.

503.     For example, Citigroup created a "High Grade" CDO called Bonifacius, which at its peak held $2.5 billion of assets. Approximately $777 million of these assets (approximately 33%) were actually other CDO securitizations that could not be sold. In fact, in some instances Bonifacius purchased the majority of some junior tranches of other CDOs (purchasing the entire AA-rated junior tranche of the Pinnacle Peak CDO, and 68% of the A-rated junior tranche of the Diversity Harbor CDO).

504.     The pattern exhibited by Citi's Bonifacius CDO was repeated elsewhere. The Raffles Place Funding II CDO, the Armitage ABS CDO, the Pinnacle Peak CDO and the Jupiter High Grade VII CDO all allocated 35% of their assets to other Citi CDOs. Two Citi CDOs allocated 90% of their assets to tranches of other CDOs (HSPI Diversified Funding I and II).

505.     Some of Citigroup's CDOs even purchased junior tranches of each other in a Byzantine cross-securitization process that could only be designed to conceal Citi's true exposures from investors. For example, a Citi CDO called 888 Tactical Fund invested in various tranches of a CDO called Class V Funding III, while Class V Funding III purchased tranches from 888 Tactical Fund. These two CDOs were issued simultaneously in February 2007. 888 Tactical Fund performed this same trick with other Citigroup CDOs, including the Armitage CDO and the Ridgeway Court Funding I CDO.

506.     These reiterative repackaging schemes accounted for most CDOs that Citi created from late 2006 to late 2007, and constituted the bulk of Citigroup's underreported "super senior"

exposure.  Because Citigroup knew that it could not sell the junior tranches, and knowingly repackaged them into other "High Grade" CDOs, Citigroup's scienter is established as to its false statements regarding CDO exposures and valuations.

> **3.    The Fraud Defendants Knew Citi Was Obligated To Consolidate The Off-Balance Sheet Entities**
>
> > **a.    The Fraud Defendants Knew Citi Would Not Let The SIVs Fail, And Therefore That It Was Required To Consolidate Them Once Trouble Emerged**

507.    The Fraud Defendants knew Citi never intended to let its SIVs fail, and that it would take whatever steps were necessary to prevent substantial losses for the SIV investors. Yet Citi repeatedly denied that this was the case, instead emphasizing the absence of a contractual commitment to provide support.

508.    Citi had decided by the fall of 2007 that it would support the SIVs, despite its repeated protestations that it had no obligation to do so.  Before finally admitting it would consolidate its SIVs and assume their liabilities, Citi took the following actions to support its SIVs:

- In mid-October 2007, Citi participated in talks among a group of major banks to create a "super SIV" to rescue the existing SIVs, including Citi's, if the commercial paper market failed; and

- In its Form 10-Q for the third quarter of 2007, filed on November 5, 2007, Citi disclosed that it had provided $10 billion to shore up its SIVs and that the SIVs had drawn on $7.6 billion in credit Citi provided, $3.3 billion of which had been drawn down by September 30, 2007.

509.    On October 19, 2007, the *New York Times* published an article that revealed why Citi's non-performing "corporate loan" total had doubled to $1.2 billion in just three months, the bulk of which was a loan to shore-up an SIV.  Citi had provided a back-up line of credit to an SIV that would be called if the SIV could not borrow and a German bank could not meet its promise to make the loan.  Yet, the very facts that triggered Citi's obligation to extend the loan

had occurred at the time the agreement was made and the so-called "corporate loan" was simply

Citi disguising its commitments to shore-up the SIVs it managed in the event of a potential

default.  As summed up by the article: "That's a neat trick.  You don't make the loan until you

know it will be a bad loan."[90]

510.    Russell Golden, technical director of the FASB, observed that SIV sponsors such

as Citigroup "say they don't have any liquidity backstop, they don't have any guarantee . . . [b]ut

then they act like they always had a guarantee."  Bradley Keoun, *Citigroup's $1.1 Trillion of*

*Mysterious Assets Shadows Earnings*, BLOOMBERG, July 13, 2008.

511.    In testimony before the UK's House of Commons, Citigroup admitted that it

backstopped the SIVs because it would suffer reputational damage if it allowed the SIVs to fail,

thus admitting that Citi was implicitly required to do so.  On December 4, 2007, William Mills

(Chairman and CEO of Citigroup's Europe, Africa and Middle East division) testified before the

House of Commons' Select Committee of the Treasury:

> Q1229 John Thurso:  I am now thoroughly perplexed.  You have
> something that is not an asset or a liability; it is classed as an
> exposure by other people.  If you did bring it into your balance
> sheet it would have an impact but you do not intend to do so.  Can
> you help me?
>
> Mr Mills:  I will do the best I can.  The facts are: we have
> sponsored vehicles that have outside investors that have provided
> the equity to support these vehicles.  Those equity investors have
> an economic interest in these transactions.  The exposure arises
> from the fact that from a business model point of view they are
> funded short term and their assets are long term.  What the market
> is trying to estimate is, if, in fact the liquidity crisis continues, will
> we, Citigroup, provide the liquidity to fund these vehicles so they
> do not have to go into an asset disposal mode, especially in an
> environment where people feel that that would just add more fuel
> to the fire. What we have said, particularly because we understand

---

[90] Floyd Norris, *No Way to Make a Loan*, N.Y. TIMES, Oct. 19, 2007, at C1.

the assets in these vehicles, is that these vehicles are in the process
of orderly unwinding.  The vehicles have sold ...

Q1230 John Thurso:   You are saying that you do not have an
exposure?

Mr Mills:  There is the moral hazard issue as to whether or not
from a reputational point of view if we do not step in and support
these vehicles it will somehow hurt our reputation in the market.

Q1231 John Thurso:  But as far as your stated public balance sheet
goes there is no asset or liability on you involved in these things?

Mr Mills:  Right now, Sir, we have supported the vehicles.  I can
get back to the Committee with an exact number, but it is
somewhere in the neighbourhood of $8 billion.

Q1276 Chairman:  As a result of this crisis do you agree that you
have suffered reputational damage?

Mr Mills:   I believe that we have suffered reputational damage,
yes.

512.     The existence of this implicit guarantee is further supported by an inspection

report prepared by an examiner for the Federal Reserve Bank of New York, and sent to Citi's

board of directors on April 15, 2008.  The report finds that "the firm's contingency funding plans

did not consider the potential impact of supporting Citi-advised [SIVs] for reputational reasons"

and that "[underestimated and/or unreported probabilities of funding certain off-balance sheet

exposures (e.g., liquidity puts on CDO conduits and SIVs) . . . were a substantial challenge to

corporate treasury."[91]

### b.     The Fraud Defendants Knew Citi Was Obligated To Consolidate The Commercial Paper CDOs

513.     The Fraud Defendants also knew that Citi was obligated to consolidate the

Commercial Paper CDOs.  As detailed above, the accounting rules regarding consolidation are

clear that Citi's liquidity puts constituted a variable interest, meaning the rules for consolidating

---

[91] Fed Report at 3, 7.

a variable interest entity were applicable.   Indeed, it was exactly the circumstances that render the rule applicable – when the put options will be called on to perform in the event expected losses occur – that caused Citi to repurchase those CDOs (rather than deal with the liquidity puts).  Thus, Citi's actions confirmed that Citi was required to consolidate these CDOs all along, and that Citi knew it could be "called on to perform" if the losses were to occur.

514.    Additionally, Citi admitted during the November 5, 2007 conference call that it had repurchased the Commercial Paper CDOs during the summer of 2007, yet the Fraud Defendants had made no disclosure at all regarding these assets until November 4, 2007 – revealing nothing in the October 1, 2007 pre-earnings release or in the October 15, 2007 earnings release (or the conference call held to discuss those results).  Regardless of how the Commercial Paper CDOs were classified prior to the repurchase, Citi knew by the summer of 2007 that it had acquired an additional $25 billion in CDO exposure, and chose to conceal this material fact from its investors.

### 4.    The Fraud Defendants Concealed Citi's Exposure to Billions of Dollars of Illiquid Auction Rate Securities

515.    The Fraud Defendants' deception of investors was not limited to Citi's subprime lending-related activities.  They also concealed from investors that Citi had accumulated over $11 billion dollars of risky, illiquid ARS, which it then had to write down significantly.  When the extent of Citi's exposure was revealed and Citi was forced to repurchase $7.3 billion of ARS from its customers, the Company's stock price declined further, causing additional damage to investors.

516.    The Fraud Defendants were aware as the fall of 2007 progressed that the ARS market as a whole was subject to growing illiquidity.  By November, the problems had spread beyond the ARS backed by complex securities, particularly into ARS issued by municipalities,

which were affected by doubts regarding the solvency of bond insurers such as Ambac Financial Group and MBIA Inc.

517.    By early December 2007, Citi management was discussing how they would handle a widespread failure and the risk management personnel were analyzing the impact of failed auctions.  A December 7, 2007 email indicates that Citi had already determined it would let some ARS go if the market got worse, even if the damage would spread to other asset types. Internal emails from mid-December show that Citi was prepared to let the auctions fail for student loan ARS and fully expected broader market failures.  Citi even planned its public relations strategy for the "unavoidable eventuality" of a failed auction that loomed ahead.[92]

518.    The Fraud Defendants were also aware that auction failures had a potentially snowballing effect.  Failures of ARS marketed by other broker-dealers or for different types of ARS would impact the market as a whole.  As one internal Citi document from December 2007 noted: "[I]f one segment of the ARS market experiences fails, there is a high probability that investors will lose confidence in all sectors and asset types funded in the ARS market"[93] although in some cases investors can be convinced that the damage is limited to one type of ARS only.

519.    Similarly, the Fraud Defendants recognized that if customers learned of the growing illiquidity of the ARS assets, their fears would fuel a sell-off, further increasing the over-supply and the pressure on Citi to support the auctions.  Thus, Citi consciously monitored the awareness of retail customers and financial advisors about the ARS market developments, essentially to ensure that their customers did not realize they were holding assets that were rapidly losing liquidity.

---

[92]  SEC Compl. ¶ 64.

[93]  SEC Compl. ¶ 56 (quotations omitted).

520.     In August 2008, investors learned that Citi had reached a settlement with the SEC and the New York State Attorney General, requiring Citi to repurchase $7.3 billion of additional ARS from its disgruntled clients.  Later that year, in December, when the SEC filed its complaint against the Company (in wrapping up the proceedings related to the $7.3 billion settlement), the market learned that Citi management knew as early as August 2007 that the ARS market was weakening and that it would not be able to continue to support the auctions.  Thus, as early as August 2007, the Fraud Defendants knew that both the Company and its clients were at risk of being stuck with potentially illiquid securities, yet they failed to disclose that critical information to investors.

     **5.**     **Government Investigations Support a Strong Inference of Scienter**

     **a.**     **The SEC's 2007 Investigation Into Citi's Accounting Practices**

521.     As the first wave of Citi's negative disclosures hit in the fall of 2007, the SEC launched an investigation into several of Citi's accounting practices which were implicated in the disclosures of subprime exposure and the consolidation of the SIVs and Commercial Paper CDOs.

522.     Even before Defendant Prince resigned, the SEC had opened an investigation. The SEC was reviewing how Citi accounted for various off-balance-sheet transactions, including the SIVs, which, as of early November 2007, Citi had still not yet consolidated, despite the behind-the-scenes efforts to shore them up.  The SEC was also investigating how Citi had valued subprime-related assets and whether the Company had timely disclosed its exposure, *i.e.*, the very issues at the heart of this lawsuit.

523.     The SEC investigation remains ongoing.  In May 2009, news surfaced in *The Wall Street Journal* that the SEC was working on reaching a settlement with the Company, but was working out whether any fine could be paid using TARP funds, or other sources of capital.

Sources quoted in the article also reported that the SEC was considering bringing charges against individuals, including top executives.[94]

524.    On July 29, 2010, the SEC announced that it had reached a settlement with Citigroup and two high-ranking executives related to one aspect of the investigation, Citigroup's failure to disclose its true exposure to subprime mortgage-related assets.   The SEC filed a complaint against Citi in the District of Columbia along with a proposed "Consent of Defendant Citigroup Inc."   The SEC also commenced (and simultaneously settled) an administrative proceeding against Defendants Crittenden and Tildesley.   Citigroup agreed to pay a penalty of $75 million, Crittenden agreed to pay a fine of $100,000, and Tildesley agreed to pay $80,000.

525.    According to the SEC's complaint against Citi, in April 2007 Citi's investment banking group provided senior management and Investor Relations personnel, including Crittenden and Tildesley, with a PowerPoint presentation entitled "Overview of Subprime Exposure in the Global Structured Credit Product Business" which showed that it had approximately $10.1 billion of subprime exposure.   The presentation also showed an additional $37.8 billion of subprime exposures, consisting of $14.6 billion of CDOs, and $23.2 billion of liquidity puts written on CDOs that had been sold to customers, which were deemed to be a low risk of default and were therefore excluded from the $10.1 billion.   Despite being explicitly informed of these additional $37.8 billion in subprime exposures, Crittenden and other Citigroup executives chose not to disclose them to investors in the Company's first quarter 2007 Form 10-Q, or when announcing the quarterly financial results.   The missing exposures were also omitted from discussion during the Company's earnings call with investors and analysts.

---

[94] *See* Susan Pulliam & Randall Smith, *Citi, SEC Are In Talks To Settle Asset Probe*, WALL ST. J., May 28, 2009, at C1.

526.    In July 2007, Citigroup's investment bank prepared a PowerPoint presentation, entitled "Second Quarter 2007 Earnings Review," which contained a "Sub-prime" section that showed approximately $9.5 billion in subprime exposure from CDOs and $24.5 billion of exposure from liquidity puts.  This PowerPoint was presented during a "Flash Call" meeting attended by Gerspach, Crittenden, Tildesley, and a number of other senior-level Citi executives.

527.    Immediately following the July "Flash Call" meeting, a group of senior executives met at Crittenden's request to review the subprime exposures of Citi's investment bank.   An update to the April 2007 PowerPoint was presented, showing that Citi had approximately $13 billion in subprime exposures.  By this point, the total exposure had grown to more than $50 billion, but the investment bank expressly indicated in the presentation materials that it was excluding over $39 billion of that amount from its internal analysis of subprime exposures, and thus was reporting only $13 million.  Of this excluded $39 billion, $14.7 billion was from CDOs, and $24.5 billion was from liquidity puts.   Just as in April, Citigroup executives, including Defendant Crittenden, did not report these known exposures to investors. Instead, on investor calls on July 20 and 27, 2007, Crittenden told analysts and investors that Citi's total subprime exposures had been "reduced" to $13 billion, thereby understating Citi's total subprime exposures by more than $39 million.

528.    According to the SEC complaint, these July 2007 statements about the supposed "reduction" of subprime exposures to $13 billion were misleading because a portion of that "reduction" resulted from the fact that Citigroup had taken unsold lower-rated tranches of previously underwritten CDOs, as well as warehoused subprime assets, used those assets in the creation of new CDOs, and then called them "super senior" CDOs.  These were some of the super senior CDOs that Citi deemed unlikely to default and thus failed to disclose.  As such, a

portion of the purported reduction in exposure merely resulted from moving lower tranche inventory into higher tranches, which, as stated above, Citi decided to hide from investors.

529.   In early September 2007, Crittenden met with the head of Citi's Risk Management organization (and others) to discuss valuation issues regarding the super senior CDOs, and was told that the losses on the super senior CDO tranches could be between $43 million and $1.35 billion for the third quarter 2007.  Following the meeting, Crittenden directed Citi personnel to oversee a process to determine the appropriate valuation methodology.

530.   According to the SEC, by the middle of September 2007, Crittenden and other members of senior management (including Prince, Maheras and Klein) were anticipating losses between $300 million and $500 million on the super senior tranches of the CDOs.   In anticipation of those and other losses, Citigroup decided to issue a pre-announcement of its third quarter 2007 results, and Crittenden (among others) drafted a script for a recorded call with investors and analysts to accompany the press release.  The script stated that beginning as early as January 2007, Citi saw the deterioration in the subprime markets and began the process of reducing exposure.  As outlined in the SEC's Cease and Desist Order In the Matter of Gary Crittenden and Arthur Tildesley, Citi investment bank officers expressed concerns via email (to Tildesley and others) that the script would mislead investors to conclude that the total subprime exposures were $13 billion, when in fact that number excluded substantial exposures relating to super senior CDO tranches.  Defendants Tildesley and Crittenden ignored the suggestions to clarify the language and Crittenden recorded the pre-announcement, which was released on October 1, 2007.

531.   The SEC complaint indicates that by October 1, 2007, Citigroup's still-undisclosed "super senior" CDOs and liquidity puts had reached $43 billion in face value.

Defendant Crittenden was aware of this exposure.  Citigroup was also aware, and reported, that some super senior CDOs were losing value.  Yet Citigroup knowingly and fraudulently represented in its October 15, 2007 press release and earnings conference call that its subprime exposure had declined to less than $13 billion – a figure that, as in the previous quarter, wholly omitted the exposures related to CDOs and liquidity puts.  Citi's true subprime exposure at the end of the third quarter 2007 totaled over $55 billion.

532.    On October 4, 2007, Crittenden, Gerspach and Tildesley, along with other senior Citi executives, attending a meeting during which a PowerPoint presentation entitled "Third Quarter 2007 Earnings Review, October 4, 2007," was reviewed.  This presentation shows several categories of subprime exposures, including $16.1 billion of super senior CDO tranches and $27 billion in liquidity puts.  However, on the October 15, 2007 earnings call, Crittenden – reading from a script he and Tildesley approved – stated that Citi's subprime exposures were $13 billion at the end of the second quarter and had declined during the third quarter.  Once again, the exposures relating to the super senior CDO tranches and liquidity puts, totaling approximately $43 billion, were not disclosed.  The operator on the call introduced Tildesley, Prince and Crittenden by name.  Tildesley led the call with an introduction, and was also the final speaker.  Neither Tildesley (nor Prince) ever corrected any misstatements made on the call by Crittenden despite knowing that they were materially false.

533.    After the October 15, 2007 press release and earnings call, certain ratings agencies downgraded tranches of the CDOs that Citi had been concealing.  Citi determined that these assets would need to be written down by $8 billion to $11 billion.  Only then did Citi finally tell investors the truth about the exposures, on the very day (November 4) that the write-downs were announced.

534.   Because of Citigroup's repeated material misrepresentations and omissions related to tens of billions of dollars worth of hidden subprime exposures, the SEC charged the Company with violating Section 17(a)(2) of the Securities Act and Section 13(a) of the Exchange Act.  Citigroup has consented to pay a $75 million penalty.

535.   The facts alleged by the SEC, and not challenged by Citigroup, clearly support a claim of fraud and scienter by Citigroup and Defendant Crittenden.   Internal Citigroup documents repeatedly calculated the Company's true exposure to CDOs on the books and liquidity puts related to CDOs off the books, and Citi repeatedly and purposefully chose to scrub its disclosures of these assets.

### b.     The SEC's 2010 Investigation of Citi's Use of "Repo 105"

536.   On March 11, 2010, the bankruptcy examiner investigating the demise of Lehman Brothers introduced a new term into the common financial lexicon: "Repo 105."

537.   "Repos," or repurchase transactions, are used to convert securities and other assets into cash needed for a firm's various activities, such as trading.  But they can also be used to move assets off the balance sheet to make the leverage ratios appear lower, and the firm healthier.  Under an accounting rule called FAS 140, approved in 2000, if Lehman agreed to buy back the assets at 105% of their sales price, the firm could book them as sales.  Lehman used Repo 105 transactions at the end of each quarter to reduce its reported leverage, only to repurchase the assets a few days later.

538.   Lehman's use of Repo 105, according to Wharton accounting professor Brian J. Bushee, was "clearly a dodge . . . to circumvent the rules, to try to move things off the balance sheet. . . . Usually, in these kinds of situations I try to find some silver lining for the company, to say that there are some legitimate reasons to do this . . . But it clearly was to get assets off the balance sheet."

539.    On March 29, 2010, prompted by the Lehman report, the SEC sent letters to several large banks, including Citigroup, demanding information related to any similar "repurchase agreements, securities lending transactions, or other transactions involving the transfer of financial assets with an obligation to repurchase the transferred assets" including how such transactions are accounted for.

540.    In a letter to the SEC dated April 13, 2010, Citi admitted to temporarily transferring billions of dollars off the balance sheet at the end of each quarter during the Relevant Period using repos, thus improperly reducing reported assets on the balance sheet, and misrepresenting Tier 1 leverage and Tier 1 capital.  Further, Citi has even admitted that most of these temporary quarter-end transactions (as much as $9.2 billion in one quarter) were improperly classified as "sales."

541.    The SEC specifically asked Citi to identify the business purpose for the repo transactions, and Citi could not point to any.  In fact, in the April 13, 2010 letter, Citi admitted that the repo transactions were used solely for the purpose of managing the balance sheet.  Citi admitted that the "repurchase transactions were undertaken . . .  to assist the markets business in complying with internal limits on the amount of the U.S. GAAP balance sheet made available to the global trading desks."

542.    On May 25, 2010, before the Citi and SEC letters were released to the public, *The Wall Street Journal* reported that, like Lehman, Citigroup was "among the most active at temporarily shedding debt just before reporting their finances to the public."  The article looked at 18 large banks and concluded that as a group, they had routinely used repos at the end of each quarter as "window dressing" to make their leverage ratios appear lower.  Three banks – Bank of America, Deutsche Bank and Citigroup – accounted for 25% of the "window dressing," and

"showed the most consistent, repeated pattern of quarter-end declines in repo debt from average levels for the same quarters."  The article noted that these worst-offending banks lowered their net borrowings in the repo market by an average of 41% at the ends of each of the past 10 quarters compared with average net repo borrowings for the entire quarter.  Once a new quarter began, they boosted their levels.  Citigroup was the worst: its reported repo debt fell by an average of 52% over the past 10 quarters.

543.    According to one accounting specialist contacted by *The Wall Street Journal*, the data suggest "conscious balance-sheet management."  He said the quarter-end numbers are "at best meaningless and at worst misleading and disingenuous."

544.    In a follow-up article on July 14, 2010, *The Wall Street Journal* reported the details of the letter exchange between the SEC and Citigroup.  In an article titled "Citi Explains How it Hid Risk From the Public," the *Journal* noted that Repo 105 transactions like those that Citi  admitted to "hide from investors the true risk banks are taking on."

545.    Just as with Lehman Brothers, Citi's use of repo transactions was a knowing attempt to mislead investors as to the true health of the Company's finances, and supports a strong inference of intent by Citi and its senior management to deceive investors.

> **c.    The SEC And New York Attorney General Recovered More Than $7.3 Billion From Citi On Its Clients' Behalf**

546.    On August 7, 2008, the SEC and New York Attorney General announced a settlement with Citi whereby more than $7.3 billion would be paid to thousands of customers who invested in auction rate securities, and Citi would pay $100 million in fines.

547.    The SEC alleged that Citi violated Section 15(c) of the Securities Exchange Act by, *inter alia*, marketing ARS as highly liquid securities through mid-February 2008 even though Citi employees knew or were reckless in not knowing that the risk of auction failures had

materially increased.  According to the Complaint that the SEC filed in December 2008, Citi and its senior management had known as early as August of 2007 that Citi could not continue supporting the auctions, and that either the Company or its clients (or both) were likely to be stuck holding the illiquid assets.

548.    Internal Citigroup documents reveal that Citigroup knew its clients who had purchased ARS "might [have] believe[d] that there [was] implied liquidity . . . because [Citi] ha[d] marketed the fact that [they] ha[d] never had a failed auction as lead manager in twenty years."[95]  Citi executives also discussed the "risk of lawsuits initiated by thousands of retail investors, high net worth clients and institutional clients because Auction Rate Securities (ARS) have been marketed as 'money market alternatives' and 'liquid investments' for 20 years.  The hundreds of ARS issuers may also seek litigation against Citi."[96]

549.    Citi knew there was no way to avoid the consequences of the imminent collapse of the ARS market.  Either it would have to increase its purchases to avoid auction failures (and lawsuits from its clients and issuers), which would impact its balance sheet, or it would have to let the auctions fail and risk facing the wrath of its clients and suitors, which would then create the risk of litigation.  Either way, the ARS situation materially impacted Citi's finances, and Citi knew or was reckless in not knowing that these dangers loomed and should be disclosed to the Company's investors.

### d.    The Senate FCIC Investigation

550.    On May 20, 2009, the United States Senate formed the Financial Crisis Inquiry Commission (the "FCIC") to help determine "the causes . . . of the current financial and economic crisis."  The FCIC has reviewed approximately 2 million pages of documents and

---

[95]  SEC Compl. ¶ 26.

[96]  *Id.*

subpoenaed numerous witnesses to testify.  Citigroup was a particular focus of the hearings, given that the government bailout of Citi exceeded the assistance given to any other financial institution.  A final report is expected to be released by the end of 2010.

551.  Current and former Citigroup executives testified on April 7 and 8, 2010.  The testimony of these executives, along with numerous documents released by the FCIC, confirms that Citi materially misled investors during the Relevant Period.

552.  For example, Richard Bowen III, Senior Vice President and Business Chief Underwriter for Correspondent Lending in Citi's Consumer Lending Group, confirmed that Citi had failed to disclose that it had abandoned its underwriting policies in connection with correspondent channel loans.  He testified that in 2006 and 2007, Citi's lending practices "made a mockery of Citi credit policy" and he repeatedly warned business unit management.

553.  Specifically, Bowen testified that by mid-2006, more than 60 percent of mortgages bought from other banks and sold to investors (including Fannie Mae and Freddie Mac) were "defective," meaning that Citi had abandoned its policy that at least 90% of subprime mortgages in purchased pools must conform to Citi underwriting standards.  When investors (including Fannie Mae and Freddie Mac) discovered Citi's misrepresentations about the loans' failures to meet Citi's stated underwriting standards, Citi was forced to buy them back because they were sold with representations and warranties guaranteeing that the loans were underwritten according to Citi's standards.

554.  Bowen testified, "I started issuing warnings in June 2006 and attempted to get management to address these critical risk issues."  He continued, "These warnings continued through 2007 and went to all levels of the consumer-lending group."

555.    In a November 3, 2007 email headlined, "URGENT – READ IMMEDIATELY – FINANCIAL ISSUES" Bowen warned top managers of "possibly unrecognized financial losses" among other risks related to these underwriting lapses.  Defendant Crittenden was copied on the email.

556.    The FCIC also confirmed that Citi knew by the end of 2006 that housing prices had fallen, and had written into its financial models the assumption that housing values would continue to fall in 2007.  As discussed above, even so-called "super-senior" CDO tranches are impaired when housing values stop rising; worse, when housing prices actually fall, these tranches can suffer near-total impairment.  The FCIC established that Citi was assuming price declines in 2007, which confirms that Citi mispriced its CDOs in its disclosures to investors.

557.    Defendant Maheras admitted during his testimony that even in 2006, he was aware that the subprime market was collapsing and that Citi needed to reduce its exposure quickly: "We were negative on subprime, as a matter.  We were, from the very earliest part of 07 and the end of '06, we were in most of our business areas, reducing our risk around subprime . . . We weren't sitting there twiddling our thumbs and assuming that housing could never go down. **We had in our base case that housing was going down during '07 and would likely continue.**"

558.    Likewise, the FCIC established that before and during the Relevant Period, Citi was unable to sell even its so-called "super-senior" CDO tranches, which constituted a "red flag" that its valuations were significantly overstated.  FCIC Chairman Angelides stated that he intends to probe how Citi could have possibly valued its CDOs at par when it was unable to sell them: "If I have a home I think is worth $200,000 but there's no market for it and no one will pay me

$200[,000], it's not worth $200[,000] . . . I think I want to probe this, because I want to understand whether . . . these things were booked at levels that just weren't reflective of reality."

559.    Further, the FCIC has revealed that Citi was aware of numerous reports detailing and criticizing its CDO risk management, and yet chose not to disclose the information to shareholders.  For example, on April 8, 2010, the FCIC revealed that the OCC, one of Citi's regulators, wrote a report on March 29, 2004, concluding that the quality of Citi's risk management was "less than satisfactory."  The report specifically mentioned Citi's super-senior CDO tranches as an asset class that posed risk management problems.

560.    The FCIC also established that the Citi liquidity puts, which were not revealed to investors until November, 2007, were approved as early as 2002 in a meeting of Citi's Capital Markets Approval Committee.   These puts were approved precisely because their undisclosed, off-balance-sheet nature "allowed" Citi to avoid otherwise applicable capital requirements.

561.    The Commission revealed that an internal memo from October 2006, circulated widely at Citi, warned that the $25 billion of exposure to CDOs via the undisclosed liquidity puts constituted a "severe concentration risk."  The Citigroup executive in charge of CDO operations [Dominguez] not only recalled the document, but testified that the memo was distributed widely within Citigroup: "[T]hat working paper engendered a lot of discussion, reexamination of how we were treating it.  There were many more people involved that were on that distribution list."  Thus, Citi not only violated GAAP by failing to disclose this exposure, but Citi and its senior executives were aware of the risk and knowingly failed to disclose the risk to investors.

562.    As discussed above, the FCIC also examined CDS collateral calls that Goldman made on AIG starting in July 2007.  Because a CDO default swap insures the holder against the risk that the CDO might fail, holders may demand that the counterparty post collateral when the

asset prices start to fall.  The FCIC investigation revealed that Goldman and other banks were making collateral calls on AIG based on CDO prices far below Citi's marks.  That AIG eventually acquiesced to many of these calls, and Goldman was forced to mark down its own portfolio in tandem, underscores the reliability of these marks, and the indefensibility of Citigroup's refusal to report fair values of these securities.

### 6.   Citi's Numerous Violations Of GAAP Support An Inference Of Scienter

563.   As alleged herein, Citi violated numerous provisions of GAAP, as well as SEC regulations, in its financial reporting during the Relevant Period.  As a result, Citi's financial statements failed to accurately portray the Company's financial position and results of operations.

564.   Defendants Prince, Pandit, and Crittenden certified that they reviewed the Company's financial statements and that the financial statements conformed with GAAP and other reporting requirements.[97]  Additionally, Defendant Gerspach signed each of the Company's Form 10-K and Form 10-Q filings during the Relevant Period.  However, the nature and extent of Citigroup's accounting violations, in conjunction with the Fraud Defendants' own statements, support the inference that as senior executives with oversight of the Company's financial reporting, the Fraud Defendants knew that Citigroup was perpetrating a fraud by concealing mounting losses and hiding its actual holdings of subprime-related assets.

---

[97]   Defendant Prince signed a certification for the financial statements in the 2006 Form 10-K and in the Form 10-Q filings that were made during his tenure as CEO.  Defendants Pandit and Crittenden signed certifications for the financial statements in the 2007 Form 10-K and in the Form 10-Q filings made during their respective tenures.

**7.    Motive And Opportunity:  Citi Avoided The Necessary Disclosures, Write-downs, And Reserve Increases In Order To Preserve Its Tier 1 Capital Ratio**

565.    The Fraud Defendants' motive to inflate Citi's Tier 1 capital ratio, coupled with their opportunity to commit fraud by virtue of their control over Citi's financial reporting and public statements, raises a strong inference of scienter.   As described below, the Fraud Defendants knew that properly considering the implications of Citi's subprime exposure and of its commitments to its SIVs would reduce the Company's Tier 1 capital ratio, possibly to levels that would prompt regulatory scrutiny and investor alarm.   The Fraud Defendants concealed material information to ensure that this ratio did not cross that line.

566.    A bank's Tier 1 capital ratio provides investors and regulators essential information regarding the bank's overall financial strength, as a measure of its ability to withstand substantial losses.   A bank with a Tier 1 capital ratio of 6% or greater is considered "well capitalized."   Falling below that 6% threshold triggers regulatory scrutiny and raises a red flag to investors.

567.    Citigroup, like other banks, knew it was essential to maintain its well capitalized status, and repeatedly represented in its public statements that it maintained a well capitalized position.   Thus, it was important to the Fraud Defendants that Citi's Tier 1 capital ratio stay far above the crucial 6% mark; the Company's internal goal was 7.5%.   In fact, for the years 2002 through 2006, Citi's reported Tier 1 capital ratio averaged 8.7%, with a low of 8.59% in 2006.

568.    As Citi's losses began to increase in 2007, its reported Tier 1 capital ratio began to slide, decreasing to 8.2% in the first quarter and down further to 7.91% in the second quarter. The Fraud Defendants knew that additional undisclosed losses would bring the ratio down further, and that consolidating additional risky assets and adding to loan loss reserves would decrease that ratio even more.   Similarly, the Fraud Defendants knew that taking appropriate

write-downs on Citi's risky subprime-related assets would decrease the Company's asset base materially, putting further downward pressure on the Tier 1 capital ratio. The Fraud Defendants also knew that because Citi was highly leveraged, even a small loss in its risky assets could deplete its capital.

569. Citi's concern over its deteriorating Tier 1 capital ratio is also evidenced by its abuse of Repo 105 transactions suspiciously close to the end of each quarter in order to temporarily move assets off the balance sheet, as discussed above. Citi's refusal to consolidate its SIVs, despite clear market consensus that Citi had implicitly guaranteed their liquidity, is also evidence that Citi executives consciously chose to manipulate the Company's true capital position. Michael Shedlock, writing for Seeking Alpha, noted the odd juxtaposition in Citi's third quarter 2007 Form 10-Q of the admission of the $10 billion liquidity facility provided to the SIVs, and the statement that Citi "will not take actions that will require the Company to consolidate the SIVs." The author commented that the announcement appeared "to be an attempt to whitewash Citigroup's exposure . . . because [if] those assets are off balance sheet, Citigroup does not have to mark those losses to market. Citigroup desperately does not want those SIVs on their balance sheet."

570. Indeed, Defendant Pandit told his employees on November 17, 2008 that Citi had "significantly reduced our risky assets while putting the Company in a very strong capital position" and was "well positioned from a capital standpoint to weather future potential challenges." Pandit knew these statements were false when made, and it is now known that Pandit and other executives had already begun discussing a bailout with the federal government to avoid bankruptcy.

571.   The Fraud Defendants artificially inflated Citi's reported Tier 1 capital ratio by concealing its exposure to toxic subprime assets, making inadequate increases in its loan loss reserves, and failing to consolidate off-balance-sheet entities.  The Fraud Defendants' motivation to keep the Tier 1 capital ratio above the 6% threshold supports a strong inference of scienter.

**B.      PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE**

572.   At all relevant times, the market for Citigroup's common stock was an efficient market for, *inter alia*, the following reasons:

> (i)     Citigroup's common stock met the requirements for and was listed on the New York Stock Exchange, the Tokyo Stock Exchange, and the Mexican Stock Exchange;

> (ii)    The trading volume for Citigroup common stock was substantial, trading at an average of more than 40 million shares per day during the Relevant Period;

> (iii)   In excess of $200 billion dollars of Citigroup listed debt securities were issued and outstanding during the Relevant Period, exceeding the entire market capitalization of the Company;

> (iv)    As a regulated issuer, Citigroup filed periodic public reports with the SEC and NYSE;

> (v)     Citigroup regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major news wire services and other wide-ranging public disclosures, such as communication with the financial press and other similar reporting services;

(vi)     The market reacted swiftly to public information disseminated regarding Citigroup; and

(vii)    Citigroup was followed by numerous national securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

573.    As a result of the foregoing, the market for Citigroup's common stock promptly digested current information regarding Citigroup from all publicly available sources and reflected such information in the stock price at all relevant times. Under these circumstances, Plaintiff suffered injury through its purchase or acquisition of Citigroup common stock at artificially inflated prices and a presumption of reliance applies.

574.    In addition to the foregoing, Plaintiff is entitled to a presumption of reliance because, as more fully alleged above, Citigroup failed to disclose material information regarding its business, financial results and business prospects.

## XIII.    TOLLING OF THE STATUTE OF LIMITATIONS ON PLAINTIFF'S FRAUD-BASED CLAIMS

575.    The statute of limitations on Plaintiff's Section 10(b) and 20(a) claims has been tolled since November 8, 2007, by virtue of the filing on that date of a putative class action, which was later consolidated with certain related class actions under the caption *In re Citigroup Inc. Securities Litigation*, Master File No. 07-cv-9901 (SHS) in the United States District Court for the Southern District of New York. The consolidated class action asserts Section 10(b) and 20(a) claims arising from the same or substantially similar facts as are alleged herein, and all Defendants (except for Tildesley) named in Plaintiff's Section 10(b) and 20(a) claims herein are

defendants in the class action.  Plaintiff falls within the definition of the class on whose behalf that putative class action was filed and remains pending.

576.    The statute of limitations on Plaintiff's claims against defendant Tildesley was tolled until July 29, 2010, when the SEC filed a complaint against Tildesley and Crittenden and simultaneously entered an Order Instituting Cease-and-Desist Proceedings against them.  Prior to that time, Plaintiff neither knew nor had reason to believe that Tildesley had knowledge of the false and misleading nature of the statements that he made (and caused Citigroup to make) to investors, and thus Plaintiff neither knew nor had reason to believe that Tildesley acted with scienter or was a culpable participant in Citigroup's violations of the securities laws.

## XIV.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR TO PLAINTIFFS' FRAUD-BASED CLAIMS

577.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this Complaint.  The statements complained of concern Citigroup's financial statements and historical and/or current conditions affecting the Company.  Many of the statements pleaded herein were not specifically identified as "forward-looking statements" when made.  To the extent any forward-looking statements were identified as such, there were no meaningful cautionary statements identifying the important then-present factors that could and did cause actual results to differ materially from those in the purportedly forward-looking statements.

578.    Alternatively, to the extent that the statutory safe harbor would otherwise apply to any forward-looking statements that form the basis of Plaintiff's fraud-based claims, the Fraud Defendants are liable for those statements because at the time each of those statements was made, the speaker(s) knew the statement was false or misleading, lacked a reasonable or good faith basis for believing the statement to be accurate, knew and failed to disclose adverse

information relating to the statement, and/or the statement was authorized and/or approved by an executive officer of Citigroup who knew that the statement was materially false and misleading when made.

## XV.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

**COUNT SIX**
**For Violation Of Section 10(b) Of The Exchange Act**
**And Rule 10b-5 Promulgated Thereunder**
**(Against Citigroup, Prince, Pandit, Crittenden, Gerspach, Druskin, Maheras, Klein,**
**Freiberg and Tildesley)**

579.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

580.    This Count is asserted against the Fraud Defendants pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

581.    During the Relevant Period, the Fraud Defendants: (a) deceived the investing public, including Plaintiffs, as alleged herein; (b) artificially inflated the market price of Citigroup's common stock; and (c) caused Plaintiff to purchase or otherwise acquire Citigroup common stock at artificially inflated prices.

582.    As alleged herein, each of the Fraud Defendants, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b), made untrue statements of material facts and/or omitted to state material facts necessary to make the statements made not misleading, which operated as a fraud and deceit upon Plaintiff, in an effort to inflate and maintain the artificially inflated price of Citigroup's common stock.  They did so by the use, means or instrumentalities of interstate commerce and/or of the mails.

583.    The facts alleged herein give rise to a strong inference that each of the Fraud Defendants acted with scienter.    Each of the Fraud Defendants knew or with extreme

recklessness disregarded that their statements were materially false and misleading and/or omitted material facts for the reasons set forth herein.

584.    As a result of the Fraud Defendants' materially false and misleading statements and failure to disclose material facts, as set forth above, the market prices of Citigroup's common stock was artificially inflated throughout the Relevant Period.

585.    Unaware that the market price of the stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Fraud Defendants, or upon the integrity of the market in which the stock traded, and the truth of any representations made to appropriate agencies and to the investing public, Plaintiff purchased or acquired Citigroup common stock at artificially inflated prices during the Relevant Period.  At the time they acquired this stock, Plaintiff did not know and had no reasonable basis to know of the false and misleading nature of the Fraud Defendants' statements.

586.    As a direct and proximate result of the Fraud Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases and sales of Citigroup common stock.

587.    By reason of the foregoing, the Fraud Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, and are liable to Plaintiff for damages suffered in connection with Plaintiff's transactions in Citigroup's common stock during the Relevant Period.

## COUNT SEVEN
### For Violation Of Section 20(a) Of The Exchange Act
**(Against Prince, Pandit, Crittenden, Gerspach, Druskin, Maheras, Klein, and Tildesley
Based On Citigroup's Violation Of Section 10(b))**

588.    Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs of this Complaint as if fully set forth herein.

589.     This Count is asserted against Defendants Prince, Pandit, Crittenden, Druskin, Maheras, Klein, Gerspach and Tildesley (the "Section 20(a) Defendants") under Section 20(a) of the Exchange Act.

590.     As alleged above, Citigroup violated Section 10(b) and Rule 10b-5, promulgated thereunder, and Plaintiffs suffered damages as a direct and proximate result of those violations.

591.     The Section 20(a) Defendants acted as controlling persons of Citigroup within the meaning of Section 20(a) of the Exchange Act by reason of their positions as senior executive officers of Citigroup, their ability to approve the content and issuance of Citigroup's public statements, and their control over Citigroup's day-to-day operations.   The Section 20(a) Defendants had the power and authority to direct and control, and did direct and control, directly or indirectly, the decision-making of the Company as set forth herein.   Each of the Section 20(a) Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the conduct giving rise to the violations of the federal securities laws alleged herein, and exercised the same.

592.     The Section 20(a) Defendants prepared, signed, and/or approved the Company's press releases and SEC filings that contained material false and misleading statements or omitted material facts.   They were provided with or had unrestricted access to copies of those statements prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

593.     As alleged herein, the Section 20(a) Defendants culpably participated in Citi's violations of Section 10(b).

594.    By virtue of their positions as controlling persons of Citigroup, the Section 20(a) Defendants are jointly and severally liable to Plaintiff pursuant to Section 20(a) of the Exchange Act for Citigroup's violations of Section 10(b).

### JURY DEMAND

Plaintiff demands a trial by jury as to all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.    Awarding compensatory damages in favor of Plaintiff against all of the Defendants for all losses and damages suffered as a result of Defendants' wrongdoing alleged herein, and for all damages sustained as a result of wrongdoing by persons controlled by Defendants and/or for whose conduct Defendants are responsible pursuant to principles of *respondeat superior*, in an amount to be determined at trial, together with interest thereon;

B.    Awarding Plaintiff rescission and/or rescissory damages;

C.    Awarding punitive damages against Citigroup and Freiberg and in favor of Plaintiff;

D.    Awarding Plaintiff its fees and expenses incurred in this action, including attorneys' fees and expert fees;

E.    Awarding Plaintiff prejudgment interest and/or opportunity cost damages; and

F.    Granting such other and further relief as the Court may deem just and proper.

Dated:  November 16, 2011                    **GRANT & EISENHOFER P.A.**

*Stuart M Grant*

Stuart M. Grant
Megan D. McIntyre
Shelly L. Friedland
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel:  (646) 722-8500
Fax:  (646) 722-8501

*Attorneys for Plaintiff*